David Lavine, SBN 166744
The Law Office of Andrew Wolff, P.C.
1956 Webster, Ste. 275
Oakland, CA 94612
Phone: 510-834-3300
Fax: 510-834-3377
Email: david@awolfflaw.com

Guy E. Mailly, SBN 135720
Mailly Law
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
Phone: 714-384-6531
Email: gmailly@bohmwildish.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NORTHERN CALIFORNIA

|  |  |
|---|---|
| TIMOTHY BROWN, ) | |
| ) | |
| **Plaintiff and Putative Class Representative,** ) | **COMPLAINT** |
| ) | |
| v. ) | **CLASS ACTION** |
| ) | |
| 140 NM LLC; BAR AGRICOLE, LLC; ) | |
| THADDEUS M. VOGLER; ) | |
| HOPEMOORELAIN, LLC; RUSSELL MOORE; ) | |
| ALLISON HOPELAIN; DUENDE, LLC; ) | |
| PAUL CANALAS; ES VERDAD, LLC; ) | |
| JOHN PALUSKA; ANDREW HOFFMAN; ) | |
| GOLDEN GATE RESTAURANT ) | |
| ASSOCIATION; UNION SQUARE ) | |
| HOSPITALITY GROUP, LLC; DANIEL ) | |
| MEYER; SABATO SAGARIA; CRAFTED ) | |
| HOSPITALITY, LLC; THOMAS ) | |
| COLICCHIO; MOMOFUKU 171 FIRST ) | |
| AVENUE, LLC; DAVID CHANG; MARLOW, ) | |
| INC.; ANDREW TARLOW; HAPPY ) | |
| COOKING HOSPITALITY, INC.; ) | |
| GABRIEL STULMAN; MOLINERO, LLC; ) | |
| JONAH MILLER; NATE ADLER; ) | |

**BIRTH OF THE COOL, LLC;**         )
**DANIEL HUMM; WILL GUIDARA; NEW**  )
**YORK CITY HOSPITALITY ALLIANCE,**  )
**INC.; ANDREW RIGIE, and DOES 1-500,**  )
                                  )
    **Defendants.**                    )
                                  )

## I.    INTRODUCTION

1.  Every year American consumers freely and voluntarily give over forty billion dollar in tips to the nation's approximately three million waiters, waitresses, and bartenders. Tipping is a private transaction between the customer and the server and tips are the legal property of the employee. As discussed herein, however, restaurant owners are engaged in a sophisticated unlawful conspiracy to put that money into their own pockets.

2.  In the fall of 2014, a handful of Bay Area restaurants agreed "as a group" to eliminate tipping and increase prices by twenty percent. They are part of a larger conspiracy spearheaded by the Union Square Hospitality Group out of New York City and its founder and CEO Danny Meyer. The conspiracy is in its early experimental stage, focused on developing and disseminating best practices for switching to a no-tipping, "hospitality-included" business model. The no-tipping movement is the most significant issue in the industry today. One conspirator predicts that "ten years from now we're going to look back and go, 'Oh, God, do you remember when we used to tip?'"

3.  The ongoing conspiracy unlawfully transfers millions of dollars from customers and servers to restaurant owners in violation of federal and state antitrust laws. Participating restaurants and a compliant media have portrayed the no-tipping/higher prices movement as intended to promote social justice and equality, while the real aim and effect is greater profit at the expense of workers and consumers.

4.  The antitrust laws prohibit concerted action that unreasonably restrain competition. Restaurants may unilaterally increase prices and/or ban tipping without violating the antitrust laws. Such unilateral action, however, may be difficult to sustain because the resulting loss of customers and servers to competitors may render the change unprofitable.

5. The charged conspiracy constitutes a *per se* unreasonable restraint of trade in violation of the Federal Sherman Act, the California Cartwright Act, and the New York Donnelly Act. The purported motives of the participants or reasonableness of the conduct or prices is immaterial because there is a "conclusive presumption that [horizontal price fixing] is unreasonable."[1] To establish liability, one need show only the existence of an agreement or understanding to fix prices, formal or informal, and that each defendant knowingly joined the agreement. Whether the participants understand their conduct is unlawful is also irrelevant.

6. This action is brought on behalf of a putative class of consumers. Pursuant to law, persons overcharged as a result of a price-fixing conspiracy are entitled to recover triple their damages plus costs and reasonable attorney's fees. Injured servers and other customarily-tipped employees may also have a viable claim for treble damages.

7. This is a civil action. Price fixing is also a felony, with criminal penalties under the Sherman Act of up to ten years in prison and $1,000,000 in fines for individuals, and up to $100,000,000 in fines for businesses.

## II.    PARTIES

8. Timothy Brown is a named plaintiff and class representative in this action. He purchased food from certain defendant restaurants during the course of the conspiracy, and was overcharged as a direct result of the conspiracy.

9. Defendant, 140 NM LLC, d/b/a Trou Normand, is a limited liability company organized under the laws of the State of California, with its principal place of business at 140 New Montgomery Street in San Francisco.

---

[1] *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 343-44 (1982). *See also National Society of Professional Engineer v. United States*, 435 U.S. 679, 692 (1978) (*per se* rule reaches to "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.")

10. Defendant, Bar Agricole, LLC, d/b/a Bar Agricole, is a limited liability company organized under the laws of the State of California, with its principal place of business at 355 11th Street in San Francisco.

11. Defendant, Thaddeus M. Vogler, resides in California and is the owner and managing member of Trou Normand and Bar Agricole.

12. Defendant, Hopemoorelain, LLC, d/b/a Camino, is a limited liability company organized under the laws of the State of California, with its principal place of business at 3917 Grand Avenue in Oakland, California.

13. Defendant, Russell Moore, resides in California and is an owner and managing member of Camino.

14. Defendant, Allison Hopelain, resides in California and is an owner and managing member of Camino.

15. Defendant, Duende, LLC, d/b/a Duende, is a limited liability company organized under the laws of the State of California, with its principal place of business at 468 19th Street in Oakland, California.

16. Defendant, Paul Canalas, resides in California and is the owner and managing member of Duende.

17. Defendant, ES Verdad, LLC, d/b/a Comal, is a limited liability company organized under the laws of the State of California, with its principal place of business at 2020 Shattuck Avenue in Berkeley, California.

18. Defendant, John Paluska, resides in California and is an owner and managing member of Comal.

19. Defendant, Andrew Hoffman, resides in California and is an owner and managing member of Comal.

20. Defendant, Golden Gate Restaurant Association ("GGRA"), is a trade association organized under the laws of the State of California, with its principal place of business at 220 Montgomery Street in San Francisco. Upon information and belief, GGRA has over 600 due-paying members.

21. Defendant, Union Square Hospitality Group, LLC ("USHG"), is a limited liability company organized under the laws of the State of New York, with its principal place of business at 24 Union Square East in New York City. It operates the following restaurants in New York City: Union Square Café, Gramercy Tavern, Blue Smoke, Jazz Standard, The Modern, Cafe 2, Terrace 5, Maialino, Caffe Marchio, North End Grill, Marta, Martina, Porchlight, Untitled, Studio Cafe, and Daily Provisions. USHG co-owns the GreenRiver restaurant in Chicago. USHG also runs a consulting business that offers "competitive analysis" services.

22. Defendant, Daniel "Danny" Meyer, is the founder and CEO of USHG and the founder of the fast-casual chain Shake Shack. He is listed as No. 1 on <u>Nation's Restaurant News'</u> 2016 "Power List," described as "the most definitive list of industry leaders who are not only setting trends today, but also shaping them for tomorrow."

23. Defendant, Sabato Sagaria, is USHG's chief restaurant officer.

24. Defendant, Crafted Hospitality, LLC, is a limited liability company organized under the laws of the State of Delaware. It owns four restaurants in New York City, including Craft located at 43 East 19th St., one restaurant in Los Angeles, two in Nevada, and one in Miami.

25. Defendant, Thomas Colicchio, is the founder. co-owner, and managing member of Crafted Hospitality.

26. Defendant, Momofuku 171 First Avenue, LLC ("Momofuku"), is a limited liability company organized under the laws of the State of New York with its principal place of business at 171 First Avenue, New York City. It owns approximately fifteen restaurants located in New York City, Washington, D.C., Las Vegas, Sydney, and Toronto, including Nishi located at 232 Eighth Avenue in New York City.

27. Defendant, David Chang, is the chef, founder, managing member, and co-owner of Momofuku.

28. Defendant, Marlow, Inc. ("Marlow"), is a limited liability company organized under the laws of the State of New York, with its principal place of business at 85 Broadway in

Brooklyn. It owns five restaurants in Brooklyn: Diner, Reynard, The Ides, Roman's, and Achilles Heel.

29. Defendant, Andrew Tarlow, is the founder and CEO of Marlow.

30. Defendant, Happy Cooking Hospitality, Inc., is a limited liability company organized under the laws of the State of New York, with its principal place of business at 96 Grove Street in New York City. It owns five restaurants in Manhattan:  Fedora, Perla Cafe, Bar Sardine, Jeffrey's Grocery, and Joseph Leonard.

31. Defendant, Gabriel Stulman, is the founder and CEO of Happy Cooking Hospitality.

32. Defendant, Molinero, LLC, dba Huertas, is a limited liability company organized under the laws of the State of New York, with its principal place of business at 101 1st Avenue in New York City.

33. Defendant, Jonah Miller, is the executive chef, co-owner and a managing member of Huertas.

34. Defendant, Nate Adler, is a co-owner and a managing member of Huertas.

35. Defendant, Birth of the Cool, LLC, dba Eleven Madison Park, is a limited liability company organized under the laws of the State of New York, with its principal place of business at 11 Madison Avenue in New York City. It has three Michelin stars and is considered by many to be the best restaurant in the world.

36. Defendant, Daniel Humm, is an owner and managing member of Eleven Madison Park.

37. Defendant, Will Guidara, is an owner and managing member of Eleven Madison Park.

38. Defendant, New York City Hospitality Alliance, Inc. ("Alliance"), is a limited liability company organized under the laws of the State of New York, with its principal place of business at 65 West 55th Street, Suite 203A, New York City. It was founded in 2012 and, upon information and belief, has over 600 due-paying members.

39. Defendant, Andrew Rigie, is the executive director of the New York City Hospitality Alliance.

### III.    UNCHARGED CO-CONSPIRATORS

40. Numerous individuals and businesses not charged herein have actively and knowingly facilitated and assisted in the formation and operation of the conspiracy and are identified in the caption as Does 1-500. This complaint will be amended to add additional named defendants as appropriate.

### IV.    JURISDICTION AND VENUE

41. This court has subject matter jurisdiction over the Sherman Act claim pursuant to the Clayton Act, 15 U.S.C. § 15, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent …," and 28 U.S.C. § 1331, which provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

42. This court has subject matter jurisdiction over the California and New York state law claims pursuant to 28 U.S.C. § 1367(a), which provides that district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

43. Venue lies in this court pursuant to 28 U.S.C. § 1391(b)(2), which provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions given rise to the claim occurred …"

44. This court has general personal jurisdiction over the following defendants who reside in or do regular business in the State of California: a) Vogler, b) 140 NM LLC, c) Bar Agricole, LLC, d) Hopemoorelain, LLC, e) Moore, f) Hopelain, g) Duende, LLC, h) Canalas, i) ES Verdad, LLC, j) Paluska, k) Hoffman, l) Golden Gate Restaurant Association, m) Craft Hospitality, Inc., and n) Colicchio.

45. This Court has specific personal jurisdiction over Union Square Hospitality Group, Meyer, Sagaria, Marlow, Inc., and Tarlow as such persons have had sufficient contacts with the

State of California related to or arising out of the alleged claims such that this Court may exercise jurisdiction over them consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

46. Upon information and belief, this court has personal jurisdiction over the remaining defendants as well. Discovery will determine the nature and extent of defendants' contacts with the State of California generally and that specifically concern the charged conspiracy.

## V.    FACTUAL ALLEGATIONS

47. On **July 9, 2013**, Danny Meyer tweeted: "Considered eliminating tipping years ago, and then servers asked to keep things as they were. Your opinion please." Tom Colicchio responded: "@dmeyer I'm thinking the same for craft." David Chang responded: "@tomcolicchio @dmeyer we are more than kicking around the idea at @momofuku of figuring out how to increase prices removing tips w/o revolt."

48. On **October 24, 2014**, the <u>San Francisco Chronicle</u> reported on an agreement between the Bay Area defendants to increase prices and eliminate tipping:

> Citing both pragmatic and philosophical reasons, a small collection of Bay Area restaurateurs is eliminating tipping. Instead of expecting diners to leave a tip, the restaurants will automatically add a 20 percent service charge to all bills — and not accept any additional gratuity beyond the service charge. The five businesses — Comal in Berkeley, Camino and Duende in Oakland, and Bar Agricole and Trou Normand in San Francisco — each plan to institute the policy within the next few weeks, forsaking the ubiquitous model they believe is outdated. And they expect more restaurants could follow suit. "If we were doing this, and there was a sense that the rest of the world wouldn't pay much mind to it, I would be more concerned. But this is on everybody's minds," said Comal partner John Paluska.

49. On **October 24, 2014**, the <u>San Francisco Eater</u> reported on the agreement:

> [A] new band of top-notch (but not high-end) restaurants have decided to make another run at the no-tipping policy, hoping their collective power will have an impact. Over the next few weeks, sister spots Bar Agricole and Trou Normand, along with an unaffiliated trio of East Bay restaurants, Camino, Comal, and Duende, are kissing tipping goodbye. In its place: an automatic 20% gratuity. The restaurateurs say this move is intended to get out ahead of the minimum-wage increases that will likely pass in both SF and Oakland, for both ideological and economic reasons. "Why rely on legislation to do the right thing?" Thad Vogler, owner of Bar Agricole and Trou Normand, told the *Chron*.

50. On **October 27, 2014**, during a KQED radio show, Vogler said the restaurants acted together:

> **Michael Crasney** [Host]: Let me begin Thad Vogler with you and I said this is largely I suppose as a catalyst for you doing this the minimum wage change and discrepancies … in pay between the front, those who are serving and busing, and so forth, and the back, those who are cooking and dishwashing.
>
> **Vogler:** Yea, I think that's accurate. There has been talk of a fifteen dollar minimum wage in San Francisco. It seems sort of inevitable. I was surprised to see that I had a gut reaction to that of oh no as a small business owner, and as I've sat with that it seems crazy that anyone would hesitate to guarantee a fifteen dollar minimum wage in San Francisco. I mean even fifteen dollars is not sufficient to exist here. So I just realized it would be silly to wait for legal reasons to do that and we as a group decided to commit to that now.
> . . .
> **Crasney**: But why move toward this? What is the big positive in this?
>
> **Vogler**: A number of reasons. One, there has long been a, it's been unfortunate that the kitchen is excluded from this portion of revenue so a kitchen employee on a Monday we do one hundred people makes the same as on a Saturday where you do two hundred and fifty people. The kitchen is excluded from the excitement of selling more, the profitability of selling more, the financial benefit of selling more. It just seems, it longed seemed to a lot of us unfair to exclude systematically a big part of your house from that reservoir of money. We don't want to exclude the front of the house from that incentive. We just want to broaden the incentive to allow kitchen employees to benefit. Another thing is that you know restaurants … I mean part of the charm is they have long been sort of lawless institutions with two sets of books and there is a lot of grey market economy with the restaurants and as a small business owner you don't really want to be a part of it. There's a whole lot of tax that's not getting paid on the tip pool by tipped employees and also by business owners that are avoiding paying payroll tax by not accounting for all the gratuity that's received. … As a business owner it is sort of nice to clean up your books in that way and do everything above board and fully transparently.

51. Gwyneth Borden, executive director of GGRA, participated in the show from New York City, where she was attending the Ninth Annual International Chef's Conference. One of the presentations was "Should America Ban Tipping?" One panelist said that one problem with ending tipping and increasing prices is that price-sensitive customers will look at the higher menu prices and go elsewhere. He also said that restaurants have an "uphill battle" going it alone and that "it's up to restauranteurs and upscale restaurants with customers

who aren't price sensitive to lead the charge."

52. A server on the show said eliminating tips could reduce his income by 40-50 percent. He also said - "The people in the kitchen should be paid. If they're not paying the fifteen dollars per hour now … I mean the only way they are going to get a decent wage in the kitchen is being forced I guess by minimum wage."

53. In or around **late 2014**, pursuant to their agreement, tipping was eliminated prices were raised at Trou Normand, Bar Agricole, Camino, Comal and Duende.

54. Comal's website said: "We believe in what Danny Meyer calls 'enlightened hospitality' – that providing good service is its own reward.  We want our staff to provide the best possible service, but we want the motivation to provide this great service to come not from the hope of a big tip but rather from pride in a job well done." In the Q and A:

> **Question**:  Why don't you just incorporate the cost of service into the menu pricing and eliminate the service charge?

> **Answer:**  We considered doing so, and still hope to do so sooner than later. But it's a difficult thing to do in a competitive marketplace where the vast majority of restaurants price their menus based on the assumption that their service staff will make a significant portion of their compensation from tips. As more restaurants move to a service charge in lieu of tip (which we believe will happen in the coming months and years), the circumstances will be more favorable to taking this additional step.

55. On **January 12, 2015**, a class action was filed against Colicchio alleging that employees at his Wichcraft chain were unlawfully docked tips, denied overtime, paid below minimum wage, and sexually harassed. Colicchio has reportedly said New York laws requiring that workers receive written notice of a wage change is a "technicality" and that "it's absolutely wrong" to penalize employers who violate such laws.

56. In or about **January 2015**, the NYC Hospitality Alliance released the results of a survey showing that New York City servers earn on average $25.34 per hour including tips, and bartenders earn on average $27.48 per hour including tips

57. On **February 2, 2015**, the NYC Alliance sponsored an industry conference titled "Have We Reached the Tipping Point for Tips?"  One panelist said that restaurants would not pay

servers twenty-five dollars per hour if tipping was eliminated. Rigie said – "One of the most interesting things that I grapple with, and I know many of you in this room we've had these discussions. What is it going to take the industry to change … One of the big things that is holding people back … they don't want to be the test case where we get rid of tipping ... our tipped employees will get a straight hourly wage which will reduce their hourly rate and then they are going to work across the street at my competitor. And that just really seems to be the big challenge and I don't know if there is really any one way that enough restauranteurs at one time are going to make a switch and say we're going to move from tipping …"

58. On or about **February 8, 2015,** Colicchio told Crain's New York Business that it would be easier to eliminate tipping "if a Jimmy Haber, Danny Meyer, or Daniel Boulud did it … I expect that ten years from now, no one will know what a tip is."

59. The Wall Street Journal reported that around **August 2015**, Meyer gathered together fifteen of New York's top restauranteurs, representing about eighty establishments, to tell them that USHG was planning to end tipping and raise prices. The apparent purpose of the meeting was to solicit participation by the attendees and, upon information and belief, other participants did indicate they may follow USHG's lead.

60. On or about **September 15, 2015**, Colicchio said that Craft's new lunch service would be gratuity free with higher prices. "It's time for a change, it's time to pay servers a salary … Waitstaff should no longer be beholden to someone who might not like the way they look." Upon information and belief, Colicchio attended the meeting referenced in Par. 59, above.

61. On **October 14, 2015**, Danny Meyer announced that USHG would eliminate tipping and increase prices at all of its NYC restaurants by the end of 2016:

Dear Friends,

I am writing to share some important news about Union Square Hospitality Group that we want you to understand before your next visit to one of our restaurants.

Recently, our entire company has been engaged in a robust conversation about how we can provide even more meaningful career opportunities and advancement for our 1,800 employees. It has become increasingly clear to us that a major obstacle in this endeavor is the practice of tipping.

There are countless laws and regulations that determine which positions in a restaurant may, and may not share in gratuities. We believe hospitality is a team sport, and that it takes an entire team to provide you with the experiences you have come to expect from us. Unfortunately, many of our colleagues — our cooks, reservationists, and dishwashers to name a few — aren't able to share in our guests' generosity, even though their contributions are just as vital to the outcome of your experience at one of our restaurants.

After a thoughtful, company-wide dialogue, I'm proud to let you know that Union Square Hospitality Group will eliminate tipping throughout our family of restaurants. Starting at The Modern in late November, you will no longer find a tip line on your check, and there will be no need to leave additional cash at the table, the coat check, or the bar. Our other New York restaurants will make this change over the course of the next year.

Once these changes are implemented, the total cost you pay to dine with us won't differ much from what you pay now. But for our teams, the change will be significant. We will now have the ability to compensate all of our employees equitably, competitively, and professionally. And by eliminating tipping, our employees who want to grow financially and professionally will be able to earn those opportunities based on the merit of their work.

We are making a bold decision for our team and our guests, and we don't take this lightly. We encourage you to share your thoughts and feedback at HospitalityIncluded@ushgnyc.com.

We remain more committed than ever to our promise of delivering excellent dining experiences with warm hospitality — and we hope that you will both support our team and join us on this journey.

With gratitude, Danny Meyer

62. On or about **October 15, 2015**, Meyer said that the price that consumers will pay under the hospitality-included model will likely exceed the price that would have been paid before implementation (including tip). According to Meyer "[t]he average person is going to do the math and say I was going to pay A plus B anyway. In our case, it's going to be A plus B plus C, because in addition to the 20% you would've tipped, we're also trying to right what

has been a labor of wrong, and that's going to cost a couple more points on top of that." In addition, sales tax is paid on the higher prices but is not paid on tips.

63. On **October 15, 2015**, Meyer thanked Restaurant Opportunity Centers United (see Par. 88-94, below) via twitter: "Thanks go to your education for helping our industry to understand the 'why.' #HospitalityIncluded."

64. USHG's announcement received almost universal praise from the mainstream media.

65. On **October 15, 2015,** Meyer appeared on <u>CBS This Morning</u>:

**Charlie Rose**: So you call this Hospitality Included. Why are you doing this?

**Meyer**: You know what. I love the hospitality business as much as anyone on Earth. What I don't love is a situation which is over the thirty year career I've had, the disparity between what somebody can make in the dining room with a tipping system and what somebody can make in the kitchen has widened by about 200 percent.

**Rose**: A lot more being made by the waiters than the cooks.

**Meyer**: Yes. And I love the fact that waiters make good money. As a matter of fact, the waiters at our restaurants when we eliminate tipping will make as much or more in seventy-five percent of the cases than they're making right now. But, when you have a tip, I don't think the general public fully understands where that tip can go and where it's not allowed to go. So for example, when you leave a tip at any restaurant, not only is the waiter generally sharing it with all other waiters, but they're not allowed to share it with anyone in the kitchen. So the very people that cook your food …

**Rose**: Why are they not allowed?

**Meyer**: Because that's how laws are written across the country.

**Rose**: Does it have something to do with taxes or what?

**Meyer**: It has nothing to do with taxes. It's that gratuities are only allowed to be shared amongst the people who actually face you during the meal. So that means that on a really really busy Saturday night when everybody's high fiving themselves because they did such a great job taking care of you, the cooks are sweating a little bit more while the waiters are counting a lot more cash.

**Ross:** Let me say this. The person I want to be happy is the cook. (Laughter)

**Gayle King**: Danny, people say if it is too good to be true, does that mean we're going to pay in other ways. Now the prices of the food are going to be going up?

**Meyer**: Well, the price of your meal is exactly what it is. So for example, when you agreed many, many years ago that it was worth paying a little more for organic vegetables or for locally grown vegetables, or animals that were raised responsibly, that got put into the menu prices. And right now it is going to be put into the menu prices not just what we pay the cooks and the florist and the reservationist and for tablecloths but what we pay our servers as well and that's our responsibility to do it. At the end of the day, when you get your credit card bill a month later, that line when you come to one of our restaurants should look just about exactly as it would have if you had struggled in the dark to put on the tip. So it's true that the menu price itself will look higher to you by about 21 percent, but the total at the bottom will be the same. The benefit is that we will get a chance, because we don't have to worry about who will not get tips, to make it an equitable playing field for everyone.

**King**: And not worry about people who don't give good tips.

**Meyer**: That is one of the most demoralizing things in the world if someone stiffs a waiter for slow service and it may not have been the waiter's fault.

**Norah O'Donnell**: Danny this is on the front page of every business section in every major paper in this country because it will revolutionize eating if other restaurants follow your lead. Can you guarantee that it will only be a 20 percent increase in the menu price, or could it go as high as 35 percent as some analysts are suggesting?

**Meyer**: We'll we're going to start it at 21 percent and try to make it work as best we can. I think it's really important, Norah, to understand that January 1st of next year minimum wage is going to be going up everywhere. And as soon as minimum wage goes up, not just our restaurants but every restaurant is going to have to raise their prices. That doesn't require you to eliminate tipping. But we looked at that moment in time and we said if we're going to have to raise our prices anyway, why don't we use this opportunity to make the restaurant business a much more sustainable place? I just got to add one more thing. We are facing across the whole country the biggest single labor shortage in talented cooking skills that we have ever seen, and part of the reason is that if you're a young kid and you want to go to cooking school with big, big bills, how do you tell your parents what I really want to do is work for eleven dollars an hour, ten dollars an hour, nine dollars an hour, and then live in a big city like New York. So for the very sustainability of the business we think this is important.

**O'Donnell**: All right. Really interesting. Thank you restaurant legend. You earned that well. (Laughter)

**Meyer**: Thank you Queen Gayle. (Laughter)

66. On **October 19, 2015,** Meyer appeared on Fox's <u>Mornings With Maria</u>:

**Maria Bartiroma**: Restauranteur and Union Square Hospitality Group CEO Danny Meyer taking a stand on wages. In an effort to pay his workers more, he is eliminating tipping from restaurants. He joins us now to talk more about it. Dagan McDowell is also joining the conversation. Danny good to see you. Welcome.

**Meyer**: Thanks Maria.

**Bartiroma**: You have such successful franchises out there and you want to put this across all the restaurants – no tipping?

**Meyer**: We're going to roll it out over the course of the next year. Well the first thing is that a lot of people don't understand that the tipping system as it is has completely lost any value that it may have ever had. Most restaurants share tips so all the waiters share the tip that you leave so that it doesn't really go to the person you thought it was going to go to, but the law prevents a restaurant from sharing your tip with the people who are cooking your food. So at the end of the day, what's happened is that -- it can be a good thing for servers who want to work on commission. It's a bad thing for servers who want to make a profession out of it, but it's a terrible think if you're the person cooking the food.

**Bartiroma**: I couldn't believe that when I read that. Why is it banned that the people cooking the food don't get a piece of that tip?

**Meyer**: You tell me. It's a government thing.

**Bartiroma**: That is so weird.

**Meyer**: It's something that has actually created a disparity where over the past thirty years the kitchen wages have gone up 22 percent on an hourly basis in thirty years whereas in the dining room has gone up well over 250 percent.

**Unknown Male**: Danny your strategy, will it help the quality of life of the people working in your restaurant?

**Meyer**: It's going to help us to reverse what's been a horrible drought in labor in the kitchen. There is absolutely no incentive to go to culinary school and cook at the level that you need to at one of our restaurants when you know that you just can't make that much money.

**Dagan McDowell**: One thing that everybody has said, certainly on twitter, I've seen so much conversation about this, if I can't reward my server, then the service is going to stink. It's my discretion that I get to say, I get to determine if the service was good or not, what do you say to that.

**Meyer**: I say that's my job. I say if you come to one of our restaurants and one of our servers is not offering warm hospitality unless you give him a tip, I don't want that server working for me, and they won't at the end of the day. I would also ask you a question. When you see a menu price in any restaurant, let's say you're going to buy the roast chicken, it includes the full price of the roast chicken, including the cook's salary. If the roast chicken is dependent upon you tipping the cook to be good, would you go back to that restaurant?

**Bartiroma**: It's a great point. I mean I just. People might want to do an extra tip on top of, I mean obviously prices will be higher right because you're incorporating the tip in there?

**Meyer**: The menu price that you see will be higher but the guy that would have tipped is gonna tip anyway so by the time you get your credit card bill it's the exact same thing as if I put it in there in the first place.

**Anastasia Amoroso**: Actually when we look at tipping now, unless the service is really, really horrible, you probably still default to an automatic 20 percent. So if that's the case, then that will be passed on to the cooks, to the servers, and so forth. How much of an increase are they looking at in terms of their real wages?

**Meyer**: Well what we're going to be able to do is to have that discretion ourselves, so by putting the full price into the menu, being transparent about it, it allows us to do two things. Number one is, that we get to determine what everybody's revenue, what everybody's income is on a merit basis. Do you know that every single waiter makes the exact same adjusted minimum wage whether they are good or not. Do you know that every single waiter today shares in the tip that you gave this one waiter right over here. How about if I have the opportunity to pay somebody what I think they're worth. And what we're going to do for our servers because it is an outstanding profession for many of them is to not only raise their wage to nine bucks per hour[2] from two dollars thirty five per hour[3] but we're also going to institute revenue sharing for our servers so that just like today when the restaurant's revenues go up, they're going to have the incentive to sell and to make more money, so we're not going to take that away from them.

**Bartiroma**: I like it. I think you're selling me.

67. Meyer was also interviewed on a Comcast webcast around the same time:

---

[2]. The minimum wage in New York City for non-tipped employees (for employers with more than ten employees) increased from $8.75 per hour to $9.00 per hour effective December 31, 2015.

[3]. The minimum wage in New York for tipped employees increased from $5.00 per hour to $7.50 per hour effective December 31, 2015. The federal tipped minimum wage is $2.13, but it has no applicability in states with a higher minimum wage for tipped employees.

**Host**: You're changing tipping. You're changing the whole thing. So tell me about that.

**Meyer:** Well we're eliminating tipping in all of our restaurants over the course of 2016. We started at The Modern at the end of 2015 and we just rolled it out two weeks ago at Maialino, our Roman restaurant. And were doing these one by one because we learning more and more and more but it was important for us to take a stand on this for a huge host of reasons. Some of them are philosophical, some of them are financial, and I would say some of them are political.

**Host**: So let's start with the philosophical reasons.

**Meyer:** The philosophical reason to eliminate tipping is that it's one of the most demeaning practices in our entire society. If you are on the receiving end of a tip it means that the person who is tipping you believes that you would not have otherwise been nice to them or given them good service or prompt attention at a bar or given them their coat back or whatever you know given them the coffee they had actually ordered if you had not left them a tip. And it's complete nonsense. And if you're the person whose performing that service and you are actually someone who takes pride in doing a good job at the thing you're doing, you don't want the other person to think that the only reason you did a great job, and suggested that bottle of wine is so that two and a half hours later you could pick their pocket. Or you don't want to be somebody who thought the only reason I actually brought you your coat back instead of some other guy's coat back is because you're going to throw three dollars at me and buy your coat back from me. So the other thing philosophically is that in the years that I've been a restauranteur, what the tipping system has done is unfortunately created a huge wedge and divide between people in the back of the house, whose hourly wage has barely gone up in the thirty years that I've been in the restaurant business, and people in the dining room who earn tips whose incomes have gone up about three hundred percent cause what a tip is it's a multiplier of menu prices.

**Host**: That's really interesting.

**Meyer**: And menu prices have gone up. The tipped percent has gone up. But meanwhile the hourly wage of back of the house employees has barely gone up and in most states in the country including New York, there is something called the eighty-twenty rule. It's a rule that says unless someone spends eighty percent of their time face-to-face with a guest, they are not eligible to share in tips. So if you come to one of our restaurants in New York or actually probably eighty prevent of every full-service restaurants in this country, tips are pooled. What that means is that you the customer think, let's say you're one of those rare customers that uses your tip as a way to punish someone for bad service which I think is kind of ridiculous because that should be my job to not give you a raise or to fire you if you are giving bad service. So let's say you are one of those people. So now you leave five percent or zero percent or ten percent to prove a point, and you think you're really hurting that server, well you're really hurting everyone in the entire front of the house because in a pooled house everyone is getting that whack. Or if you're someone who thinks that you're going to get a better table next time because you're a big tipper, which is ridiculous

because the reservationists are not allowed to share in tips. But let's say that you're someone who thinks you are going to get a good table so you leave a big tip for that server, that's just getting shared with thirty five other people anyway.

68. Unlike the mainstream media, many commentators have viewed with skepticism the

restauranteurs' claim they are motivated by social justice concerns:

Serving is one of the last jobs women with little education can do and make decent wages to support their families. I served previously as a second job on the weekend and the tip system motivated me to put out my best at every table. I enjoyed the challenge and the fast pace of the job is motivated by the money collected at the end of the shift. Restaurants will never pay $20 - $30 an hour, and that is what good servers make.

This is about a separate economy that exists in the restaurant business and how the owners want to get their hands on it. I'll be willing to bet that Danny Meyer (and those like him) were advised by their billionaire friends that they have millions of dollars flowing through their restaurants and that they need to absorb and control it. Why else would they all of a sudden care about their labor pool, of which, their history includes passing legislation to pay people under the minimum wage and traditionally offer[ing] the least amount of benefits possible (in most cases) and zero job security. This is about the redistribution of wealth, which is only acceptable for the bottom up and not the other way around. They want to take the tip money that servers earn and pay their kitchen staff. That's it. … The best part of this episode is the demonization of the server and how it's unfair that they make so much more than the kitchen staff. Gee, I always thought it was the owner's job to pay the kitchen staff?

Can [New York] Eater publish some article from who is against the no-tip system that will be NICE and FAIR? Why someone (restaurateur), that so far have always paid so little to the back of the house, now sadly should change? WHY??? As owner, you minimize your cost and maximize your profit: so you'll keep pay as low as you can [for] your chefs, and now with the money that you "stole" from the waiter, you'll badly pay your front of the house staff…… and eventually you'll become richer (and cooler, telling friends and Eater that you do this for equality!!!)

Whose fault is it the back of the house isn't paid enough? It's the owner's fault. If Danny Meyer thinks his employees need to get paid more he is free to pay them more. The problem is he wants them to get paid more, but doesn't want to raise his prices and doesn't want to decrease his profit. He is shifting from waiters to back of house. He is 100% robbing Peter to pay Paul. And no one in the media is asking the right questions or the right people.

Congratulations on doing your part to muddy the waters on the no tipping issue. Once again, this is REALLY about owners paying their cooks a proper wage, NOT robbing the servers to pay the cooks. Which is what a no tipping model really is. The no tipping model is a perfect cover for more restauranteur shenanigans. The very same tricks that have

landed many, many restauranteurs of note (including the sainted Danny Meyer) in tip related settlements/lawsuits.

It annoys me when chefs/owners who go the no-tipping route view themselves as progressive or noble. Newsflash: If you felt the cooks were underpaid, you always had the power to raise their pay. You just chose to pocket the money yourself. Now all you're doing is responding to minimum wage increases by raising prices to accommodate a wage increase while you yourself "maintain the same level of profitability" which is completely fine except you want to pat yourself on the back like you're doing something noble. Just raise the prices and spare us the "we are proud to lead the charge" and the "we hope to strengthen and promote a movement towards a more equitable compensation system."

All of these moves are reactionary instead of progressive. Cooks have been underpaid for years, why all of a sudden is a dramatic change being made? Because the [minimum] wage increase is happening! Bingo! ... If you thought cooks were so underpaid then you should have [paid them] out of your own pocket.
Maybe when they're doing all their financial modeling and forecasting they could budget more money towards paying their cooks and work from there? Just a thought. If higher cooks' pay were prioritized, it would happen without taking tips from servers, bussers and bartenders.

 [T]ipping isn't creating a wage disparity or low BOH wages. In fact, it's what allows restaurateurs to pay BOH a living wage. Catch is, restaurateurs must be willing to curb their profits a bit.

Meyer would have us believe that the reason he is banning tipping is to reduce wage inequality between servers and cooks. I call "B.S." … It's pure capitalist genius cloaked as crusading socialist justice.

As a retired bartender in NYC for 35 years we know what's going on…Steal the waiters tips in a roundabout way to pay others in the restaurant. … All the food sites like eater.com and the NYT only have been promoting the owners side of the story … as I've said in the past pay the kitchen and floor managers more $.

Danny Meyers has been in charge of how much kitchen staff makes, not the servers. Now deciding that Front of House makes too much money (is that possible in New York?) he is trying to redistribute server's wages. So are servers really supposed to believe owners will have their best interests in mind when they have proven to not raise kitchen wages in years?

If you want to pay your kitchen staff more, just F***ING do it. Nothing was ever stopping you. Hospitality Included will result in a pay cut for hundreds. Period. Don't make yourself out to be a fair wage pioneer. If you want to be truly fair, how about medical coverage. How about eliminating "at-will employment?"

I'm sure the same industry that has lobbied to keep the server wage at $2.13/hr for decades will be very fair with their #notipping policies.  How many people have put themselves through college with their tip money? I personally know two dozen.

wow!!! they make more money?? wow?? how? Ah … yes … they taking the tips from the waiters and putting in their pocket… great management!! and great article (or was [it] a press release hard to find the difference)

As a restaurant owner, so much of this is questionable, most notably, [The Modern Executive Chef Abram] Bissell's claim that The Modern only generates a 7% profit. When you take into account that they pay their senior line cook just $24k/year (something I'd be ashamed to admit in private, let alone on public radio), it's clear something is amiss. … In short, no one takes on the high risk and hard work required to open a restaurant just to make a 7% profit. These are either real estate investments disguised as restaurants, or the owners and executive staff receive highly inflated salaries. Before reporting on an issue with such great potential to impact an entire industry, I suggest next time the Freakonomics crew scratch the surface a little deeper.

I agree BOH should be paid better. Interesting how Mr. Meyer and company are "wracking their brains" to offset the disparity when Mr. Meyer is worth a current estimate of over $386 Million. Instead the message is that FOH employees are overpaid. … [T]he record profits they saw were a direct result of a revenue stream that was going straight from customer to server go instead to Danny Meyer directly which he used to increase the salaries of floor managers and yes give BOH employees a modest wage increase. … Was this [Freakonomics] episode an attempt at journalism or just a commercial for Danny Meyer's establishments?

Call me cynical in 2016, but, I find it hard to believe that the restaurateurs who are crusading for this No Tip policy are altruistically trying to figure out a redistribution rather than simply trying to get THEIR hands [on] the cash left on the table. Please.

Owners are jacking employee tip jars across the country. DUHHHHH

69. On **October 17, 2015**, Meyer congratulated Camino for "leading the way."

70. On **October 18, 2015**, USHG said it would share best practices regarding hospitality included at its upcoming October 27, 2015, town hall.

71. On **October 19, 2015**, USHG tweeted "listen in on the growing dialogue around #HospitalityIncluded, and ask us questions #hospitalityincluded@ushgnyc,com."

72. On **October 27, 2015**, USHG held a town hall at the Martha Washington Hotel in NYC at which it discussed its decision to end tipping.  The meeting was hosted by Journee, a trade association of restaurant owners and hospitality professionals. USHG tweeted to Journee

founder Anthony Rudolf: "Thank you for hosting the industry talk. Looking forward to keeping the conversation going!"

73. On **November 2, 2015**, USHG sponsored a town hall to discuss and answer questions regarding hospitality included. Meyer tweeted: "So grateful to see so many guests for joining us to dialogue on #hospitalityincluded." USHG said at the town hall that the price of a meal after the implementation of hospitality included will increase about 5-8 percent over what it was prior to implementation.

74. In **November 2015**, Joe's Crab Shack ("Joe's"), announced it would "lead[] the industry" and switch to no-tipping and increase prices by about fifteen percent at 18 of its restaurants in the Midwest, calling it a "forward thinking policy."

75. On or about **November 15, 2015**, Colicchio said on CNBC's <u>On The Money</u> that he eliminated tipping because "I think that I should be able to control or at least compensate my staff. We know that studies at Cornell University [show] that the amount of money left at a tip has very little to do with service. It has more to do with your accent, your race, and your gender, as a server, and so I would prefer to compensate my staff." (However, supporters of the no-tipping movement also argue that studies show that people tip the same regardless of service.)

76. On or about **November 19, 2015**, USHG implemented hospitality included at The Modern. The menu prices did not all increase by the same amount. As one example, the price of a three-course dinner increased from $98 to $122, an increase of 24.5 percent. In additional, the extra sales tax (8.875%) on that meal is $2.13 (0.08775 x 24).

The Modern's December 2015 profits were the highest ever because, according to Meyer, "doing the right thing is the most profitable thing." Meyer also said that "all of our leaders in all of our restaurants are clamoring to be next. They all want to do this because they have seen some pretty compelling statistics."

77. On or about **December 2, 2015**, Eleven Madison Park announced that it would end tipping and raise prices. Including taxes, it increased its prices by approximately 30 percent

effective January, 2016. Upon information and belief, Eleven Madison Park was represented at the meeting referenced in Par. 59, above.

78. On **December 8, 2015**, USHG's held a hospitality included town hall, hosted by the Institute of Culinary Education. USHG tweeted: "Big thanks to @iceculinary for hosting our second #HospitalityIncluded town hall. Excited to share best practices!"

79. On or about **December 14, 2015**, Huertas announced it would end tipping and raise its prices. Alder said that he would help other restaurants adopt a no-tipping model and give them "the confidence to make this change a reality." Alder has also said: "Can we start something bigger than Huertas? Can we help other restaurants get to this point? If we're a leader in the movement, you've got to feel pretty good about where you're going. I'm super passionate about this. If we can get this passion to flow through the ranks, through our staff, throughout industry, then we're going to be in really good shape." Huertas' website states that "[w]e believe that this is the future of dining in New York City and are proud to lead the charge alongside our former employer and mentor Danny Meyer and his Union Square Hospitality Group." At the time of the announcement Sagaria tweeted "Starting today @huertasnyc Will Eliminate Tipping." Upon information and belief, Huertas was represented at the meeting referenced in Par. 59, above.

80. On or about **December 15, 2015**, Tarlow announced that he would end tipping and raise prices at all of his restaurants. He said that "having Danny out in front of it has been a huge impetus for us to take the plunge." Sagaria tweeted regarding the announcement: "Big (and inspiring news) today!" Upon information and belief, Tarlow attended the meeting referenced in Par. 59, above.

81. Around the time of his announcement, Tarlow hired a designer to create an open-source "gratuity-free" logo, which is available for free at gratuityfree.nyc. The website states:

Are you an operator that has already moved or is planning to move to a Gratuity Free model? You can use the logo we created to let your guests know that the prices they see on your menus include service.

Enter your information, and we'll get back to you with more on the Gratuity Free logo and high res files.

By submitting this form you agree to the terms of our *Privacy Policy* and consent to us communicating with you.

The logo is currently being used by restaurants in New York, California, Oregon, and, upon information and belief, elsewhere.

82. On or about **December 17, 2015**, Fedora announced that it had "joined a movement of like-minded restaurants in adopting a hospitality-included model that eliminated tipping." Sagaria tweeted at the time: "More existing news! Much respect and admiration for @gabrielstulman & team for taking this step." Fedora subsequently reverted back to a tipping model, though Stulman said he "continues to believe that [no tipping] has the potential to change hospitality for the better" and is "thankful for the support of our colleagues who remain committed." Upon information and belief, Stulman attended the meeting referenced in Par. 59, above.

83. A survey of NYC restaurant goers released on or about **January 7, 2016,** showed that the majority like tipping, think it's a good system, and are not confused by it.

84. On or about **January 8, 2016**, David Chang ended tipping at his new restaurant Nishi, located in the Chelsea neighborhood in Manhattan. Upon information and belief, Chang attended the meeting referenced in Par. 59, above.

85. On **January 18, 2016**, Journee hosted a conference titled "Learning From No-Tipping." Sagaria and Adler presented. An industry consultant tweeted: "This issue has brought ppl together in the industry that no other issue has."

86. On **January 26, 2016**, The Ford Foundation hosted a "discussion" on Suru Jarayama's new book Forked: A New Standard for American Dining." Jarayaman co-founded and co-directs Restaurant Opportunities Centers United ("ROC"), an Oakland-based 501(c)4 organization funded in part by the Ford Foundation that purports to represent the nation's restaurant workers, and yet supports the no-tipping movement even though it has and will

substantially reduce income for thousands of restaurant workers, many of whom are women of color with children.

87. ROC created Restaurants Advancing Industry Standards in Employment ("RAISE"), an association of about 200 restaurants that is a "supportive community of peers around the country, and financial resources to meet and visit with peers in other parts of the country to learn best practices." RAISE members purport to take "the high road to profitability," by, among other things, eliminating tipping. Colicchio and Meyer were early members of RAISE.

88. The ROC website identifies 215 restaurants that are taking the "high road" to profitability, including 75 in Madison, Wisconsin, 35 in New York City (including Craft and USGH), 21 in the Bay Area, and five in Chicago (including GreenRiver). "These businesses meet our high road criteria and are known leaders within the sustainable and fair food movement in their communities."

89. In an interview, Meyer told Jayaraman that tipping "gets into questions of justice, politics, social norms, economics obviously, class warfare, gender and race, and as you told me, the thing that makes me more inspired as anything is that, if you do not have your head buried in the sand and you have noticed that there has been a widening gap between those who have a lot and those who don't have enough."

90. Meyer was a featured speaker at the January 26, 2016, discussion:

Thank you so much and thank you all of you guys for being here tonight. Hi Tom [Colicchio]. I knew you'd be here. So this has been a fascinating journey, and I've been so educated by Saru. … And I didn't have the courage but I did have the interest about 21 years ago when, right about the time that I opened a second restaurant, Gramercy Tavern along with Tom Colicchio and we were looking at tipping and kind of the problems with tipping but from a very, very different perspective than we are looking at it today quite frankly. I think it, just a quick and important thing for you guys to understand that back then the ignominious of tipping was that you would have waiters who would sometimes not have the opportunity to make the same money one night as compared to the next, and not know what they could make because of the ignorance of diners who might have thought that because the food was taking too long to get out of the kitchen, which had nothing to do with the waiter, maybe we should punish the waiter and not leave much of a

tip. And there were nights when waiters would be crying or sometimes running out on the street after guests, neither one of which was a good scene.

And so that was kind of a motivator to say why do we need tipping? Why can't we do it ourselves? Frankly I didn't have the courage to change it because waiters themselves didn't want the change to happen. Back then, not all tips were being reported as income. …

But what's happened all these years later and I really want to chalk this up to good luck which is running into Darron [Walker, President of The Ford Foundation] on an airplane, I'm going to guess what about a year ago. … and not two weeks after that getting a call from Darron saying "you know, I don't know if you've ever met this person that I know and respect so much named Saru," and I almost ran the other way when I heard her name because as much as I have been educated as a restaurateur by the work that Saru, it's true, the work that Saru has done with ROC and I truly have been educated and sensitized to some very, very different issues with respect to tipping that do not exist in the fine dining world but that do exist in a huge percentage of restaurants that are not fine dining restaurants in this country.

As a business person my style has always been to learn from people who have figured this stuff out way before I did, and then try to see if it really jives with my sense of justice, how it can be pragmatically put into practice as a business and make it work. . . .

We think it is good business to have restaurants be sustainable. They are not sustainable with the current system of tipping. And the reason they are not sustainable and what has changed dramatically over the thirty plus years that I've been a restaurateur is that every single time prices on the menu have to go up because underlying costs go up, whether it is rent or insurance or linen or flowers, or the cost of protein, the cost of any aspect, what happens is that the tip-eligible employees make more money because as the cost goes up, the multiplier called the tip therefore goes up, but nowhere along the way do restaurateurs tend to also pay their back-of-the-house tip-ineligible workers more because then the menu prices would have to go up even further, and then the disparity would only increase over time.

So quickly, let me just recap. Thirty years ago we did not have nearly the disparity between what you could make in the dining room and what you could make in the kitchen. And the cost of living in any town, never mind just New York, was quite a bit lower. So truly, you could come to work at a restaurant thirty years ago, you weren't going to get rich by being a cook but you could at least pay your rent. Today, while the cost of living has gone up at least three-fold since I first became a restaurateur, the hourly compensation for cooks and other non-tipped employees has gone up a whopping 35 percent.[4]

---

[4.] Meyer has also said (See Par. 103, below) that cook salaries at Union Square Café increased from about $10-11 in 1985 to about $11-12 in 2015, which is an increase of approximately fifteen percent.

In that same time, tipped employees with the adjusted minimum wage, have been able to make in fine dining at least 350 times as much. Try and imagine being a football coach and your defense gets paid 350 times, 350% more and your offense only gets paid 35 percent more and go back into halftime and try to make everybody feel real good. You can't do it, and nor are you ultimately going to be able to attract the next generation of kids who say when I grow up I want to play offense on a football team. And where we have a situation where culinary students can only afford to be waiters and cannot afford to be cooks, that's a serious problem in terms of the sustainability of our industry. …

And we cannot say that we care about fairness, economic fairness, we care about this country, and know that the hospitality industry is the second largest employer in this country after the government, and say that for at least half the people who work in the industry, they can't even afford to be in this industry but it's the only job they can get.

So I'm so grateful for the activism, the education, and also for the convocation that Darren has done by bringing me together with Saru, our organizations together, and really for our entire industry because in addition to I think probably doing more to increase the potential standard of living for a huge swath of our country. I think what you are doing right now has the ability to actually save our industry. Thank you so much.

91. Jayaraman said:

In 2015 something extraordinary happened, Darron brought Danny and I together. We spoke. I also spoke with Tom Colicchio. We talked about these issues maybe for the first time. We'd been talking about them, but more directly for the first time. And Danny Meyer and Tom Colicchio decided to go one step farther. They said we don't actually just want to pay a minimum wage, we don't want to pay a livable wage, we want to pay [ ] a thrivable wage. And because they were able to pay that thrivable wage, they were able to eliminate tips altogether. A huge and incredible move.

92. Jayaraman moderated a panel during the discussion:

**Jayaraman**: So we have a short panel to hear from these amazing folks. I wanted to start with Danny if that's okay, and just talk to you a little bit about hospitality included and the move. I know that we've talked about how we may come at it from different vantage points, but ultimately I think we are headed in the same path. So could you say a little bit about that and how you see it from your vantage point?

**Meyer**: Well I think what you are doing with respect to One Fair Wage,[5] if that were to sweep this country, I think the entire tipping question would almost become a moot point. Because every time minimum wage does go up, restauranteurs have to raise their prices. And because they raise their prices, tipped employees will continue to make more money.

---

[5] One Fair Wage refers to the elimination of a separate tipped minimum wage.

Unfortunately, that will increase the disparity between tipped and non-tipped employees. So if there were one fair wage whereby the two dollars and thirteen cents or two dollars and forty three cents or whatever they figure that to be becomes seven fifty or nine dollars, which is what we are paying at The Modern right now, plus a revenue share on top of that, there is no way tipping is going to survive at that point. It just can't because if the minimum wage were to go up to say ten dollars, it wouldn't be, it would be twelve dollars, or thirteen, fourteen, fifteen, now all of a sudden the menu prices are going to become so high that diners will revolt about paying a tip on top of that. They won't. They just won't do it. And I think there will be a collision which is great between what you are advocating for and those restaurants who are eliminating tipping so that it is all going to come together as one.

. . .

**Jayaraman:** I know Tom wanted to speak out about how he can bring the public along. … What we need of the public and consumers to support the high road.

**Colicchio**: Quick numbers. If minimum wage goes up to fifteen dollar that means that that it is the porter who is making fifteen dollars an hour. Cooks are making eighteen, twenty dollars. Waiters are making thirty dollars an hour at that point, thirty five dollars, forty dollars an hour, okay. Now if and when, when I implement tip free, I'm going to raise my prices by twenty percent, twenty-two percent. On top of that I would have to raise prices by another twenty-four percent. So we're talking about almost a fifty percent increase if minimum wage goes to fifteen dollars an hour and there is one fair wage for everybody. On top of eliminating tips.

Now it may be double dipping according to what you [Meyer] are saying because tips are going to be eliminated anyway. You may have to because nobody is going to go along with a fifty percent increase. So we're [Meyer and I] kind of saying the same thing. We're coming at it very differently. And so, when I say we need the public to come around for the high road, they need to get used to the fact that it is going to cost more money to go out to dinner. Simple fact.

So I'm all for an increase. One fair minimum wage. But journalists that are out there. You're going to have to start getting used to seeing prices increased. Now it's going to get tiered, factored in over a period of time, and so, but other things are going to go up too, not just wages. Because the person who is delivering the food is now going to make fifteen dollars an hour, food is going to cost more. Person at the laundry is going to be making more money. Our laundry is going to cost more.  Everything is going to go up. So you have your classic inflation that sort of is going to set in into restaurants.

So we all want this. But we have to get the message out to the public, why we're doing this, why it's important, and especially in a city like New York, a liberal city like New York, how the public will start complaining about this, that they don't want to pay more yet they want to see everybody make more. And so we need to educate the public on why this is happening and how we can make it happen. We can't do it alone. We need everyone

to help out here. So if we want to create a fairer wage, it has to be fair across the board for everybody.

93. Jayaraman travels around the country arguing to local policy makers that servers at casual sit-down restaurants such as IHOP and Oliver Garden make about $1.50 in tips per hour, and hence a wage of $15 without tips would be a significant raise. In reality, servers at Olive Garden, where the average check per person is $16.50, on average make over $15.00 per hour in tips alone, and a $15 flat wage would be a significant decrease in pay.

94. Paradoxically, Meyer and Colicchio support the One Fair Wage movement even though they believe that tipped servers at their restaurants are grossly overpaid.

95. On **January 30, 2016**, television personality Anthony Bordain said about the no-tipping movement: "As Danny goeth, so shall the rest. … For a whole lot of reasons, it's the way of the future."

96. On **February 2, 2016**, USHG's held a hospitality included town hall at the Redbury Hotel. USHG tweeted: "How does no tipping work at @The ModernNYC and @maialino_nyc? Come find out at our #HospitalityIncluded Town Hall."

97. According to a **February 3, 2016**, article, Meyer and "30 fellow restauranteurs have committed" to eliminate tipping, "and dozens of restaurants have followed suit."

98. On **February 25, 2016**, USHG implemented hospitality included at Maialino.

99. A **March 2016** study by UC-Irvine economics professor Richard McKenzie found that ending tipping will substantially reduce the income of many servers.

100. On **March 2, 2016**, the Alliance sponsored "The Tipping Conference." The conference summary states: "An unprecedented 50% increase in the tip wage combined with other operational challenges has the hospitality industry and the dining public buzzing. The NYC Hospitality Alliance will again bring the restaurant industry together for candid conversations about gratuities, the law and eliminating tipping in lieu of alternative compensation models." Sagaria and Colicchio presented. Sagaria tweeted regarding the meeting -- "Thanks for bringing the industry together and keeping the conversation going."

101. On **March 4, 2016**, industry consultant and television personality John Taffer said the no-tipping movement benefits owners at the expense of servers.

> Most waitresses and bartenders can make more than the $14 or $15 an hour in tips that the restaurant is going to pay them. So I think it's sneaky. I put 18 percent gratuity on the check, I pay you $15 an hour and I run a negative 4 percent labor cost. I'm making money on your back. Those excess tips are kept by me, not you. And I think there's something inherently wrong about it.

102. On **March 10, 2016**, Sagaria tweeted that the no-tipping movement is "an (ultra) marathon. Not a sprint. One restaurant at a time."

103. On **March 11, 2016**, Meyer was interviewed by Bon Appetit Editor Adam Rapoport at the South by Southwest Conference ("SXSW") in Austin on the topic "Will 'No-Tipping' Save the Restaurant Industry?" Meyer said, inter alia:

   a. USHG "felt an obligation to lead on this," and runs a "help-line" for restaurants interested in switching to a no-tipping business model.

   b.  A no-tipping model can work at all types of restaurants and price points.

   c. He would prefer a surcharge to higher menu prices because "it would allow our menu prices to remain apparently competitive with everybody," but surcharges are probably illegal in New York City

   d. The switch to no-tipping at The Modern increased profitability. "If you do the right thing you actually end up being more profitable."

   e. An entry-level line cook at The Modern prior to the switch earned about ten or eleven dollars per hour, "and by the way that ten or eleven dollars has come all the way up from nine or ten dollars when I started Union Square Café [in 1985]. Completely ridiculous."

   f. After the switch, the salary for a beginning server increased from $7.50 (the tipped minimum wage) to $9.00 (the regular minimum wage effective December 31, 2015), in addition to a revenue share of 13.5 percent of top-line revenue for all employees, and

   g. Top-line revenue numbers are disclosed to all staff.

104. On **March 12, 2016**, Chang tweeted "No tipping policy is advantageous for diner and restaurants in places with larger dining rooms. I think 90-120 seats is sweet spot: learning."

105. On or about **March 22, 2016**, a server at The Modern was quoted saying that his income decreased approximately 15-20 percent after the elimination of tipping.

106. On or about **March 29, 2016**, Chang said that servers at no-tipping restaurants are "getting capped out" and "could be making a lot more if they were taking tips," and that a no-tipping policy "allows restaurant owners to remix the way their service charges are distributed to their staff, which we gotta do if we're going to hang onto the best kitchen talent."

107. On **April 11, 2016**, GGRA's held its second annual conference in San Francisco. The Program says "[t]he San Francisco Bay Area Restaurant Community is poised to lead the nation on solutions to the industry's most vexing problems." Vogler, Hoffman, and Sagaria presented on the opening panel, titled "The Tipping Point: A Year Later." USHG tweeted afterwards that it was "honored to share in the dialogue and learn from our west coast peers."

108. On **April 18, 2016**, Colicchio said during a Bloomberg interview that the no-tipping movement may succeed if a lot of restaurants switch:

> At Craft, if I were going to pay my servers an hourly wage that is on [a] par with what they're currently making, it would be in the neighborhood of $34 an hour. So back waiters or bussers in the range of $22. They're making a good wage because of tips. Now, we do away with tips. The only way to fund that would be through raising prices. If the average tip is about 20 percent, we still have to raise prices 23 percent, because then you're going to push up wages for everyone else. If I were to do it tomorrow, it puts me at a competitive disadvantage to someone who is just shopping online looking at prices. If everyone does it, then I think we'll see some change.
> The younger generation, millennials who are going out to eat, they're used to not leaving tips. If you look at companies like Uber, I love the fact that I can walk out of the car and not worry about a tip. So I think it's going to change, and I think 10 years from now we're going to look back and go, "Oh, God, do you remember when we used to tip?" Just like now we say, "Remember when you used to smoke in a restaurant?"

109. On **April 28, 2016**, USHG implemented hospitality included at North End Grill.

110. In or around **May 2016**, American Express released a survey of 503 randomly sampled U.S. restaurants. Eighteen percent had adopted a gratuity-free model, 29 percent said they plan to adopt a gratuity-fee model, 17 percent said they may do so if other restaurants followed suit, and ten percent were undecided.  Twenty-six percent said they had no present intention to end tipping.

111. On **May 1, 2016**, USHG sponsored a "talk and open house" at its GreenRiver restaurant in Chicago titled "Tipping the Scale: Wages, Workplace Culture and the Gratuity-Free Future." Sagaria presented and Vogler was scheduled to present but his flight was delayed. Prior to the meeting, USHG tweeted "Join us. Industry leaders will be sharing tips on tipping."

112. On or about **May 4, 2016**, Joe's announced that it would start accepting tips again at fourteen of the eighteen restaurants that had eliminated tips in November 2015, because customers didn't like the no-tipping system and servers "voted with their feet" and quit. Bob Merritt, the CEO of Joe's parent, Ignite Restaurant Group, Inc. said "[w]e are going to try to figure out why it worked in some places and why not in others. The way we look at it is: We are really continuing the tests in place with where it works."

Upon information and belief, representatives of Joe's discussed its no-tipping plans with other restaurant groups at trade association meetings and elsewhere.

113. On **May 15, 2016**, Vogler said on PBS's <u>Weekend Edition</u> that he went back to tipping because of server attrition and because others who said they would switch did not switch:

> We were losing staff. Servers mostly … We were continuing to hire young new people, train them, and then they would get the set of skills necessary, and they would generally give notice and move to other restaurants in our community who were still on a traditional tip economy.
>
> It has been a tremendous amount of work, and we all remain very much in favor of it, ideologically, and I, like many, think it may be the way things are going. We just started to feel like an ideologue, insisting on this way of doing it when others in our

community that had said they would switch were not switching. So it really wasn't happening after a year the way we had thought it might.

Vogler said one mistake he made was to only increase prices by twenty percent, and that some restaurants "making the switch now are raising their prices by more like forty percent." Vogler further said profits increased when he ended tipping and he remains interested in implementing the policy in the future if more of his competitors do likewise. Vogler shared his learning and

On or about **June 4, 2016**, Chang ended his no-tipping policy at Nishi and lowered the menu prices. He said that "[t]his is by no means the end of the no-tipping discussion at Momofuku. But at this moment, we think a tipping model will benefit our guests and staff."

114. On **July 14, 2016**, USHG implemented hospitality included at Marta.

115. On **July 15, 2016**, Colicchio said on Larry King Live Now that "I just don't see why professional waiters who are working in great restaurants, why they want to be subject to someone's whim when it comes to paying them."

116. On **November 2, 2016**, USHG Chief Culture Officer Erin Morin was the keynote speaker at the 2016 Colorado Restaurant Association ("CRA") Conference in Denver. She discussed USHG's the implementation of hospitality included, the amount and manner in which prices were increased, impact on employee compensation and retention, difference in implementation in different restaurant types, communicating the change to employees and customers, economic modeling, mistakes made and lessons learned, etc. She showed the audience an USGH produced, three-part animated video on the history of tipping, the economics of tipping, and investing in the future with hospitality included. She said her biggest regret is that hospitality included was not implemented sooner. She said that USHG held a number of town halls with "colleagues" (i.e., competitors) to educate them on best practices. She said that The Modern was selected as the first to implement hospitality included because it has three different

concepts within one business – the bar room with a more casual type of service and menu, the formal dining room, and a private dining room for large events. Also, The Modern customers are less price-sensitive as compared to customers at some other USHG restaurants, and The Modern had one of the strongest leadership teams who could "figure this out."

In a Q&A, Beth Gruitch, CRA representative and co-founder of Denver's Crafted Concepts restaurant group, said to Morin -- "what an honor and what a wealth of knowledge. … It's been quite the journey for you all and you know we're about to embark on [hospitality included] here in Colorado a little bit so we're kind of tip toeing around these things …"

117.   On or about **November 10, 2016**, USHG settled for $700,000 a class action alleging it unlawfully required tipped employees to share their tips with non-customarily tipped employees including managers.

118.   On **November 16, 2016**, a hospitality conference was held in Brooklyn titled "Hospitality Included: One Year Later" to discuss "trial and error." The panel included Adler, Tarlow and Dino Laverini, USHG's Director of Operations.

119.   On **December 1, 2016**, Gramercy Tavern implement hospitality included.

120.   On **December 12, 2016**, Meyer discussed his decision to end tipping on a Motley Fool podcast:

It came about, really, for a number of reasons. It's something I've thought about, really, for 20 years, because I just think that it's a crazy system that never should have started in the first place. It was a system that started literally the day after slavery was abolished in America and two different industries, the restaurant industry and the Pullman train car industry, successfully petitioned the government to allow for nonpayment of part of the workers because they proved that they could get their customers to pay those people instead.

And the notion that a tip is actually an indicator or a predictor of the kind of service that you are going to get is also ludicrous, because the implication is that the tipping system prevents bad service, because the waiter or waitress is afraid that you're going to stiff them, which is already an adversarial and negative connotation.

But for anyone who's ever bad service, obviously the tipping system didn't prevent it. And then what it encourages is one of two things -- either trying to punish the server with a bad tip, which feels horrible because how do you know that the food took too long because of the waiter? How do you know that wasn't something that happened in the kitchen? Or how do you know that it wasn't because another table was late getting to the restaurant and the kitchen got backed up. So it's a completely false predictor and/or reward or punishment system for service.

And then furthermore, the worst part of it today is that because by law tips are not legally able to be shared with cooks in the kitchen, what it means is that you've created a huge disparity between what a tip-eligible person can make and what a non-eligible person can make. And so we've had, in the 30 years I've been in the restaurant business, about a 250% increase in compensation for tipped employees and about a 25% increase for non-tipped employees.

And that's horrible and it's unconscionable to say in our culture we care for our employees first, but we only care for part of our employees. It would be like if you went to a football game and you paid the offense 10 times as much as you paid the defense, and then you expected halftime to be Kumbaya. It's just that people don't feel good.

So we decided to take things into our own hands and get rid of it. And we think we need to do it for the very sustainability of our restaurants in a city where every time menu prices go up (which they do, because real estate continues to go up, health insurance goes up, labor, minimum wage keeps going up). Every time that goes up in a tipping restaurant and you have to tip on top of higher menu prices, the disparity between what a tipped employee and a non-tipped employee just increases.

And so we decided instead of complaining about it, or saying, "Well, that's horrible, but that's just the way it is, that's the system." Whoever wrote the rule that we can't address the system and correct it ourselves?

121.  On **January 2, 2017**, Meyer said that "tipping is actually one of the biggest hoaxes ever pulled on an entire culture, the American culture. … There's just nothing good about it."

122.  On or about **January 4, 2017**, Boulder, CO restauranteur Bobby Stuckey said that "hospitality included … will end up being one of the biggest game changers in the industry. While it is going to be hard to execute, it will in the long run be the best for our fun but crazy industry."

123.  On **January 17, 2017**, Meyer said that profits at USHG restaurants implementing a no-tipping policy dropped initially (contrary to what he had said earlier), but "came back up" as the managers learned to "operate under a new economy."

124. In and around **February 2017**, the NYC Hospitality Alliance has lobbied New York City government officials to allow restaurants to impose surcharges. The City directly benefits from the conspiracy through greater tax revenues because sales tax is not collected on tips but is collected on increased prices or surcharges.

125. On **March 5, 2017**, Sagaria presented on hospitality included at the Charleston Wine and Food Exposition ("CWFE"). Sagaria said that restaurants need to switch to a service-included model and that a "policy mandate" to include service in pricing would help stem the flow of servers to other restaurants. He further said "we need to figure it out now or there won't be a tomorrow" and that there is no one-size-fits-all model and within USHG they employ different modes of implementation at different restaurants. A conference summary says that tipping "represents a large, culturally engrained power dynamic that's difficult for any one restaurant to change. If we are really committed to finding a way to reduce the wage and power disparity in our restaurants, build continuity and sustainability into the business and employment model, and treat everyone fairly, and we agree that abolishing tipping is the way to do that, it may take the entire industry … to get behind it."    Following the conference, Sagaria tweeted "Thank you for a thought provoking and timely dialogue on #HospitalityIncluded" and "TY for continuing the conversation! We can all agree something needs to change. The biggest question is how our industry makes that change." CWFE tweeted in response: "Some doing different models during the day – counter service then table service at night. No one way to tackle."

126. On **March 27, 2017**, RAISE hosted the Diners United and Tipped Workers Resource Center Conference in D.C. Participants discussed "business practices and strategies to promote the High Road to profitability," including, upon information and belief, the strategy of eliminating tipping and increasing prices.

127. On **March 28, 2017**, Sagaria participated in a "dynamic dialogue" on hospitality included sponsored by the Chef Action Network, a national association of restaurant owners.

128. On or about **June 6, 2017**, Sagaria said that switching to hospitality included is like "opening a restaurant all over again," but USHG remains committed to implementing hospitality included at its remaining NYC restaurants.

129. On **June 16, 2017,** Meyer and Sagaria spoke about hospitality included at the 2017 Food and Wine Classic in Aspen, Colorado. Meyer purportedly said "we have to stop blaming the tipping system for cooks not getting paid well. You can pay people the way you want to pay people …"

130. On **July 20, 2017**, Sagaria presented on Hospitality Included to bar and restaurant owners and managers at the 2017 Tales of the Cocktail festival in New Orleans. He reportedly told the audience that prices on many menu items increased by 40% following the implementation of hospitality included.

131. On **July 24, 2017**, Meyer said during an interview that he remains committed to hospitality included, and that "I think it's inevitably gonna be part of how restaurants do business, I don't know how long it's going to take to get there, I think some have wanted to do it because from a philosophical standpoint they completely embrace it but from a mathematical and/or emotional standpoint in terms of leadership they haven't quite figured out how to do it." He said the first time patrons experience it "there is actually a moment where you have sticker shock …" He said that he is "sad when a restaurant earnestly tries it and cannot figure out the math." He said that "one of the worst things about tips, it's a drug, and people cannot get off the drug, you start waiting tables as a tipped employee usually to put yourself through some other thing you are pursuing, and you make so much money … that you end up waking up twenty years later and your career that you were first interested in passed you by …" Meyer said that he believes in 10-15 years, no tipping will be the "industry norm."

132. As of the date of this complaint, at least eight of USHG's restaurants have implemented hospitality included: Café 2 at MOMO, Café Marchio, Daily Provisions, Gramercy Tavern, Maialino, Marta, Martina, North End Grill, The Modern, and Union Square

Café. USHG's website says that "our other New York restaurants will continue the change throughout 2017."

133.  Meyer is scheduled to speak to restaurateurs about hospitality included on **October 9, 2017**, at the Colorado Restaurant Association's annual Colorado Restaurant Show in Denver.

134.  Moran and Sagaria are scheduled to speak on hospitality included at the National HR in Hospitality Conference and Expo in Las Vegas in **March 2018**.

135.  Switching to a hospitality-included model is a complex process. According to an industry consultant:

> Minimum wage hikes are on the horizon for many of our clients and this changes everything for the restaurant industry. Menu prices must go up and tips could possibly be a thing of the past. Our online resources and staff are here to help you determine the best steps to take to maintain a profitable business … If the hospitality included model is one that you are exploring, then you likely realize the necessity to reevaluate and devise new budgets, a new business plan, and even a new break-even analysis. Revisiting this part of your business may be reminiscent of when you first opened your doors. Not to worry. [Our] leading teams comprised of industry experts in restaurant accounting, menu engineering, and labor management will help guide you through the transition.

136.  Competing restaurants in other locations have agreed to implement a no-tipping model. For example, in Portland, Oregon in the summer of 2016 a group of restaurants ended tipping and increased prices by about 18 percent, and used the gratuity-free logo referenced in Par. 82, above. One of the owners was quoted saying: "My overall hope is that this will slowly evolve in the restaurant industry. … A lot of restauranteurs are talking about this right now. Almost every restauranteur I know this is one of the first things on their mind."  And it was reported that in Minneapolis in or around February 2017 a "who's who of local restaurateurs" met "in a back room … in a really out of the way space" and discussed no-tipping/higher prices as a response to minimum wage hikes. One attendee reportedly said that "it seems like they are trying to keep it quiet."

137. There is evidence that dozens of restaurants in San Francisco "collectively" agreed to impose surcharges after the city enacted legislation in 2008 requiring certain employers to provide health insurance for their employees. Trau Normand and Bar Agricole currently charge a five percent surcharge purportedly "to support San Francisco employer mandates."

138. In 2014 a group of Los Angeles restaurants agreed to add a three-percent surcharge on all sales, purportedly in response to the federal Affordable Care Act. One of the LA conspirators reportedly said he was "inspired by the Northern California pioneers" and that he emailed a group of "like-minded restaurant owners" to see whether they could "plan a course of action together." Another of the LA conspirators was reported saying that "we decided it would be a good thing to do as a group. … Usually when lots of people do things it's easier to make change."

139. Upon information and belief, much of defendants' price-fixing activity has been conducted in secret. Formal discovery should reveal additional evidence of price fixing and defendants' real motives and efforts to conceal their illegal conduct.

## VI.   CLASS ALLEGATIONS

140. This suit is brought as a class action pursuant to Rule 23, Fed.R.Civ.Pro. The class is defined as:

All persons who purchased food or drinks from a defendant restaurant during the time period the restaurant had in place a no-tipping policy.

Excluded from the class are: i) past or present owners, officers, managers, or corporate employees of defendant restaurants, ii) past or present owners, officers, managers, or corporate employees of any other restaurant that has instituted a no-tipping policy, iii) past or present officers and employees of GGRA or the NYC Hospitality Alliance, iv) past or present owners, officers, managers, or corporate employees of any restaurant or other business that is or was a member of GGRA or the NYC Hospitality Alliance, v) individuals identified by name in this Complaint as supportive of the no-tipping movement, vi) individuals who attended any of the meetings or conferences referenced in this Complaint, vii) individuals who attended any other industry meetings or conferences that concerned the no-tipping movement, and viii) the judge and magistrate assigned to this matter, and their law clerks.

141. The alleged class is so large that joinder of all members is impracticable.

142. Questions of fact and law common to all class members predominate over questions affecting only individual class members. Among the common factual and legal questions:

   a. Whether the defendants agreed with one another and/or with others to increase prices at their establishments.

   b. Whether the defendants agreed with one another and/or with others to end tipping at their establishments.

   c. The amount of the agreed-upon price increases.

   d. Whether the defendants implemented the agreed-upon price increases, and when.

   e. The identity of co-conspirators not made defendants in this action.

   f. The specifics of meetings and other communications in furtherance of the charged conspiracy (e.g., date, location, participants and witnesses, who said what).

   g. Actions taken to conceal the conspiracy.

   h. Actions taken to portray the conduct as legal and in the public interest.

   i. Whether the class incurred an antitrust injury, and

   j. The proper measure of injury and damages.

143. These common issues are central to the litigation. The only significant factual question not common to the class as a whole is the specific amount of damages each class member incurred. The amount of damages can be determined from credit card records and other evidence of purchases.

144. The claims of the class representatives are typical of the claims of the putative class members. There are no unique defenses that apply to the class representatives that do not apply equally to other class members.

145. The class representative will fairly, adequately, and diligently represent and protect the interests of the class.

146. The class representative does not have any interest in conflict with or antagonistic to the interests of other class members.

147. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and could overburden the courts. Further, individual cases may be impractical and too costly relative to the potential recovery. In the absence of a class action, defendants may retain the benefits of their wrongful conduct and the charged conspiracy may continue unabated.

148. Defendants have acted on grounds generally applicable to the putative class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

149. The class representative has retained competent counsel experienced in class action litigation and antitrust litigation.

## VII.    CAUSES OF ACTION

### COUNT 1: VIOLATION OF FEDERAL SHERMAN ACT
### (15 U.S.C. §1)
### (Against All Defendants)

150. The preceding paragraphs are re-alleged in full and incorporated herein.

151. The Sherman Act makes unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations …" 15 U.S.C. Section 1.

152. Horizontal price fixing is a *per se* violation of the Sherman Act, and the purported reasonableness of the fixed price or claimed motive of the participants is immaterial.

153. Each defendant is jointly and severally liable for the entirety of the damages caused by the conspiracy.

154. As discussed herein, beginning in or around the fall of 2014, defendants knowingly negotiated formed, entered into, and joined the charged price-fixing conspiracy, and subsequently put the agreement into effect by ending tipping and increasing prices at their establishments.

155. The charged conspiracy has and continues to impact and affect interstate commerce, and has occurred and continues to occur within the flow of interstate commerce. The defendants are located in California and New York. Representatives of USHG travelled to San Francisco, Austin, Charleston, Denver, Chicago and other locations to facilitate the conspiracy. Vogler traveled to Chicago to facilitate the conspiracy. A representative of GGRA traveled to New York City in furtherance of the conspiracy. Tarlow developed a "gratuity-free" logo used by restaurants in New York, California and Oregon among other places. Upon information and belief, some restaurant owners who attended USHG town halls in New York City do business outside the State of New York. Conspirators in California communicated with conspirators in New York City via electronic means and social media. Many members of the putative class are domiciled in a state other than the state where they incurred damages.

156. The class representative and putative class members were overcharged on their purchases from defendant restaurants as a result of the conspiracy, and are entitled to recover treble their actual damages, and costs and reasonable attorneys' fees pursuant to the Clayton Act, 15 U.S.C. Section 15(a).

157. The charged conspiracy is ongoing and thus injunctive relief requiring defendants to withdraw from the conspiracy, is necessary, appropriate and in the public interest.

**COUNT 2: VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C. §§ 1962 *et seq*.)**
**(Against All Defendants)**

158.   The preceding paragraphs are re-alleged in full and incorporated herein.

159.   Defendants and their co-conspirators voluntarily and intentionally engaged in a scheme to defraud another of money and engaged in specific fraudulent acts pursuant to the scheme with intent to defraud.

160.   On multiple occasion, defendants and their co-conspirators used the United States mail and interstate wire communications, including telephone calls, emails, and social media postings, for the purpose of executing and furthering the scheme. Some of said communications were between California defendants and New York defendants.

161.   The charged conspiracy constitutes an enterprise within the meaning of 18 U.S.C. § 1962.

162.   Defendants and their co-conspirators participated in the conspiracy through a continuous and related pattern of racketeering activity, including multiple violations of the federal mail fraud statute (18 U.S.C. § 1341), and/or the federal wire fraud statute (18 U.S.C. § 1343).

163.   The class representative and the defined class were injured in their property and person by reason of defendants' racketeering activities, in that they were overcharged on food and drink purchases from defendant establishments and their co-conspirators.

**COUNT 3: VIOLATION OF CALIFORNIA CARTWRIGHT ACT**
**(California Business and Professions Code § 16720, et seq.)**
**(Against California Defendants[6])**

164.   The preceding paragraphs are re-alleged in full and incorporated herein.

---

[7]. The California defendants are: Trou Normand, Bar Agricole, Vogler, Camino, Moore, Hopelain, Duende, Canalas, Comal, Paluska, Hoffman, and Golden Gate Restaurant Association.

165. Defendants entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade as described above.

166. Defendants' conduct is a violation of California Business and Professions Code Sections 16720, *et seq*., also known as the Cartwright Act.

167. The class representative and putative class members were overcharged on their purchases from defendant restaurants as a result of the conspiracy, and are entitled to recover treble their actual damages, and costs and reasonable attorneys' fees pursuant to the Cartwright Act.

168. The charged conspiracy is ongoing and thus injunctive relief requiring defendants to formally withdraw from the conspiracy is necessary, appropriate and in the public interest.

## COUNT 4: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (California Business and Professions Code §§ 17200, et seq.)
### (Against California Defendants)

169. The preceding paragraphs are re-alleged in full and incorporated herein.

170. Defendants' price-fixing conduct constitutes unfair competition and unlawful and fraudulent business acts and practices in violation of California Business and Professional Code Sections 17200 *et seq*.

171. Defendants intend by their actions to impair and injure competition between and among them, and to increase prices to the detriment of consumers, and to reduce and suppress wages to the detriment of their servers and other customarily-tipped employees.

172. Defendants' violation of the Cartwright Act constitutes a violation of California's Unfair Competition Law.

173. As a result of defendants' violations of the California Business and Professions Code Section 17200, they have unjustly enriched themselves at the expense of the class representative, the defined class, and servers and other customarily-tipped employees.

The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

174. To prevent this unjust enrichment, defendants should be required, pursuant to Business and Professions Code Sections 17203 and 17204, to disgorge their illegal gains for the purpose of making full restitution to all injured class members. Defendants should also be permanently enjoined from continuing their violations of the California Business and Professions Code.

175. The acts and business practices alleged herein constitute a continuing course of unfair competition by means of unfair, unlawful, and fraudulent business acts and practices within the meaning of California Business and Professions Code Sections 17200, *et seq.*, including, but not limited to, violations of the Cartwright Act.

### COUNT 5:  VIOLATION OF NEW YORK DONNELLY ACT
### (New York General Business Law § 340)
### (Against New York Defendants[7])

176. The preceding paragraphs are re-alleged in full and incorporated herein.

177. The Donnelly Act provides that contracts, agreements, arrangements, or combinations in restraint of trade are unlawful.  The Act is interpreted consistent with the Sherman Act with respect to horizontal price-fixing agreements.

178. The evidence indicates that the New York defendants engaged in unlawful price fixing by, *inter alia*:

    a.  Aiding and abetting the price-fixing activity in the California as discussed herein;

    b.  Meeting in secret with each other and with other restauranteurs and reaching a consensus to increase prices and end tipping at their establishments; and

---

[8.] The New York defendants are: USHG, Meyer, Sagaria, Crafted Hospitality, Colicchio, Momofuku, Chang, Marlow, Tarlow, Happy Cooking Hospitality, Stulman, Huertas, Miller, Adler, Eleven Madison Park, Humm, Guidara, NYC Hospitality Alliance, and Rigie.

c.  Providing assistance and "best practices" to restaurants in New York and elsewhere interested in switching to a no-tipping model; and

d.  Increasing prices and eliminating tipping as agreed upon.

179.  The violation of the Donnelly Act has caused and continues to cause pecuniary injury and damages to the defined class and to servers and other customarily tipped employees who work or have worked at defendant restaurants in New York and California.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his behalf and on behalf of the defined class pray that this Court enter judgment on his behalf and on behalf of the class and order that:

1.  The Court has personal jurisdiction over all named defendants;

2.  This action is certified as a class action pursuant to Federal Rule of Civil Procedure 23, and the defined class is as stated in the Complaint;

3.  Defendants shall pay the costs and expenses of a court-approved notice program designed to notify putative class members of their claims;

4.  The charged conspiracy violates the Sherman Act, the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act;

5.  Plaintiff and the class members shall recover threefold their actual damages, in addition to pre-judgment and post-judgment interest, costs and reasonable attorneys' fees; and

6.  Defendants must withdraw from the conspiracy and, in a manner and form approved by the Court, notify their co-conspirators and appropriate law enforcement officials that they have done so.

The Court should make further findings and award further relief as is just and proper and in the public interest under the circumstances.

1

**DEMAND FOR JURY TRIAL**

2

3

Pursuant to Federal Rule of Civil Procedure 38(b)(1), plaintiff hereby demands a trial by

jury on all matters triable by jury.

4

5

**LAW OFFICES OF ANDREW WOLFF, P.C.**

6

Date:  October 6, 2017                          /s/

7
                                        David Lavine
                                        Attorneys for Plaintiff
8                                       TIMOTHY BROWN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28