1   Judith A. Zahid (215418)
    (jzahid@zelle.com)
2   **ZELLE LLP**
    44 Montgomery Street, Suite 3400
3   San Francisco, CA 94104
    Telephone:   (415) 693-0700
4   Facsimile:   (415) 693-0770

5   Jennifer Duncan Hackett (*pro hac vice*)
    (jhackett@zelle.com)
6   **ZELLE LLP**
    1775 Pennsylvania Avenue, NW, Suite 375
7   Washington, D.C. 20006
    Telephone:   (202) 899-4100
8   Facsimile:   (612) 336-9100

9   *Counsel for Defendants 140 NM LLC,*
    *d/b/a Trou Normand; Bar Agricole, LLC,*
10  *d/b/a Bar Agricole; Thaddeaus M. Vogler;*
    *Hopemoorelain, LLC, d/b/a Camino;*
11  *Russell Moore; Allison Hopelain;*
    *Es Verdad, LLC, d/b/a Comal;*
12  *John Paluska; Andrew Hoffman*

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                    **OAKLAND DIVISION**

16

17  TIMOTHY BROWN,                  )  CASE NO. 4:17-CV-05782-JSW
                                    )
18              Plaintiff,          )
                                    )  **DEFENDANTS' MOTION TO DISMISS**
19      v.                          )  **PURSUANT TO FED. R. CIV. P. 12(b)(1) AND**
                                    )  **12(b)(6)**
20  140 NM LLC, *et al.*,           )
                                    )  Date:      April 12, 2019
21              Defendants.         )  Time:      9:00 a.m.
                                    )  Courtroom:  5
22                                  )  Judge:     Hon. Jeffrey S. White
                                    )
23                                  )  Action Filed: October 6, 2017
                                    )
24  _____ )

25

26

27

28

1

# **TABLE OF CONTENTS**

2

**Page**

3 NOTICE OF MOTION AND MOTION ................................................................................1

4 RELIEF REQUESTED...........................................................................................................1

5 STATEMENT OF ISSUES TO BE DECIDED .....................................................................1

6 MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

7 I.  INTRODUCTION ......................................................................................................1

8 II.  STATEMENT OF ALLEGATIONS ..........................................................................3

9   A.  Parties...............................................................................................................3

10   B.  Plaintiff's Claims .............................................................................................3

11 III. SUMMARY OF ARGUMENT ...................................................................................5

12 IV. ARGUMENT................................................................................................................5

13   A.  Plaintiff Fails to Allege Article III Standing....................................................5

14   B.  Plaintiff Again Fails to Plausibly Allege Antitrust Claims..............................7

15   C.  Plaintiff's Cartwright and UCL Claims Also Fail ...........................................9

16 V.  CONCLUSION...........................................................................................................11

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page

3 <u>Cases</u>

4 *Bates v. United Parcel Serv.*,
511 F.3d 974 (9th Cir. 2007) ............................................................................................6

5

6 *Brown v. 140 NM LLC*,
Case No. 17-cv-05782-JSW, 2019 WL 118425 (N.D. Cal. Jan. 7, 2019) .................. passim

7 *In re Capacitors Antitrust Litig.*,
154 F. Supp. 3d 918 (N.D. Cal. 2015) ...........................................................................5, 6

8

9 *Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ........................................................................................................8

10 *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*,
No. SACV 12-2146 JGB (MLGx), 2013 WL 3337676 (C.D. Cal. June 28, 2013) .............9

11

12 *In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...........................................................................6

13 *Gaitan v. Mortg. Elec. Registration Sys.*,
No. EDCV 09–1009 VAP (MANx), 2009 WL 3244729 (C.D. Cal. Oct. 5, 2009) ............10

14

15 *Gerlinger v. Amazon.com Inc.*,
526 F.3d 1253 (9th Cir. 2008) .........................................................................................5

16 *Glen Holly Entm't, Inc. v. Tektronix Inc.*,
343 F.3d 1000 (9th Cir. 2003) .........................................................................................8

17

18 *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
No. CV 07-00043 MMM (SSx), 2007 WL 4976364 (C.D. Cal. Oct. 29, 2007),
*aff'd*, 323 F. App'x 571 (9th Cir. 2009) ..........................................................................9

19

20 *Ismail v. Wells Fargo Bank, N.A.*,
No. 2:12-CV-01653-MCE, 2012 WL 5425175 (E.D. Cal. Nov. 6, 2012) ..........................10

21 *Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ......................................................................................8, 9

22

23 *Krantz v. BT Visual Images, LLC*,
89 Cal. App. 4th 164 (2001) ..........................................................................................10

24 *LAI v. USB-Implementers Forum, Inc.*,
No. CV 14-05301-RGK (PJWx), 2014 WL 12600969 (C.D. Cal. Nov. 21, 2014) .............9

25

26 *Lewis v. Casey*,
518 U.S. 343 (1996) ........................................................................................................6

27 *Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................................5

28

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ........................................................................7

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................5

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ........................................................................9

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ....................................................................................5

*Stahl Law Firm v. Judicate W.*,
   No. C13-1668 TEH, 2013 WL 6200245 (N.D. Cal. Nov. 27, 2013)................7

*Walker v. USAA Cas. Ins. Co.*,
   474 F. Supp. 2d 1168 (E.D. Cal. 2007) ...........................................................9

**Federal Rules**

Fed. R. Civ. P. 12(b) ...............................................................................................1, 7

DEFENDANTS' MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(1) AND (12)(b)(6)
   iii   
CASE NO. 4:17-CV-05782-JSW

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 12, 2019, at 9:00 a.m., in Courtroom 5 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California 94612, Defendants 140 NM LLC, d/b/a Trou Normand; Bar Agricole, LLC, d/b/a Bar Agricole; Thaddeaus M. Vogler; Hopemoorelain, LLC, d/b/a Camino; Russell Moore; Allison Hopelain; Es Verdad, LLC, d/b/a Comal; John Paluska; and Andrew Hoffman ("Defendants") will, and hereby do, move the Court to dismiss the Second Amended Complaint (ECF No. 123) ("SAC") filed by Timothy Brown on January 29, 2019, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

This Motion is supported by the following Memorandum of Points and Authorities and all exhibits attached thereto, and the [Proposed] Order filed concurrently herewith, the pleadings and papers on file herein, and such other matters that may be presented to the Court at hearing.

**RELIEF REQUESTED**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendants request that this Court dismiss Timothy Brown's Complaint in its entirety.

**STATEMENT OF ISSUES TO BE DECIDED**

1. Does the Court have subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)?

2. Does Count 1 of the Complaint against Defendants for violation of Section 1 of the Sherman Act state a claim upon which relief can be granted?

3. Does Count 2 of the Complaint against Defendants for violation of California's Cartwright Act state a claim upon which relief can be granted?

4. Does Count 3 of the Complaint against Defendants for violation of California's Unfair Competition Law state a claim upon which relief can be granted?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On January 7, 2019, the Court dismissed Plaintiff's First Amended Complaint ("FAC") against all Defendants, and stated in its comprehensive decision, "It is not clear to the Court how

Brown will be able to allege a plausible price fixing conspiracy that consists of just four restaurants, given the number of restaurants in the Bay Area. However, because the Court cannot say it would be futile, it will grant Brown a final opportunity to amend the complaint solely against the California Defendants." *Brown v. 140 NM LLC*, No. 17-cv-05782-JSW, 2019 WL 118425, at *13 (N.D. Cal. Jan. 7, 2019).

Given the Court's clear guidance, one would expect the SAC to include new and improved allegations against Defendants that would answer the Court's question. Instead, Plaintiff's new "facts" not only fail to demonstrate a plausible price-fixing conspiracy, but establish as a matter of law that Plaintiff has no Article III standing. In its previous opinion, the Court found that Plaintiff satisfied the Article III standing requirement by alleging that he suffered damages by paying more at a New York restaurant than he would have in the absence of a no-tipping policy. *Id.* at *3. Now, however, Plaintiff concedes that, depending on some undefined notion of the "quality of his dining experience," he pays the same or ***more*** in tips than the 20% service charge about which he complains. SAC ¶ 33. Plaintiff therefore no longer asserts that he paid more at any defendant restaurant due to the "no-tipping policy" than he otherwise would have in the absence of the alleged conspiracy.

Plaintiff's other edits consist of omitting most (but not all) references to the former, now dismissed, New York restaurant defendants, adding a few conclusory subheadings, and making vague references to other restaurants in other parts of the country (including the dismissed New York restaurant defendants), none of which solve the problems which led to the Court's dismissal of the FAC.[1] Plaintiff's supposed "conspiracy" now amounts to a few discussions among four restaurants out of several thousand in the Bay Area, two of which abandoned their no-tipping policy soon after they adopted it (and from which Plaintiff made zero purchases). The Court has already considered and rejected these allegations.

Finally, Plaintiff again fails to show that Defendants' conduct violates California's consumer protection statute for the same reasons that his antitrust claims fail. Plaintiff has not

---

[1] For the Court's convenience, Defendants attach as Exhibit 1 a document comparing the FAC to the SAC.

1  demonstrated that Defendants' actions were unfair to consumers, let alone unlawful or

2  fraudulent.  The Court should dismiss the SAC for the same reasons that it dismissed the FAC, as

3  well as for lack of standing.

4  **II.    STATEMENT OF ALLEGATIONS**

5        **A.    Parties**

6        Plaintiff Timothy Brown is an individual who purports to represent a nationwide class of

7  individuals "who purchased food or drinks from a Defendant restaurant as early as 2014 during

8  the period when any such restaurant had in place a no-tipping policy and consequently increased

9  its menu prices or added a surcharge."  (SAC ¶¶ 13, 66.)  As with the previous Complaints, the

10  SAC includes no information regarding Plaintiff's place of residence, although in previous

11  briefing, he admitted that he is a resident of Minnesota.  *Brown*, 2019 WL 118425, at *3.  While

12  Plaintiff still names all four Bay Area restaurants from his previous Complaints as Defendants,

13  he only alleges that he made purchases at two of those restaurants, one in Oakland and one in

14  Berkeley, both on the same day in 2017 and at no other time.  (SAC ¶ 32.)  He does not allege

15  facts about what he ate at either restaurant, and only alleges the amount he paid ($10.93) at one

16  of them.  (SAC ¶ 32.)

17        The SAC names nine Defendants, including four restaurants in San Francisco, Oakland,

18  and Berkeley and five individual restaurant owners in San Francisco, Oakland, and Berkeley.

19  (SAC ¶¶14-22.)  Plaintiff also adds a sentence about various other unnamed restaurants in other

20  cities across the country, but alleges no connection between these restaurants and Defendants.

21  (SAC ¶24.)

22        **B.    Plaintiff's Claims**

23        Plaintiff's claims in the SAC are a pared-down version of those found in the dismissed

24  FAC.  The specific allegations relating to Defendants are virtually identical to those in the

25  previous Complaint, and Plaintiff adds nothing new to bolster his conspiracy allegations, which

26  are now confined to four Bay Area restaurants.  As he did before, Plaintiff alleges that

27  Defendants conspired to raise menu prices, either by increasing menu prices or adding

28

surcharges.[2]  (SAC ¶2.)  As before, the SAC alleges no evidence or any details about an unlawful agreement among Defendants regarding the implementation of tipping policies, and in fact, Plaintiff deletes a number of the allegations contained in the FAC.

Because the New York restaurants were dismissed as defendants, Plaintiff now alleges a narrow "conspiracy" among four small restaurants in the Bay Area, two in San Francisco, one in Oakland and one in Berkeley (although Plaintiff again attempts to bring in the New York restaurants, apparently as unnamed co-conspirators).  (SAC ¶¶2, 30, 31, 81.)  Plaintiff now alleges that he tips based on the quality of service at the restaurants in which he dines (SAC ¶33), but makes no allegations regarding the quality of service at either of the Defendant restaurants where he purchased food (both purchases were on the same day and Plaintiff appears to have done so solely for purposes of alleging a purchase as opposed to choosing those restaurants for a dining experience).  Further, as before, the Complaint's allegations amount to public conversations (the same as were cited in the FAC) among restaurant owners about the merits of a no-tipping policy at, for example, trade association meetings, in the media, and in the same emails to one another referenced in the FAC.  (*See, e.g.*, SAC ¶¶35, 37, 40, 51.)  The Complaint offers no new allegations regarding Defendants, and admits that two of the four Defendants abandoned the "no-tipping policy" at least three years ago.[3]  SAC ¶ 62.

Based on these allegations, which the Court already found insufficient to defeat a motion to dismiss for failure to state a claim, Plaintiff asserts claims for price-fixing in violation of Section 1 of the Sherman Act (SAC ¶¶ 77-83) and the California Cartwright Act (SAC ¶¶ 85-88); and unfair competition in violation of California's Unfair Competition Law (SAC ¶¶ 90-95).  As before, none of those claims has any merit.

---

[2] Plaintiff devotes one paragraph of the SAC to a vague allegation that "dozens" of San Francisco restaurants are also "colluding on 'health care' surcharge."  (SAC ¶ 65.)  Because Plaintiff does not include any details about this unsubstantiated allegation, nor does he allege injury or damages for this supposed conspiracy, Defendants do not address it further.

[3] Plaintiff fails to mention that one of the four Defendant restaurants, Camino (formerly in Oakland), was permanently closed prior to his filing of the SAC.

III.    **SUMMARY OF ARGUMENT**

Plaintiff presents the Court with no new allegations that are sufficient to defeat a motion to dismiss.  Plaintiff alleges nothing new with respect to the four restaurant Defendants, two of which no longer utilize the "no-tipping" policy.  There are no allegations in the SAC that demonstrate a conspiracy among the Defendants to violate the antitrust laws.  Further, Defendant cannot demonstrate injury because, as the Court previously held, he does not allege that he would have paid less than the 20% surcharge he paid at one of the restaurants (which he visited on one occasion in 2017).

IV.    **ARGUMENT**

A.    **Plaintiff Fails to Allege Article III Standing**

Before proceeding to the merits of Plaintiff's claim, the Court must first determine whether Plaintiff has sufficiently established Article III standing.  *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (standing is a "jurisdictional prerequisite"); *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 924 (N.D. Cal. 2015) (standing is a "threshold inquiry" for any case, including class actions).  Plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  In other words, Plaintiff must affirmatively plead facts demonstrating "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) ("plaintiff bears the burden of demonstrating that her injury-in-fact is 'concrete, particularized, and actual or imminent'").

Plaintiff also again seeks injunctive relief.  As this Court stated when dismissing Plaintiff's request for injunctive relief in the FAC, "To show he has standing to pursue injunctive relief, Brown must 'demonstrate that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with a 'sufficient likelihood that he will again be wronged in

a similar way.'"  *Brown*, 2019 WL 118425, at *3 (*quoting Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotations omitted)).

As a class representative, Plaintiff must show that he personally has been injured, not that injury has been suffered by some unnamed class member whom Plaintiff claims to represent.  *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (dismissing state law claims based on law of states where no named plaintiff resided) (quoting *Lewis v. Casey*, 518 U.S. 343, 347 (1996)).  The named plaintiff must have standing with respect to *each* claim the class representative seeks to bring.  *Ditropan,* 529 F. Supp. 2d at 1107 (citations omitted).  Otherwise, the Court "lacks jurisdiction over the claim and must dismiss it."  *Capacitors Antitrust Litig.*, 154 F. Supp. 3d at 925.

This Court dismissed Plaintiff's request for injunctive relief, stating, "Brown is a resident of Minnesota, and he does not allege that he intends to dine at any Defendants' restaurants in the immediate future."  *Brown*, 2019 WL 118425, at *3.  Plaintiff alleges no new facts in the SAC that would cause the Court to revisit its ruling, and his request for injunctive relief should again be dismissed.  Indeed, Plaintiff alleges only that he dined at two of the four Defendant restaurants on one occasion, both on the same day in 2017, one of which is now permanently closed.

With respect to standing to assert a claim for damages, the Court previously held that Plaintiff established standing to seek damages because he "alleges that he paid $5.00 more for a fried-chicken sandwich than he would have absent the alleged price fixing conspiracy."  *Id.*  That allegation, of course, related to Plaintiff's experience at a ***New York*** restaurant.  Although Plaintiff still includes the allegation regarding the $21 chicken sandwich he bought in New York, that fact is irrelevant as to the California Defendants.  Instead, Plaintiff now asserts that he has standing because he purchased food from two Defendants, Comal and Camino.

- With regard to Comal, Plaintiff does not state how much he paid, only that a 20% service charge was added to the bill in lieu of a tip.  (SAC ¶32.)  He does not allege what he bought or what he would have tipped but for the service charge.

- With regard to Camino, Plaintiff alleges he bought a $10.93 meal, that service was included and that there was no tip line on his bill. *Id.* Plaintiff does not state whether Camino's service surcharge was 20% or some other amount.

Plaintiff then states that he "generally tips in an amount tied to the quality of his dining experience, sometimes at 20%, but often less, and occasionally more" (SAC ¶ 33), but makes no allegations regarding the quality of service at either Camino or Comal beyond making a documentary record for his complaint. Of course, Plaintiff can offer no allegations regarding the other two Defendant restaurants (Bar Agricole and Trou Normand) where he chose not to dine and, instead, reports that they both went back to tipping in 2016. (SAC ¶ 62.)

These allegations come nowhere near the level of specificity needed to establish a concrete and particularized legal harm. Because Plaintiff fails to meet his burden of alleging standing, the Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). *See Stahl Law Firm v. Judicate W.*, No. C13-1668 TEH, 2013 WL 6200245, at *3 (N.D. Cal. Nov. 27, 2013) (lack of Article III standing requires dismissal for lack of subject matter jurisdiction) (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)).

## B.  <u>Plaintiff Again Fails to Plausibly Allege Antitrust Claims</u>

Even if the Court finds that Plaintiff has standing, the Second Amended Complaint must be dismissed for failure to state a claim. In dismissing Brown's FAC, the Court stated:

> Because Brown alleges the California Defendants raised menu prices (by some unspecified amount) and added a 20% service charge to their menus, it is not clear to the Court which prices he contends are fixed. If it is the menu prices, the email he relies on does not contain allegations about increasing menu prices. Brown does not include any other allegations from which the Court can infer that the California Defendants agreed to increase menu prices, let alone agreed to a uniform increase in prices. If it is the service charge, the Court concludes he has not alleged facts showing he was injured by that practice because he does not allege he would have paid less than 20% as a tip.

*Brown*, 2019 WL 118425, at *13.

As before, "Brown must allege facts that show (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities

intended to harm or restrain trade or commerce among the several States, . . . (3) which actually injures competition." *Id.* at *10 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).  "Additionally, Brown must allege facts that show he suffered antitrust injury, *i.e.*, loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.* at *11 (*quoting Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (internal quotes omitted); *see also Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007-08 (9th Cir. 2003).  Plaintiff again fails to do so.

Now that the New York restaurants have been dismissed with prejudice, Plaintiff must allege sufficient facts to show that four Bay Area restaurants (only two of which are in the same city) entered into a price-fixing conspiracy that restrained competition not just in California, but in other states as well, and injured Plaintiff.  He does not even come close.  Plaintiff's allegations regarding a conspiracy that reaches beyond California amount to (1) a few vague and conclusory sentences about unnamed restaurants in other states; and (2) many of the same allegations regarding the New York defendants that this Court considered and dismissed.  Further, Plaintiff has again failed to plausibly allege that "Defendants agreed to increase menu prices, let alone agreed to a uniform increase in prices."  *Brown*, 2019 WL 118425, at *13.   Nor has Plaintiff alleged facts showing he was injured by any service charge "because he does not allege he would have paid less than 20% as a tip."  *Id*.  Indeed, Plaintiff now admits that he sometimes tips more than 20% and sometimes exactly 20%, based on the "quality of his dining experience."  (SAC ¶ 33.)

As stated above, Plaintiff's new allegations in the SAC are few.  He includes a conclusory allegation that a "significant number" of restaurants (in the Bay Area and elsewhere), instead of a "handful," (FAC ¶2) conspired to increase prices by "around" twenty percent, "either by adding a surcharge or increasing menu prices."  (SAC ¶ 2.)  He supplements a few additional sentences from the same emails among the Bay Area restaurants that the Court found insufficient to defeat a motion to dismiss, none of which further his conspiracy allegations.  The rest of Plaintiff's new allegations are mostly conclusory statements with no factual support.

Plaintiff's vague and imprecise allegations of agreement are, as before, insufficient to state a conspiracy claim.[4]  *See, e.g.*, *Kendall*, 518 F.3d at 1048 (affirming dismissal because complaint "does not answer the basic questions:  who, did what, to whom (or with whom), where, and when?"); *LAI v. USB-Implementers Forum, Inc.,* No. CV 14-05301-RGK (PJWx), 2014 WL 12600969, at *4 (C.D. Cal. Nov. 21, 2014) (dismissing complaint because conspiracy claim was "nothing more than a legal conclusion"); *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, No. SACV 12-2146 JGB (MLGx), 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013) (dismissing complaint that did "not allege whether there were one or multiple agreements, the form those agreements took, who executed them, or when or where they were enacted"); *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV 07-00043 MMM (SSx), 2007 WL 4976364, at *10 (C.D. Cal. Oct. 29, 2007) (dismissing complaint because plaintiff did not allege when, how, or by whom the purported agreement was made, nor did plaintiff identify the parameters of the agreement), *aff'd*, 323 F. App'x 571 (9th Cir. 2009); *see also In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (rejecting at the pleading stage allegations of parallel conduct where Defendants adopted similar policies).

With respect to injury, the Court held that Plaintiff failed to show he was injured because he did not allege that he would have paid less in tips than the 20% service charge.  Instead of remedying that error in the SAC, Plaintiff doubles down and alleges that he sometimes pays more than 20%, sometimes 20% and sometimes less.  This is even less evidence of injury than the Court was presented with (and dismissed) in the FAC.  Plaintiff's failure to demonstrate that he (and competition) were injured is another reason for dismissing the SAC.

## C.   Plaintiff's Cartwright and UCL Claims Also Fail

As the Court previously found, the viability of Plaintiff's Cartwright Act and UCL claims hinge on the viability of the Sherman Act claim.  *Brown*, 2019 WL 118425, at *10 (citing *Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1174 (E.D. Cal. 2007)).  Because Plaintiff has

---

[4] Plaintiff again alleges a *per se* conspiracy, but as stated in Defendants' previous briefing, Plaintiff fails to allege either a *per se* or rule of reason claim.  Nothing in the SAC changes that analysis.

failed to plausibly allege a conspiracy among Defendants that caused him antitrust injury, those state law claims must also fail, as they did before.  This is especially the case because Plaintiff fails to bolster his state law claims with any additional allegations, instead choosing to plead identical allegations as he did in the FAC that the Court dismissed.  Because Plaintiff has again failed to allege a viable Sherman Act claim, his state law claims must also be dismissed.  *Ismail v. Wells Fargo Bank, N.A.*, No. 2:12-CV-01653-MCE, 2012 WL 5425175, at *5 (E.D. Cal. Nov. 6, 2012).

Since the Cartwright Act claim fails, Plaintiff's UCL claim also fails.  *See Gaitan v. Mortg. Elec. Registration Sys.*, No. EDCV 09–1009 VAP (MANx), 2009 WL 3244729, at *11 (C.D. Cal. Oct. 5, 2009) (plaintiff "cannot state a UCL claim based on those predicate violations, since he has not alleged any 'unlawful' activity"); *Krantz v. BT Visual Images, LLC*, 89 Cal. App. 4th 164, 178 (2001) (UCL claim must "stand or fall depending on the fate of the antecedent substantive causes of action").

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

1   **V.**      **CONCLUSION**

2        For the foregoing reasons, the Court should again dismiss Plaintiff's complaint for lack of

3   subject matter jurisdiction and for failure to state a claim.

4

5   DATED:  February 19, 2019                    Respectfully submitted,

6                                                By: */s/  Judith A. Zahid*_____
                                                     Judith A. Zahid (215418)
7                                                    (jzahid@zelle.com)
                                                     **ZELLE LLP**
8                                                    44 Montgomery Street, Suite 3400
                                                     San Francisco, CA 94104
9                                                    Telephone: (415) 693-0700
                                                     Facsimile:  (415) 693-0770
10
                                                     Jennifer Duncan Hackett (*pro hac vice*)
11                                                   (jhackett@zelle.com)
                                                     **ZELLE LLP**
12                                                   1775 Pennsylvania Avenue, NW, Suite 375
                                                     Washington, D.C. 20006
13                                                   Telephone: (202) 899-4100
                                                     Facsimile:  (612) 336-9100
14
                                                     *Counsel for Defendants 140 NM LLC, d/b/a*
15                                                   *Trou Normand; Bar Agricole, LLC, d/b/a Bar*
                                                     *Agricole; Thaddeaus M. Vogler;*
16                                                   *Hopemoorelain, LLC, d/b/a Camino; Russell*
                                                     *Moore; Allison Hopelain; Es Verdad, LLC,*
17                                                   *d/b/a Comal; John Paluska; Andrew*
                                                     *Hoffman*
18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Judith A. Zahid, hereby certify that on February 19, 2019, I electronically filed the above document with the U.S. District Court for the Northern District of California by using the CM/ECF system.  All participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

/s/ Judith A. Zahid
Judith A. Zahid

*Counsel for Defendants 140 NM LLC, d/b/a Trou Normand; Bar Agricole, LLC, d/b/a Bar Agricole; Thaddeaus M. Vogler; Hopemoorelain, LLC, d/b/a Camino; Russell Moore; Allison Hopelain; Es Verdad, LLC, d/b/a Comal; John Paluska; Andrew Hoffman*

4852-3868-3784v1

# EXHIBIT 1



David Lavine, SBN 166744
LAW OFFICES OF ANDREW WOLFF, P.C.
1950 Broadway, Fourth Floor
Oakland, CA 94612
Phone: 510-834-3300
Fax: 510-834-3377
Email:

Guy E. Mailly, SBN 135720
MAILLYLAW
MAILLY LAW
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
Phone: 714-384-6531 6531
Email: gmailly@maillylaw.com Email:

David Lavine, SBN
166744 MAILLY LAW
100 Pine Street, Ste.
1250 San Francisco, CA
94111
Phone: 415-745-3250
Email: dlavinelaw@gmail.com

Steven E. Uhr, Admitted *Pro HaeHac Vice* (Minn. No. 284038) LAW OFFICE OF STEVEN E. UHR, PLLC
11   7010 W 84th St. Circle Bloomington, MN 55438
12   Phone: 952-239-0346
Email: seuhr@uhrlawoffice.com
Email:

# UNITED STATES DISTRICT COURT

## DISTRICT OF NORTHERN CALIFORNIA

## OAKLAND DIVISION

Plaintiff,

v.

140NMLLC,

TIMOTHY BROWN,

)

SECOND AMENDED
COMPLAINT

)

**Case No. 4:17-cv-05782-JSW**

v.

)

CLASS ACTION

)

FIRST

)

BAR AGRICOLE, LLC,                    )
THADDEUS M. VOGLER,          )
HOPEMOORELAIN, LLC,          )
RUSSELL MOORE,                      )
ALLISON HOPELAIN,                  )
ES VERDAD, LLC,                        )
JOHN PALUSKA,                         )
ANDREW HOFFMAN,                 )

Case 4:17-cv-05782-JSW Document 123 Filed 03/30/18 Page 2 of 79

121 **140 NM LLC,** )

222 ~~GROUP~~**BAR AGRICOLE, LLC,** )
~~DANIEL MEYER~~
**THADDEUS M. VOGLER,**
323 **HOPE~~MOORE~~LAIN,** )
24 **LLC, RUSSELL MOORE,** )
25 **ALLISON HOPELAIN,** )
**ES VERDAD, LLC,** )
26 **JOHN PALUSKA, and** )
**ANDREW HOFFMAN,** )
27 )
28 **Defendants.** )
_____ )

~~CRAFTED HOSPITALITY, LLC,~~ )
~~THOMAS COLICCIDO,~~ )
~~MOMO HOLDINGS, LLC,~~ )
~~MOMOFUKU 232 EIGHTH AVE., LLC,~~ )
~~DAVID CHANG,~~ )
~~MARLOW, INC.,~~ )
~~ANDREW TARLOW,~~ )
~~HAPPY COOKING HOSPITALITY, INC.,~~ )
~~GABRIEL STULMAN,~~ )
~~MOLINERO, LLC,~~ )
~~JONAH MILLER,~~ )



NATE ADLER,                          )
BIRTH OF THE COOL, LLC,              )
MAKE IT NICE, LLC,                   )
DANIEL HUMM,                         )
WILL GUIDARA,                        )
NEW YORK CITY HOSPITALITY            )
ALLIANCE, INC.,                      )
and ANDREW RIGIE,                    )
                                     )
         Defendants.                 )
                                     )

## I.    INTRODUCTION

19

## I.   BACKGROUND

1.      1.        Every year, American consumers freely and voluntarily paygive over forty billion dollars in tips to the nation's nation's approximately three million waiters, waitresses, and bartenders.  Tipping is a private voluntary transaction between the customer and the server.  Tips are the legal property of the employee.  As discussed herein, however, restaurant owners are in the Bay Area and elsewhere are engaged in a sophisticated unlawful conspiracy to increase prices and takeeliminate tips from servers.

2.      In the fall of 2014, a handfulsignificant number of Bay Area restaurants agreed ""as a group"" to eliminate eliminate tipping and increase prices by around twenty percent , either by adding a surcharge or increasing menu prices. They are part of a larger conspiracy spearheaded by the Union Square Hospitality Group out of New York City, together with its

founder and Chief Executive Officer

Danny Meyer. The ~~conspuacy ls m~~ conspiracy is in its early

~~experimental~~ stage, focused on developing and disseminating

best practices for ~~switching to a~~

~~raising prices and implementing a~~ no-tipping, ~~""~~"hospitality-included~~"~~" business ~~model developed by vanguard restaurants.  The no-~~

model.

3.   The no-tipping

movement is, in the estimation of many, the most significant issue in the restaurant industry

today.  One conspirator predicts that ~~""~~"ten years from now ~~we're~~ we're going to look back and go,

~~B         'Oh, God~~ 'Oh, G-d, do you remember when we used to tip?~~""~~'" The ~~conspirators  refer to the no-tipping~~ hope and

~~movement  as "the tipping  point," with the clear  implication~~ expectation is that ~~there may~~ soon ~~be~~ enough

restaurants ~~making~~ will make the switch to establish the ~~""~~"critical mass~~"~~" necessary  for  the  movement  to

~~"~~  "catch  fire~~on a much larger scale~~" and  become  the  new  industry  norm. _____  Industry

~~3~~insiders cleverly refer to that moment as the "tipping point."

4.        Participating  restaurants  have  disingenuously  portrayed  the  no-tipping  movement  as

intended to promote social justice and equality, ~~though~~when the real aim and effect is greater profit at the expense of workers and consumers.  Their owners have said that the goal is to reduce pay

disparity between front of the house ("FOH") workers, such as servers and bussers, who

customarily receive tips, and back of the house ("BOH") workers, such as cooks and

dishwashers, who do not receive tips. Owners pay what the market dictates, so they recognize

that increases in the minimum wage will force them to pay all workers more, and they are

looking for a new revenue stream to pay the increased costs in a way that protects their bottom

26    line.

27    5.      The "problem" from the owners' perspective is that servers make $25-$35 per hour  and

28    more including tips, and good servers could be hired for substantially less if one could, through

collusion, effectively prevent them from working elsewhere where tips are still permitted.  As pointedly noted at a "no-tipping" industry conference in 2015, defendant Hopelain said: "There's not that much money to be made in the restaurant business, and the waiters cannot make all of it."

6.     Owners have said that the extra revenue from switching to a no-tipping model will  be used only to pay wages. This is meaningless from an economic perspective; it is comparable to saying that the extra revenue will only be used to pay for food, or to pay rent. Directly or indirectly, the extra revenue from the elimination of tipping increases profit, or reduces loss.

7.     The antitrust laws prohibit concerted action that unreasonably restrains competition. Restaurants may unilaterally increase prices and/or ban tipping without violating the antitrust laws. Such unilateral action, however, may be difficult to sustain because the resulting loss of customers and servers to competitors may render the change unprofitable.  It is alleged herein that Bay Area restaurants took the sustainable approach by raising prices in concert, in violation of antitrust restrictions.

8.     The charged conspiracy constitutes a *per se* unreasonable restraint of trade, in violation of the Federal Sherman Act, and the California Cartwright Act, and the New York Donnelly Act. . The purported motives of the participants or any asserted reasonableness of the conduct or increased prices is immaterial because there is a ""conclusive presumption that [horizontal

16    price fixing] is unreasonable." ."[1]  To

1     establish liability, an impacted consumer need ~~show~~ prove only

17    ~~2~~ the existence of an agreement or

understanding to fix prices, formal or informal, and that each

18    ~~3~~ defendant knowingly joined the

agreement.  ~~Whether all~~It is the ~~participants understand that their~~

4     ~~conduct is unlawful is irrelevant to liability.~~

5     ~~6.     As discussed herein, there is substantial direct evidence of a common purpose and~~

6     ~~concerted action — that is, a conspiratorial~~ agreement ~~— including emails between and among~~

7     ~~some defendants in which they acknowledge the existence of a joint effort to increase prices,~~

8     ~~as well as meetings among defendants at which the implementation of a no-tipping policy was~~

9     ~~discussed, followed shortly by participants implementing the policy. As some defendants~~

10    ~~acknowledge and bemoan, coordinated action, rather than uncoordinated, independent action,~~

11    ~~is necessary to the long-term success of their common plan.~~

12    ~~7.     Conspirators recognized the advantage of making the switch as a group as a way to~~

13    ~~retain servers, whose income is reduced under the new policy, and whose inclination to flee to~~

14    ~~another tipping restaurant is a natural result of the loss of tip income, as well as minimizing~~

15    ~~"sticker shock" on the part of diners if higher menu~~to fix prices ~~were more ubiquitous. As one~~in

16    concert that constitutes the violation.  In the

17    ~~defendant said — "What is it going to take~~presence of direct evidence of such an agreement, as

18    herein alleged, circumstantial evidence of,

19    for example, the ~~industry to change ... One~~timing of effectuation of the ~~big things that~~

20    21 ~~is holding people back ... they don't want~~agreement, is not required to be ~~the test case where we~~

~~get rid of tipping ... our~~either alleged or

20    ~~tipped employees will get a straight hourly wage which will reduce their hourly rate and then~~

22    ~~they are going to work across the street at my competitor. And that just really seems to be the~~

23

proven

9.      Because price-fixing conspiracies are, by their nature, conducted in secret, typically only circumstantial evidence of collusion is available at the pleading stage.   As described herein, there is substantial direct evidence of the charged conspiracy, including unambiguous emails among the conspirators setting and acknowledging their agreement to increase prices.

[1] *Arizona v. Maricopa County Medical Soc*., 457 U.S. 332, 343-44 (1982). *See also National Society of Professional Engineer v. United States*, 435 U.S. 679, 692 (1978) (*per se* rule reaches to "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.").

Both the volume and the striking quality of such evidence of collusion set this case in a stronger posture relative to most other antitrust conspiracies at the pleading stage. Formal discovery is expected to uncover additional evidence.

10.     The conspirators recognize the importance of concerted action, both from the perspective of not upsetting customers and of retaining servers.   As one co-conspirator said -- "What is it going to take the industry to change … One of the big things that is holding people back … they don't want to be the test case where we get rid of tipping ... our tipped employees will get a straight hourly wage which will reduce their hourly rate and then they are going to work across the street at my competitor. And that just really seems to be the big challenge and I ~~don't~~don't know if there is really any one way that enough restaurateurs at one time are going to

make a switch and say ~~we're~~we're going to move from tipping ~~..."~~…".

~~8.     Restaurants did lose servers as a consequence of the switch, many of whom were making well in excess of $40 per hour including tips. However, the restaurants could hire as replacements competent servers willing to work for $20 or less per hour. The difference ends up in the pockets of the owners. At a "no tipping" industry conference in 2015, defendant Hopelain said: "There's not that much money to be made in the restaurant business, and the waiters cannot make all of it."~~

~~9.     If the industry is to change to a gratuity-free model over the long term -- the express goal of the conspiracy -- and the so-called "new restaurant" is to be recognized as the norm, the change ideally and perhaps necessarily begins with a core group of restaurants respected in the industry to drive the movement forward. New York City and San Francisco are in the estimation of many the two most significant markets in the restaurant industry in the United States, and Union Square Hospitality Group, which owns about fifteen successful restaurants, is perhaps the best known and most respected restaurant group in New York City. Meyer is a rock star in the industry, nationally recognized by *Nation's Restaurant News* in 2016 as~~

number—concerning them. Their actions constitute the actions of gatekeepers who are

not only setting trends today, but

also shaping them for tomorrow."

11. Key to success of the "new restaurant" is active, using substantial, resources and sophisticated efforts

to market the new system to restaurants expertise to facilitate the formation and operation of the conspiracy in local geographic markets throughout the United States. This is done in part

through the media – which has almost without exception supported and promoted the no-

tipping model – and through social media, such as the Twitter hashtag #hospitalityincluded, as

well as industry conferences and meetings to get the word out and to assist restaurants in

switching to a no-tipping model. Meyer and other USHG representatives have traveled around

the country to promote the Danny Meyer stated in 2016 that he believed that "hospitality included model at industry events. Substantial

collaboration between the New York and San Francisco restaurant markets, including the

sharing of "best practices" and lessons learned, increases the likelihood of success in both

markets, and beyond.

10. This action is brought on behalf of a putative class of consumers. Pursuant to law,

persons overcharged as a result of a included" "would not succeed unless our industry would convert," that "many, many restaurants have converted, that "we have a team of two or three people spending a lot of their time going on … industry panels talking about how we're doing it" and that "we have invited industry members to our town hall meetings" to discuss and consult on "hospitality included."

12. Whether such price-fixing conduct operating across geographic markets is part of a larger conspiracy are entitled to recover triple theiris a question of fact. There is no legal requirement that all conspirators must

damages plus costs and reasonable attorney's fees. Injured servers and other customarily-tipped employees may also have a viable claim for treble damages.

12

13

14      12.

19   compete with all other conspirators, and market definition is not an element of a *per se* price-

20   fixing case.   Any-sized segment of an industry that engages in  concerted price-fixing is  liable

21   under federal and state antitrust laws, regardless of whether, and of how many, competitors

22   choose to participate. Additionally, persons and trade associations outside of the Bay Area are

23   liable as participants in a Bay Area conspiracy if they knowingly facilitate and assist in the

     conspiracy's  formation  or  operation,  regardless  of  whether  such  persons  compete  with  Bay

24   Area restaurants for customers.

25

26

27

28

## ~~I.~~II.  PARTIES

13.   Timothy Brown ~~("("~~Brown~~")")~~ is ~~a named~~the plaintiff and ~~putative~~ class representative in this ~~action~~matter.

14.   Defendant 140 NM LLC, d/b/a Trou Normand is a limited liability company organized under the laws of the State of California, with its principal place of business at 140 New Montgomery Street in San Francisco.

~~14~~15.   Defendant Bar Agricole, LLC, d/b/a Bar Agricole is a limited liability company organized under the laws of the State of California, with its principal place of business at 355 11ᵗʰ Street in San Francisco.

16.   Defendant Thaddeus M. Vogler ~~("("~~Vogler~~")")~~ resides in California and is the owner and managing member ~~ofTrou~~of Trou Normand and Bar Agricole.

16. Defendant Hopemoorelain, LLC, d/b/a Camino is a limited liability company organized

under the laws of the State of California, with its principal place of business at 3917

Grand

Avenue in Oakland, California.

1718. Defendant Russell Moore ("("Moore")") resides in California and 1sis an owner and managing member of Camino.

19. Defendant Allison Hopelain ("("Hopelain")") resides in California and is an owner and managing member of Camino.

19. 20. Defendant ES Verdad, LLC, d/b/a Comal is a limited liability company organized under the laws of the State of California, with its principal place of business at 2020 Shattuck

Avenue in Berkeley, California.

2021. Defendant John Paluska ("("Paluska")") resides in California and is an owner and managing member of Comal, as well as Comal Next Door, which opened in 2018 as a non-

21tipping restaurant.

22. Defendant Andrew Hoffman ("("Hoffman")") resides in California and is an owner and managing member of Comal.

22. Defendant Union Square Hospitality Group, LLC ("USHG") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 24 Union Square East in New York City. It operates the following restaurants in New York City: Union Square Cafe, Gramercy Tavern, Blue Smoke, Jazz Standard, The

Modern Appetite Tavern, Marta, North End Grill, Maialino,

Porchlight, Untitled, Studio Cafe, and Daily Provisions. USHG co-owned the GreenRiverComal
Next Door.

restaurant in Chicago until it closed in January 2018.

23.     Defendant Daniel "Danny" Meyer ("Meyer") is the founder and CEO of USHG and

the founder of the fast-casual chain Shake Shack. He is listed as No. 1 on Nation's Restaurant

Case 4:17-cv-05782-JSW   Document 123   Filed 03/05/18   Page 8 of 76

News' 2016 "Power List," described as "the most definitive list of industry leaders who are not only setting trends today, but also shaping them for tomorrow."   Shake Shack, which operates at least seven restaurants in California, does not allow its employees to receive tips, i.e., they have no tip jar.

24.   Defendant Sabato Sagaria ("Sagaria") was USHG's chief restaurant officer until approximately the fall of 2017.

25.   Defendant Crafted Hospitality, LLC is a limited liability company organized under the laws of the State of Delaware.  It owns four restaurants in New York City, including Craft located at 43 East 19th St., and also owns and operates Craft Los Angeles, located at 10100 Constellation Blvd., two restaurants in Nevada, and one in Miami.

26.   Defendant Thomas Colicchio ("Colicchio") is the founder, co-owner, and managing member of Crafted Hospitality. Upon information and belief, Colicchio regularly visits California in connection with his restaurant businesses.

27.   Defendant Momofuku 232 Eighth Avenue, LLC ("Momofuku 232") is a limited liability company organized under the laws of the State of New York. It owns and/or manages Nishi restaurant, located at 232 Eighth Avenue in New York City. It is a subsidiary of Defendant Momo, *infra*.

28.   Defendant Momo Holdings, LLC ("Momo") is organized under the laws of the State of New York with its headquarters at 853 Broadway in New York City. Momo owns directly or through subsidiaries approximately fifteen restaurants located in New York City, Washington, D.C., Las Vegas, Sydney, Toronto, and Los Angeles.

29.   Defendant David Chang ("Chang") is the chef, founder, and chief executive officer of Momo. He lived in California from approximately October 2017 until January 2018 to

Case 4:17-cv-05782-JSW   Document 123   Filed 03/05/18   Page 6 of 76

facilitate the opening of Majordomo, a restaurant located at 1725 Naud Street in Los Angeles, which opened in January 2018.

30.   Defendant Marlow, Inc. ("Marlow") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 85 Broadway in Brooklyn. It owns five restaurants in Brooklyn: Diner, Reynard, The Ides, Roman's, and Achilles Heel.

31.   Defendant Andrew Tarlow ("Tarlow"), is the founder and CEO of Marlow.

32.   Defendant Happy Cooking Hospitality, Inc., ("Happy Cooking") is a limited liability company organized under the laws of the State of New York, with its principal place of business at 96 Grove Street in New York City. It owns five restaurants in Manhattan: Fedora, Perla Cafe, Bar Sardine, Jeffrey's Grocery, and Joseph Leonard.

33.   Defendant Gabriel Stulman ("Stulman") is the founder and CEO of Happy Cooking Hospitality.

34.   Defendant Molinero, LLC, dba Huertas is a limited liability company organized under the laws of the State of New York, with its principal place of business at 101 pt Avenue in New York City.

35.   Defendant Jonah Miller ("Miller") is the executive chef, co-owner and a managing member of Huertas.

36.   Defendant Nate Adler ("Adler") is a co-owner and a managing member of Huertas.

37.   Defendant Bilih of the Cool, LLC, dba Eleven Madison Park is a limited liability company organized under the laws of the State of New York, with its principal place of business at 11 Madison Avenue in New York City. Eleven Madison Park was owned by Defendant Union Square Hospitality Group until 2011 when it was sold to Humm and

Guidara. Eleven Madison Park is affiliated with Make it Nice, LLC (a New York LLC), Make

it Nice Hospitality, LLC (a New York LLC), Make it Nice Hospitality II, LLC (a New York

LLC). Upon information and belief, one or more of the Make it Nice entities owns, directly or

indirectly, Eleven Madison Park, NoMad restaurant in New York City, and the NoMad

restaurants in Los Angeles, which opened in January 2018.

38.     Defendant Make it Nice, LLC ("Make it Nice") is a limited liability company

organized under the laws of New York. Upon information and belief, Make it Nice owns Birth

of the Cool, LLC dba Eleven Madison Park, as well as the NoMad New York and NoMad Los

Angeles restaurants.

39.     Defendant Daniel Humm ("Humm") is an owner and managing member of Birth of

the Cool and Make it Nice. Humm began working at Eleven Madison Park in or around 2006,

and is a protege of Meyer. Upon information and belief, Humm spent substantial time in Los

Angeles in 2017 and early 2018 in connection with the opening of NoMad Los Angeles.

40.     Defendant Will Guidara ("Guidara") is an owner and managing member of Birth of

the Cool and Make it Nice. Guidara began working at Eleven Madison Park in or around

2006, and is a protege of Meyer. Upon information and belief, Guidara spent substantial time

in Los Angeles in 2017 and early 2018 in connection with the opening of NoMad Los

Angeles.

41.     Defendant New York City Hospitality A1liance, Inc. (the "Alliance") is a limited

liability company organized under the laws of the State of New York, with its principal place

of business at 65 West 55th Street, Suite 203A, New York City. It was founded in 2012 and,

upon information and belief, has over 600 due-paying members.

42.     Defendant Andrew Rigie ("Rigie") is the executive director of the New York City Hospitality Alliance.

III.

## ~~ADDITIONAL~~ CO-CONSPIRATORS

23.   Numerous individuals and businesses in the Bay Area and elsewhere, not named herein, ~~43.~~ have actively and knowingly

facilitated and assisted in the formation and operation of the conspiracy.

24.    Upon information and belief, over 30 restaurants in the Bay Area and over 300 restaurants nationally have eliminated tipping and increased prices by agreement with competitors. Upon information and belief, in New York City over 40 restaurants have eliminated tipping and increased prices pursuant to concerted agreement.   Upon information and belief, over 20 restaurants in the Los Angeles area, over 10 restaurants in Chicago, over six restaurants in the Twin Cities, over six restaurants in Portland, Oregon, and over 20 restaurants in Seattle have eliminated tipping and increased prices pursuant to concerted action. Specific allegations regarding concerted agreement by, and the participation of, such restaurants to fix prices, may yet be filed in this or another court with personal jurisdiction over them.

Further ~~amendment~~

~~24.~~25.    ~~8      amendments~~ may be sought to add additional ~~named~~ defendants and allegations as appropriate.

IV.        **JURISDICTION AND VENUE**

26.    This Court has subject matter jurisdiction over the alleged Sherman Act claim pursuant ~~44.~~    to the

Clayton Act, 15 U.S.C. § 15, which provides that ""any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found

or has an agent ....,"...," and pursuant to 28 U.S.C. § 1331, which provides that ""the district courts shall have

original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States.".""

45 27. This Court has ... and New York state law claims pursuant to 28 U.S.C. § 1367(a), which provides that district courts shall have

supplemental

jurisdiction over all other claims that are so related to claims in the action within

such original

jurisdiction that they form part of the same case or controversy.

46 28. Venue lies in this ~~court~~Court pursuant to 28 U.S.C. § 1391(b)(2), which provides that a civil

action may be brought in ~~""~~"a judicial district in which a substantial part of the events or

omissions given rise to the claim occurred ~~..."~~. . . ."

47.   Upon information and belief, the court 29.   The Court has general personal jurisdiction over the

25

2   following defendants who because they all reside in

and/or do substantial business in the State of California: a)

2526

3   Vogler (resides in California), b)

140 NM LLC (organized under the laws of California), c)

2627

4   Bar Agricole, LLC (organized under

the laws of California), d) Hopemoorelain, LLC

5

28

(organized under the laws of California), e)

Moore (resides in California), f) Hopelain (resides

in California), g) ES Verdad, LLC

(organized under the laws of California), h) Paluska

~~8~~ (resides in California, and i) Hoffman

(resides in California~~), j) Mamo Holdings, LLC (owns and~~).

~~operates California restaurant), k) David Chang (lived in California for part of 2017 and 2018~~

~~in connection with opening of new restaurant), l) Humm (believed to have spent substantial~~

~~time in Los Angeles in 2017 and early 2018 in connection with the opening of Nomad~~

~~restaurant in which he is believed to have an ownership interest), m) Guidara (believed to~~

~~have spent substantial time in Los Angeles in 2017 and early 2018 in connection with the~~

~~opening of Nomad restaurant in which he is believed to have an ownership interest), n) Make~~

~~it Nice, LLC (believed to be owner of Nomad Los Angeles restaurants), o) Craft Hospitality,~~

~~Inc., (owns and operates California restaurant), and p) Colicchio (ownership interest in~~

~~California restaurant; believed to regularly travel to California on business).²~~

~~48.    Upon information and belief, the Court has general and/or specific personal~~

~~jurisdiction over a) USHG, b) Meyer, c) Sagaria, d) Marlow, and e) Tarlow, as such persons~~

~~have had sufficient contacts with the State of California related to or arising out of the alleged~~

~~claims such that this Court may exercise jurisdiction over them consistent with the Due~~

~~Process Clause of the Fourteenth Amendment of the United States Constitution.~~

---

~~² Colicchio also is the head judge on Top Chef, which was filmed in California in Season 1~~
~~(2006, San Francisco), Season 2 (2007, Los Angeles) and Season 13 (2016, San Francisco, Los~~
~~Angeles, San Diego, Santa Barbara, Oakland, and Palm Springs).~~

FIRST AMENDED COMPLAINT - 17

a. USHG personnel have traveled throughout the country promoting hospitality included and upon information and belief, California was the destination for some such travels.

## V.   STANDING

30. In 2015, USHG made a "significant minority investment" in Tender Greens, a California-based "fine-casual" restaurant chain with over twenty locations in California and one in New York City. USHG has also invested in the ice-cream chain Salt & Straw, which has multiple California locations. USHG also is believed to own a significant stake in Shake Shack, which also has multiple California locations. USHG also runs a consulting business called "Hospitality Quotient" that offers "competitive analysis" services to businesses throughout the United States. Upon information and belief, Hospitality Quotient has provided consulting services to businesses in California. Also, the contacts of Meyer and Sagaria on behalf of USHG, described below, are attributable to USHG.

b. Meyer is believed to travel to California regularly on business, including in connection with USHG's investments in Tender Greens and Salt & Straw, and in connection with the opening of Shake Shacks in California. Meyer has communicated with at least one California defendant regarding the elimination of tipping (see Par. 88). Upon information and belief, Meyer had additional such communications.

c. Sagaria traveled to the Bay Area in July 2015 and in April 2016 to attend conferences and discuss hospitality included with California restaurant owners. See Par. 77, 128.

d. Marlow and its owner Tarlow developed an open-source "gratuity-free" logo which is, upon information and belief, used in restaurants throughout the United States and in California to market the elimination of tipping.

49. Upon information and belief, this Court has personal jurisdiction over all defendants, including over defendants Momofuku 232, Happy Cooking, Stulman, Molinaro, Miller, Adler, the Alliance, and Rigie, by way of the purposeful direction of their intentional acts at the State of California with knowledge that the harmful effect of their acts was likely to injure California residents.[4] Upon information and belief, such defendants were aware that: a) they were participating in the same conspiracy as the California defendants, b) California defendants provided information and support to New York defendants for the purpose and with the effect of furthering the conspiracy in New York, c) New York defendants provided information and support to California defendants for the purpose and effect of furthering the conspiracy in California, and d) California residents who 2017, Brown purchased food and drinks from the defendant restaurants were overcharged on said purchases and hence were damaged and injured as a result of the conspiracy.

50. Information regarding contacts of and by the New York defendants with the State of California is primarily in the possession of the New York defendants. None of the corporate defendants are publicly held, making pre-filing access to even a modicum of such information difficult. Discovery will be sought as needed to determine the specific nature and extent of

[4] *See Calder v. Jones,* 465 U.S. 783 (1984). Under the Ninth Circuit's interpretation of *Calder,* jurisdiction is established under the so-called "effects' test" if (1) the defendant has committed an intentional act, which is (2) expressly aimed at the forum state, and (3) causes harm which is suffered and which the defendant knows is likely to be suffered in the forum state. *See Bancroft & Masters, Inc. v. Augusta Nat. Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000).

the New York defendants' contacts with the State of California, both generally and as specifically concern and relate to the charged conspiracy.[5]

## V. STANDING

51. In April 2017, Brown purchased and consumed food from Reynard at 80 Wythe Avenue in Brooklyn, New York, and at Gramercy Tavern at 42 East 20th Street in Manhattan. The Reynard menu said that "Reynard is a gratuity-free restaurant. Everything is included in your bill. There is no need to tip." The tip line was removed from the Reynard receipt. The server at Reynard told Brown that the price of the fried chicken sandwich he ordered increased from $16 to $21 after tips were eliminated, a 31 percent increase before taxes.

52. 31. Gramercy Tavern provided to Brown a "rate your experience" postcard that said "Please note that our prices are now all-inclusive; there is no need to tip at the end of your meal. We believe that this change is the best way to take care of our people, who are the heart of this restaurant." Brown's meal at Gramercy (Strozzapreti) cost $21.78 including tax. The of this restaurant." The server at receipt said "Gramercy Tavern is a non-tipping restaurant. Hospitality Included." The server at Gramercy told Brown that a number of servers quit as a result of the implementation of hospitality included.

53. In32. On June 26, 2017, Brown purchased and consumed food from Comal in Berkeley and Camino in Oakland, owned and operated by defendants in this action. The tip line was

18    removed from both the Camino and Comal receipts. Comal added a "20%" service charge in

19    lieu of a tip"" to the bill. The Camino purchase, with service included, was for $10.93. The

22

23

24

25

26

27

28

---

[5] *See, e.g., Laub v. US. Department of Interior,* 342 F.2d 1080, 1093 (9th Cir. 2003) (jurisdiction discovery should be allowed if there is a reasonable probability that jurisdiction may be established); *Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 540 (9th Cir.1986) (discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406,430 n, 24 (9th Cir.1977) (holding that district court abused its discretion in refusing to grant discovery on jurisdictional issue).

33.     Brown generally tips in an amount tied to the quality of his dining experience, sometimes at 20%, but often less, and occasionally more. But the amount Brown generally tips, or would have tipped at any restaurant no longer accepting tips, is not legally relevant either to calculation of damages or to standing. Damages arising from a *per se* price-fixing conspiracy are not determined or reduced by what an affected customer might have voluntarily paid, but rather by the full amount resulting from the illicit agreement to raise prices in concert.

Case 4:17-cv-05782-JSW Document 180 Filed 03/08/18 01/

By virtue of 79

54.      Brown his Camino and Comal restaurant purchases, Brown establishes standing with

respect to all defendants following, including those from whom he did not make any purchases at some.[2]

of the participating restaurants, without the need for purchases at all such restaurants.[6]

55. [2] The charged conspiracy is ongoing and increasing in geographic scope. Absent

34. [4] appropriate

injunctive relief, it is likely and probable that Brown and, as well as putative class members

comprised of local and visiting diners who will be subject to higher restaurant prices in lieu of

voluntary tipping, will incur additional overcharge damages in the future.

56.

**VI.**    ~~On **July 9, 2013,** Danny Meyer tweeted: "Considered eliminating tipping years ago,~~

~~and then servers asked to keep things as they were. Your opinion please." Tom Colicchio~~

~~responded: "@dmeyer I'm thinking the same for craft." David Chang responded:~~

~~"@tomcolicchio @dmeyer we are more than kicking around the idea at @momofuku of~~

~~figuring out how to increase prices removing tips w/o revolt."~~

**57.** The Bay Area defendants had

<u>Direct Evidence of Formation of a Price-Fixing Conspiracy</u>

~~35.~~    <u>Defendants reached</u> an agreement ~~to raise prices that was confirmed in~~

~~writing. In or around **mid-September 2014,** Paluska indicated in an email that Camino,~~

~~Comal, Duende, Bar Agricole and Trou Normand and their owners had among and~~ <u>between</u>

<u>and among</u> <u>themselves</u> ~~"agreed to the following basic parameters: 1. Minimum 20% service~~

~~charge 2. No~~

~~tip line 3. Commitment~~ <u>to</u> ~~change to a service charge by (a certain date TBD) 4. That~~

~~the~~<u>raise prices and</u>

<u>eliminate tipping which was memorialized in a September 21, 2014 email from defendant</u>

<u>Paluska to 16 persons including defendant Vogler, defendant Moore, and Paul Canales, owner</u>

<u>of Oakland restaurant Duende. Defendant Hoffman was copied on the email. The email states:</u>

<u>Hello all</u>

<u>Since there's a good-sized group of us turning out for **the 11am meeting at**</u>
<u>**Camino tomorrow (Monday)**, and several others engaged in this process who</u>
<u>can't make it, we're sending out an email in advance to get everyone on the</u>
<u>same</u>
<u>page heading into the meeting.</u>

<u>Some of you have already seen the email we sent to a couple folks in recent days,</u>
<u>but we're sending it along again as it summarizes what a small group of us have</u>
<u>been able to agree on thus far:</u>

<u>***We are moving forward fairly quickly with a group of other restaurant owners***</u>
<u>***who are of similar mind regarding moving to a*** **service charge** ~~be used for employee~~</u>
~~wages, benefits, and payroll expenses"~~<u>***model. This***</u>

<u>***group includes Russ and Allison (Camino), Thad Vogler (Bar Agricole and***</u>
<u>***Trou Normand), Paul Canales (Duende) and us. While we are leaving some***</u>

22   the particulars to each restaurant owner, we have agreed to the following basis

23   parameters:

24        1.   Minimum 20% service charge
          2.   No tip line

25

26   [2] *See, e.g., Bogosian v. Gulf Oil Corp.,* 561 F2d 434, 448 (3rd Cir. 1977) (the ""fact that a
     customer has not made purchases from every co-conspirator does not prevent him from suing

27   all for each co-conspirator contributed to the charging of the supracompetitive price paid by the

28   purchaser.").")

58.   A meeting was held at Camino on ~~September 22, 2014,~~ with a "good-sized group" _Commitment_ to

~~2.3.~~ 2.   ~~discuss the no-tipping/added~~ change to a **service charge** ~~policy. Paluska sent an email to sixteen people  on~~by (a certain date TBD)

~~September 21, 2014,~~ which stated in part:

4. *That the service charge be used for employee wages, benefits, and payroll expenses*

*Our current plan is to announce as a group with a press release in mid-October,*

*with the idea of implementing the new service charge model within a few weeks*

*from the announcement, likely between Dec 1 and Jan 1.* ~~We'd~~ *We'd like to keep the*

*overall group that is linked to the announcement fairly small so that we can*

*coordinate and be as consistent with our messaging and implementation as*

*possible.*

We all feel very strongly about the four points listed above. While we have accepted that not all FOH employees will be making as much compensation with this new model as they have been making with the current paradigm, our goal is

~~this new model as they have been making with the current paradigm, our goal is~~

to keep as much consistency with FOH as possible while simultaneously raising

up the BOH compensation. The only way to do this is to charge at least a 20%

surcharge. SF restaurants have the added challenge of how to deal with the Healthy SF factor, which leads us to assume that 20% ~~isn't~~isn't a hard sell for any SF operator on the list.

~~operator on the list.~~

Another reason for the 20% minimum is that we want to do our best to shift the

13

that it is

26

27

28



in poor taste to charge a 20% service charge and simultaneously leave a tip line on the credit card bill. If a customer is moved to leave cash in addition to the 20% service charge, that's fine, but we will be sending a clear message on our menus, websites, etc that no further gratuities are expected. We want to put the customer at ease, and remove any ambiguities about what is expected.

. . .

[O]ur preference is to announce as a group in mid-October, with the goal of implementing the new system by the first of next year if not sooner. This is probably too fast for some of you who more recently joining the conversation, and we are looking forward to getting a better sense of everyone's everyone's timing and outlook outlook when we meet tomorrow. . . . [I]t's Berkeley's minimum wage jumps again on Oct 1 and will continue increasing. Oakland is poised to vote for a ballot measure that will result in a jump to $12.25 in March 2015. So we feel some sense of urgency now. That being said, it's exciting to see how many great operators are suddenly part of the discussion, and it goes without saying that it will be a very powerful statement if all of us could announce a new direction together. together.

While we feel that it's important to announce as a group, we're leaving it somewhat flexible as to when various operators actually implement the new system. That being said, we don't see a lot of positives to announcing the shift and then waiting more than 6-8 weeks. That time frame provides enough time to gauge which [Front of House] employees are going to move on (hopefully not

many) and is also a respectful notice period to give them so they don't feel they are being ambushed by the new system. And obviously it will be critical to properly announce this decision to staff before anything formal goes public.

Other topics of discussion:

* does it make sense for there to be a spokesperson for the group? (we think probably not …)…)

* should the group be formally organized or kept loose?

* should everyone in the ""group"" be committed to making the change at <u>all</u> of their establishments? (emphasis in original)

* what are the key talking points we want to put out for the press as to why we are making this change? … We It may be obvious to us, but we need to figure out a succinct positive message that we all consistently reference with the media.We want to present this as an exciting, potentially transformative moment in the restaurant business…. We don't want to appear reactive or negative.

* are there any other common points of agreement that could be added to the list above? does the list above need to be modified in any way?

* talking points / protocol for staff when addressing customer complaints, questions, etc after the change

* should we hire a PR firm to control the message and handle inquiries?

* various models being discussed — switch to hourly pay for all employees? A hybrid of hourly pay plus a bonus pool (more closely related to current tip



pool paradigms)? If choosing the hourly/bonus pool hybrid, which positions are part of the pool? Sliding scale hourly pay based on merit within each position?

. . .

CONFIDENTIALITY ———— please do not forward this email or share information about this meeting with media or hourly staff —it's— it's a sensitive issue and we want to preserve the ability to handle it with care both internally and externally.

So much more to talk about but this is already a very long email. See some of you tomorrow and looking forward to keeping the discussion going with all of you. We expect the meeting to last 60-90 minutes—. We'd like to keep it big picture as there will be plenty of opportunities to explore specific issues in—smaller groups.— smaller groups.



We'd like to get a final head count for the meeting tomorrow, so please RSVP if you can.

John and Andrew (Comal)

Russ and Allison (Camino)

(Emphasis in Original)

36.     The above-referenced meeting was held as scheduled at Camino on September 22, 2014.

Media Reports on the Existence of the Conspiracy

37.     The conspirators reached out to the media to report on their agreement. On October 24, 2014, the *San Francisco Chronicle* reported on the agreement among defendants to increase prices and eliminate tipping:

Citing both pragmatic and philosophical reasons, a small collection of Bay Area restaurateurs is eliminating tipping. Instead of expecting diners to leave a tip, the restaurants will automatically add a 20 percent service charge to all bills and not accept any additional gratuity beyond the service charge. The five businesses — Comal in Berkeley, Camino and Duende in Oakland, and Bar Agricole and Trou Normand in San Francisco each plan to institute the policy within the next few weeks, forsaking the ubiquitous model they believe is outdated. And they expect more restaurants could follow suit. "If we were doing this, and there was a sense that the rest

of the world ~~wouldn't~~

~~16~~17   wouldn't pay much mind to it, I would be more concerned. But this is on ~~everybody's~~everybody's minds~~.~~," said Comal partner John Paluska.

38.   On October 24, 2014, the *San Francisco Eater* also reported on ~~the~~this agreement:

> [A] new band of top-notch (but not high-end) restaurants have decided to make another run at the no-tipping policy, hoping their collective power will have an impact. Over the next few weeks, sister spots Bar Agricole and Trou Normand, along with an ~~WIaffiliated~~unaffiliated trio of East Bay restaurants, Camino, Comal, and Duende, are kissing tipping goodbye. In its place: an automatic 20% gratuity. The restaurateurs say this move is intended to get out ahead of the minimum-wage increases that will likely pass in both SF and Oakland, for both ideological and economic reasons.  ~~"Why"~~Why rely on legislation to do the right thing~~?"~~?" Thad Vogler, owner of Bar Agricole and Trou Normand, told the *Chron*.

Vogler Admits Existence of Conspiracy

~~26~~27   39.   On October 27, 2014, during a KQED radio show, defendant Vogler confirmed that the

**Michael Crasney** [Host]: Let me begin Thad Vogler with you and I said this is largely I suppose as a catalyst for you doing this the minimum wage change and discrepancies …… in pay between the front, those who are serving and busing, and so forth, and the back, those who are cooking and dishwashing.

**Vogler:** Yea, I think that'sthat's accurate. There has been talk of a fifteen dollar  minimum wage in San Francisco. It seems sort of inevitable. I was surprised to see that I had a gut

~~gut~~ reaction to that of oh no as a small business owner, and as ~~I've~~I've sat with that it

seems crazy that anyone would hesitate to guarantee a fifteen dollar minimum wage in ~~3~~ San

Francisco. I mean even fifteen dollars is not sufficient to exist here. So I just

realized it would be silly to wait for legal reasons to do that and *we as a group decided*

*to commit*
*to that now.* (emphasis added.)

. . .

**Crasney**: But why move toward this? What is the big positive in this?

~~Vogler~~: A number of reasons. One, there has long been a, ~~it's~~it's been unfortunate that

the kitchen is excluded from this portion of revenue so a kitchen employee on a

Monday
we do one hundred people makes the same as on a Saturday where you do

two hundred
and fifty people. The kitchen is excluded from the excitement of selling more, the profitability of selling more, the financial benefit of selling more.  It just seems, it longed seemed to a lot of us unfair to exclude systematically a big part of

your house from that reservoir of money. We ~~don't~~don't want to exclude the front of the

house from that
incentive. We just want to broaden the incentive to allow kitchen

employees to benefit.
Another thing is that you know restaurants ~~....~~... I mean part of the charm is they have long been sort of lawless institutions with two sets of books and there is a lot of grey

market economy with the restaurants and as a small business

owner you ~~don't~~don't really want to be a part of it. ~~There's~~There's a whole lot of tax ~~that's~~that's not

getting paid on the tip pool
by tipped employees and also by business owners that are

avoiding paying payroll tax

by not accounting for all the gratuity ~~that's~~that's received~~.~~

do everything above board and fully transparently.

(Emphasis Supplied)

40.     Gwyneth Borden, executive director of the Golden Gate Restaurant Association ("GORA"),("GGRA"), a trade association of over 600 Bay Area restaurants, participated in the same radio show from New York City, where she was attending the Ninth Annual International Chef's Conference. One of the presentations was ""Should America Ban Tipping?"?". Upon information and belief, onea panelist saidcommented that one problem with ending tipping and increasing prices is that price-sensitive customers will look at the higher menu prices and go elsewhere. He also

said that restaurants have an "uphill battle" going it alone and that "it's up to restaurateurs and

upscale restaurants with customers who aren't price sensitive to lead the charge."

41.   A server on the show said eliminating tips could reduce his income by 40-50 percent.

He also said - "The people in the kitchen should be paid. If they're not paying the fifteen

dollars per hour now … I mean the only way they are going to get a decent wage in the

kitchen

is being forced I guess by minimum wage."

Conspirators Address Concerns and Staying the Course

42.   On October 27, 2014, defendant Paluska sent an email to other defendants and to Duende

which stated:

Maybe we should all get together by phone or in person to check in?

We've received a handful of emails and calls from customers claiming that they

won't be

coming to Comal any more, but it's been pretty minimal.

I have to say, what's really starting to look attractive is no service charge and no

tipping — just an all in pricing structure — maybe if a bunch of places jump in on the service charge approach, maybe there will be a window where restaurants

could consider making such a move.

FIRST AMENDED COMPLAINT - 22

43.    On October 27, 2014, Jay Porter, owner of The Half Orange restaurant in Oakland, emailed a ""word of encouragement"" to defendants Hoffman and Paluska:

I see that the local media has, in the last week, discovered out that stories about tipping — even if the stories are shoddy, inaccurate, etc. — encourage vitriolic comments, which in turns drives [a lot] of clicks, making them a lot of money.

I went through this too, and it sucks, but I came to observe that the kinds of people who write inflammatory comments, bitch on Facebook, or call in to radio shows are not really the kind of people that go to thoughtful, good restaurants anyway.

Don't let you it get it you down.... . . .

A Conspirator Expresses Concern that Another Non-Tipping Restaurant has Not Increased Prices Sufficient to Sustain the Conspiracy

44.    On or about November 3, 2014, defendant Paluska became concerned that another Berkeley

restaurant had eliminated tipping but ~~only~~ imposed only a 16% surcharge. In fact, the

restaurant added an 18% surcharge. <u>Defendant</u> Paluska sent an email to <u>defendant</u> Hopelain ~~—"~~

"Allison — not sure

where you got the idea that they are doing 16%, but it looks like they are

doing 18% - phew"."

Recruitment Efforts to Enlarge Conspiracy

44.45.    On November 19, 2014, Hopelain indicated that the group should reach out to as many

restaurants as possible and ""tell people what we are doing and encourage/rally them to

do it,

too"."

68.    46.    On December 4, 2014, Hopelain sent an email to other defendants, informing
them that

"we are trying to set up a meeting for next week with other Oakland restaurants to
explain what

we are going to do. And hopefully rally them to do the same. I know a lot of people
are trying

to figure it out."

Conspirators Retain Public Relation Experts to Spin Their Agreement as Beneficial
to All

47.    Restaurant and hospitality consultant Andrew Freeman of AF&CO was
retained to

assist the Bay Area restaurants in messaging and public relations with respect to the change to
a no-tipping model.  At the time, AF&Co. was partnered with The Hall Company, a global

public relations firm specializing in the hospitality industry with offices in New ~~Yorle~~York, Los

Angeles, and Tokyo.

48.   The Bay Area restaurants at issue also retained restaurant consultant Joyce Goldstein to

~~to~~ help with public relations. She drafted an editorial supporting the no-tipping movement, which

stated in part:

Many diners and waiters have criticized replacing tipping with a service charge.

They want to hold onto the system they know. But in this financial environment,

change is inevitable because it is the right thing to do for the most people and

California should again lead the way.

. . .

Tipping in restaurants is an arcane system that gives diners the illusion that they
have power to influence service and it gives waiters the illusion that their actions
alone comprise restaurant service and determines the tip.

. . .

The Bay Area is a really expensive place to live. Line cooks (like firemen and

public school teachers) cannot afford to live here on what they earn. . . . To
survive, many of them share a one bedroom apartment with three other cooks.
Our chefs train them and soon they leave for a more affordable city or to stay,

they work two jobs and are burnt to a crisp. Given this financial environment there is a huge shortage of line cooks in the Bay Area.

. . .

Change is inevitable when it will do the most good for the most people. The Bay

area should lead the way in making the restaurant industry a more equitable

place

to work.

70Conspirators Effectuate Their Agreement to Increase Prices and Eliminate Tipping

49.     In late 2014, pursuant to their agreement, the defendants eliminated tipping from their restaurants, and either a generally applicable service charge was eliminated and added or menu item prices

were raisedincreased at Bay Area restaurants Trou Normand, Bar Agricole, Camino, and Comal. Although Duende agreed to

increase prices, itwas a party to the agreement, its owner subsequently decided not to do so before roll-out.backed out and did not

71.   Comal's raise prices through a surcharge or otherwise.[3]

A Conspirator Discusses Whether Prices Should Be Increased Through Surcharge or Higher Menu Prices

50.     Comal's website said: ""We believe in what Danny Meyer calls 'enlightened'enlightened hospitality'hospitality'

that providing good service is its own reward. We want our staff to provide the best  possible

service, but we want the motivation to provide this great service to come not from the hope of a big tip but rather from pride in a job well done".". In the Q and A:

**Question**: Why don'tdon't you just incorporate the cost of service into the menu pricing and

and eliminate the service charge?

17

**Answer**: We considered doing so, and still hope to do so sooner than later. But it's a

19

difficult thing to do in a competitive marketplace where the vast majority of restaurants

20

~~restaurants~~ price their menus based on the assumption that their service staff will make a

21

~~a~~ significant portion of their compensation from tips. As more restaurants move to a service charge in lieu of tip (which we believe will happen in the coming months and

22

years), the circumstances will be more favorable to taking this additional step.

23

72.    On **December 4, 2014,** ~~Hopelain said that "we are trying to set up a meeting for next~~ ~~week~~Conspirators Share Their Know-How with ~~other Oakland restaurants to explain what we are going to do. And hopefully, rally them to do~~ the ~~same. I know a lot of people are trying to figure it out."~~

73. On **January 12, 2015,** a class action lawsuit was filed against Colicchio alleging that employees at his Wichcraft chain were unlawfully docked tips, denied overtime, paid below minimum wage, ~~Industry~~ **and** sexually harassed. Colicchio has reportedly said Learn from Their Peers in ~~New~~ York laws requiring that workers receive written notice of a wage change is a "technicality" and that "it's absolutely wrong" to penalize employers who violate such laws.

74. In or about **January 2015,** the NYC Hospitality Alliance released the results of a survey showing that New York City servers earn on average $25.34 per hour including tips, and bartenders earn on average $27.48 per hour including tips.

75. On **February 2, 2015,** the Alliance sponsored an industry conference titled "Have We Reached the Tipping Point for Tips?" One panelist said that restaurants would not pay servers twenty-five dollars per hour if tipping was eliminated. Rigie said "One of the most interesting things that I grapple with, and I know many of you in this room we've had these discussions. What is it going to take the industry to change … . One of the big things that is holding people back ... they don't want to be the test case where we get rid ohipping ... our tipped employees will get a straight hourly wage which will reduce their hourly rate and then they are going to work across the street at my competitor. And that just really seems to be the big challenge and I don't know if there is really any one way that enough restaurateurs at one time are going to make a switch and say we're going to move from tipping…"

76. On or about **February 8, 2015,** Colicchio told Crain's New York Business that it would be easier to eliminate tipping "if a Jimmy Haber, Danny Meyer, or Daniel Boulud did it … I expect that ten years from now, no one will know what a tip is."

77. York City and Elsewhere

51. On July 26-27, 2015, GGRA held its first annual industry conference. ~~Vogler and~~ **Defendants** ~~Vogler and~~ Hopelain were **featured** panelists for the ""The Tipping Point: Rising Labor Costs ~~and~~

FIRST AMENDED COMPLAINT - 30

28

27

28

[3] A twenty percent surcharge (or twenty percent increase in menu prices) increases total cost by more than twenty percent when tax is taken into account. Tax is not paid on tips.

and the New Restaurant ~~"-"~~ session. ~~Sagaria~~ A representative of USHG attended ~~"our "~~ the Tipping Point

panel and connected with Thad

~~2~~ Vogler, owner of Bar Agricole and Trou Normand to talk about ~~Thad's~~

Thad's new then [sic] tipless

~~3~~ model, which helped inspire[] some of [the] mechanics of ~~USHG's~~

USHG's tipless policy ~~"."~~ One

questioner asked ~~""~~ what can all of us do and what can the Golden

Gate Restaurant Association

do to make this an easier step for all the rest of us to go in that direction ~~…~~… it would be nice to

have some sort of game plan that would level the playing field and make us all go in with one

~~8~~ voice and with one kind of unity so that servers do not cannot ~~[sic] really say that I don't want~~

~~9~~ to [sic] really say that I don't want to work here anymore because I can still go to the other place

that still has the old system so

to speak. If ~~everybody's~~ everybody's doing the same thing ~~,~~ we alleviate that point ~~"."~~ In response, GGRA

Executive Director Borden, the panel moderator, said that ~~"~~ "obviously as a trade association ~~,~~

we cannot do price fixing ~~…"~~ …"

~~78~~52. On September 1, 2015, ~~a group of~~ restaurant owners in Los Angeles were sued for

price fixing in

connection with their implementation in 2014 of a three-percent surcharge on

all sales. One of ~~the~~ this group reportedly said he was ~~""~~ inspired by the Northern California

pioneers ~~""~~ and that he

emailed a group of "like-minded restaurant owners" to see whether they

could "plan a course

of action together." Another of the Los Angeles conspirators was reported saying that "we

decided it would be a good thing to do as a group. … Usually when lots of people do things it's easier to make change." The case was tentatively certified as a class action in January 2018.

79. The Wall Street Journal reported that around August or September 2015, Meyer

gathered together fifteen of New York's top restaurateurs, representing about eighty

establishments, to tell them that USHG was planning to end tipping and raise prices. The

apparent purpose of the meeting was to solicit participation by the attendees and, upon

info1mation and belief, other participants indicated they would follow USHG's lead. Upon

information and belief, Meyer, in response to questions about the Los Angeles lawsuit

referenced in Par. 78, above, said that "the first rnle of this meeting is that this is the only

meeting we're ever going to have as a group."

80. On or about **September 15, 2015,** Colicchio said that Craft's new lunch service would

be gratuity free with higher prices. "It's time for a change, it's time to pay servers a salary ...

Waitstaff should no longer be beholden to someone who might not like the way they look."

Upon information and belief, Colicchio attended the meeting referenced in Par. 79 above.

81~~53~~. On October ~~14, 2015,~~ Meyer announced that USHG would eliminate tipping and

increase prices at all of its New York City restaurants by the end of 2016:

Dear Friends,

I am writing to share some important news about Union Square Hospitality
Group that we want you to understand before your next visit to one of our
restaurants.

Recently, our entire company has been engaged in a robust conversation
about how we can provide even more meaningful career opportunities and
advancement for our 1,800 employees. It has become increasingly clear to us
that a major obstacle in this endeavor is the practice of tipping.

There are countless laws and regulations that determine which positions in a
restaurant may, and may not share in gratuities. We believe hospitality is a
team sport, and that it takes an entire team to provide you with the

experiences you have come to expect from us. Unfortunately, many of our colleagues -- our cooks, reservationists, and dishwashers to name a few -- aren't able to share in our guests' generosity, even though their contributions are just as vital to the outcome of your experience at one of our restaurants.

After a thoughtful, company-wide dialogue, I'm proud to let you know that Union Square Hospitality Group will eliminate tipping throughout our family of restaurants. Starting at The Modern in late November, you will no longer find a tip line on your check, and there will be no need to leave additional cash at the table, the coat check, or the bar. Our other New York restaurants will make this change over the course of the next year.

Once these changes are implemented, the total cost you pay to dine with us won't differ much from what you pay now. But for our teams, the change will be significant. We will now have the ability to compensate all of our employees equitably, competitively, and professionally. And by eliminating tipping, our employees who want to grow financially and professionally will be able to earn those opportunities based on the merit of their work.

We are making a bold decision for our team and our guests, and we don't take this lightly. We encourage you to share your thoughts and feedback at

We remain more committed than ever to our promise of delivering  excellent dining experiences  with  warm hospitality –  and we hope that you will both support our team and join us on this journey.

With gratitude, 17, 2015, Danny Meyer

82.    On or about **October 15, 2015,** Meyer said that the price that consumers will pay under the hospitality-included model  will likely exceed  the price that would  have been paid before implementation (including tip). According to Meyer "[t]he average  person is  going to do the math and say I was going to pay A plus B anyway. In our case, it's going to be A plus B plus C, because in addition to the 20% you would've tipped, we're also trying to right what has been a labor of wrong, and that's going to cost a couple more points on top of that." In addition, sales tax is paid on the higher prices but is not paid on tips.

83.    On **October 15, 2015,** Meyer thanked Restaurant Oppmiunity Centers United (see Par. 108-12, below)  via Twitter: "Thanks go to your education for helping our industry to understand the 'why.' #HospitalityIncluded."

84.    On **October 15, 2015,** Meyer appeared on CBS This Morning:

**Charlie Rose:** So you call this Hospitality Included. Why are you doing this?

**Meyer:** You know what? I love the hospitality business as much as anyone on Earth. What I don't love is a situation which is over the thirty year career I've had, the disparity between what somebody can make in the dining room with a tipping system and what somebody can make in the kitchen has widened by about 200 percent.

**Rose:** A lot more being made by the waiters than the cooks.

**Meyer:** Yes. And I love the fact that waiters make good money. As a matter of fact, the waiters at our restaurants when we eliminate tipping will make as much or more in seventy-five percent of the cases than they're making right now. But, when you have a tip, I don't think the general public fully understands where that tip can go and where it's not allowed to go. So for example, when you leave a tip at any restaurant, not only is the waiter generally sharing it with all other waiters, but they're not allowed to share it with anyone in the kitchen. So the very people that cook your food...

**Rose:** Why are they not allowed?

**Meyer:** Because that's how laws are written across the country.

**Rose:** Does it have something to do with taxes or what?

**Meyer:** It has nothing to do with taxes. It's that gratuities are only allowed to be shared amongst the people who actually face you during the meal. So that means that on a really really busy Saturday night when everybody's high fiving themselves because they did such a great job taking care of you, the cooks are sweating a little bit more while the waiters are counting a lot more cash.

**Ross:** Let me say this. The person I want to be happy is the cook. (Laughter)

**Gayle King:** Danny, people say if it is too good to be true, does that mean we're going to pay in other ways. Now the prices of the food are going to be going up?

**Meyer:** Well, the price of your meal is exactly what it is. So for example, when you agreed many, many years ago that it was worth paying a little more for organic vegetables or for locally grown vegetables, or animals that were raised responsibly, that got put into the menu prices. And right now it is going to be put into the menu prices not just what we pay the cooks and the florist and the reservationist and for

tablecloths but what we *pay* our servers as well and that's our responsibility to do it. At the end of the day, when you get your credit card bill a month later, that line when you come to one of our restaurants should look just about exactly as it would have if you had struggled in the dark to put on the tip. So it's true that the menu price itself will look higher to you by about 21 percent, but the total at the bottom will be the same. The benefit is that we will get a chance, because we don't have to worry about who will not get tips, to make it an equitable playing field for everyone.

**King:** And not worry about people who don't give good tips.

**Meyer:** That is one of the most demoralizing things in the world if someone stiffs a waiter for slow service and it may not have been the waiter's fault.

**Norah O'Donnell:** Danny this is on the front *page* of every business section in every major paper in this country because it will revolutionize eating if other restaurants follow your lead. Can you guarantee that it will only be a 20 percent increase in the menu price, or could it go as high as 35 percent as some analysts are suggesting?

**Meyer:** We'll we're going to start it at 21 percent and try to make it work as best we can. I think it's really important, Norah, to understand that January 1st of next year minimum wage is going to be going up everywhere. And as soon as minimun wage goes up, not just our restaurants but every restaurant is going to have to raise their prices. That doesn't require you to eliminate tipping. But we looked at that moment in time and we said if we're going to have to raise our prices anyway, why don't we use this opportunity to make the restaurant business a much more sustainable place? I just got to add one more thing. We are facing across the whole country the biggest single labor shortage in talented cooking skills that we have ever seen, and part of the reason

1     is that if you're a young kid and you want to go to cooking school with big, big bills,

2     how do you tell your parents what I really want to do is work for eleven dollars an hour,

3     ten dollars an hour, nine dollars an hour, and then live in a big city like New York. So

4     for the very sustainability of the business we think this is important.

5     **O'Donnell:** All right. Really interesting. Thank you restaurant legend. You earned that

6     well. (Laughter)

7

8     **Meyer:** Thank you Queen Gayle. (Laughter)

9     85.   On **October 19, 2015,** Meyer appeared on Fox's Mornings With Maria:

10    **Maria Bartiroma:** Restaurateur and Union Square Hospitality Group CEO Danny

11    Meyer taking a stand on wages. In an effort to pay his workers more, he is eliminating

12    tipping from restaurants. He joins us now to talk more about it. Dagan McDowell is also

13    joining the conversation. Danny good to see you. Welcome.

14    **Meyer:** Thanks Maria.

15    **Bartiroma:** You have such successful franchises out there and you want to put this

16    across all the restaurants—no tipping?

17    **Meyer:** We're going to roll it out over the course of the next year. Well the first thing is

18    that a lot of people don't understand that the tipping system as it is has completely lost

19    any value that it may have ever had. Most restaurants share tips so all the waiters share

20    the tip that you leave so that it doesn't really go to the person you thought it was going

21    to go to, but the law prevents a restaurant from sharing your tip with the people who are

22    cooking your food. So at the end of the day, what's happened is that—it can be a good

23    thing for servers who want to work on commission. It's a bad thing for

24

25

26

27

28

servers who want to make a profession out of it, but it's a terrible thing if you're the

person cooking the food.

**Bartiroma:** I couldn't believe that when I read that. Why is it banned that the people

cooking the food don't get a piece of that tip?

**Meyer:** You tell me. It's a government thing.

**Bartiroma:** That is so weird.

**Meyer:** It's something that has actually created a disparity where over the past thirty

years the kitchen wages have gone up 22 percent on an hourly basis in thirty years

whereas in the dining room has gone up well over 250 percent.

**Unknown Male:** Danny your strategy, will it help the quality of life of the people

working in your restaurant?

**Meyer:** It's going to help us to reverse what's been a horrible drought in labor in the

kitchen. There is absolutely no incentive to go to culinary school and cook at the level

that you need to at one of our restaurants when you know that you just can't make that

much money.

**Dagan McDowell:** One thing that everybody has said, certainly on Twitter, I've seen

so much conversation about this, if I can't reward my server, then the service is going

to stink. It's my discretion that I get to say, I get to determine if the service was good

or not, what do you say to that.

**Meyer:** I say that's my job. I say if you come to one of our restaurants and one of our

servers is not offering warm hospitality unless you give him a tip, I don't want that

server working for me, and they won't at the end of the day. I would also ask you a

question. When you see a menu price in any restaurant, let's say you're going to buy

Case 4:17-cv-05782-JSW   Document 123   Filed 03/30/18   Page 88 of 78

the roast chicken, it includes the full price of the roast chicken, including the cook's salary. If the roast chicken is dependent upon you tipping the cook to be good, would you go back to that restaurant?

**Bartiroma:** ffs a great point. I mean I just. People might want to do an extra tip on top of, I mean obviously prices will be higher right because you're incorporating the tip in there?

**Meyer:** The menu price that you see will be higher but the guy that would have tipped is gonna tip anyway so by the time you get your credit card bill it's the exact same thing as if I put it in there in the first place.

**Anastasia Amoroso:** Actually when we look at tipping now, unless the service is really, really horrible, you probably still default to an automatic 20 percent. So if that's the case, then that will be passed on to the cooks, to the servers, and so forth. How much of an increase are they looking at in terms of their real wages?

**Meyer:** Well what we're going to be able to do is to have that discretion ourselves, so by putting the full price into the menu, being transparent about it, it allows us to do two things. Number one is, that we get to determine what everybody's revenue, what everybody's income is on a merit basis. Do you know that every single waiter makes the exact same adjusted minimum wage whether they are good or not. Do you know that every single waiter today shares in the tip that you gave this one waiter right over here. How about if I have the opportunity to pay somebody what I think they're worth. And what we're going to do for our servers because it is an outstanding profession for

many of them is to not only raise their wage to nine bucks per hour[7] from two dollars thirty five per hour[8] but we're also going to institute revenue sharing for our servers so that just like today when the restaurant's revenues go up, they're going to have the incentive to sell and to make more money, so we're not going to take that away from them.

**Bartiroma:** I like it. I think you're selling me.

86. Meyer was also interviewed on a Comcast webcast around the same time:

**Bost:** You're changing tipping. You're changing the whole thing. So tell me about that.

**Meyer:** Well we're eliminating tipping in all of our restaurants over the course of 2016. We started at The Modern at the end of 2015 and we just rolled it out two weeks ago at Maialino, our Roman restaurant. And were doing these one by one because we are learning more and more and more but it was important for us to take a stand on this for a huge host of reasons. Some of them are philosophical, some of them are financial, and I would say some of them are political.

**Bost:** So let's start with the philosophical reasons.

**Meyer:** The philosophical reason to eliminate tipping is that it's one of the most demeaning practices in our entire society. If you are on the receiving end of a tip it means that the person who is tipping you believes that you would not have otherwise

---

[7] The minimum wage in New York City for non-tipped employees (for employers with more than ten employees) increased from $8.75 per hour to $9.00 per hour effective December 31, 2015.

[8] The minimum wage in New York for tipped employees increased from $5.00 per hour to $7.50 per hour effective December 31, 2015. The federal tipped minimum wage is $2.13, but it has no applicability in states with a higher minimum wage for tipped employees.

been nice to them  or given them  good  service or  prompt  attention  at a bar or  given them their coat back or  whatever  you know  given them the coffee  they  had  actually ordered if you had not left them a tip. And it's complete nonsense. And if you're the person whose performing that service and you are actually someone who takes pride in doing a  good  job at  the thing you're  doing,  you don't want the other  person to think that the only reason you did a great job, and suggested that bottle of wine is so that two and a half hours later  you could pick their pocket.  Or you don't want to  be somebody who thought  the only reason  I actually  brought  you  your coat back  instead  of some other guy's coat back is because you're  going to throw three dollars at me and buy your coat back from me. So the other thing philosophically is that in the years that I've been a restaurateur, what the tipping system has done is unfortunately created a  huge wedge and divide between people in the back of the house, whose hourly wage has barely gone up in the thirty years that I've been in the restaurant business, and people in the dining room who earn tips whose incomes have gone up about three hundred percent cause what a tip is it's a multiplier of menu prices.

**Host:** That's really interesting.

**Meyer:** And menu prices have gone up. The tipped percent has gone up. But meanwhile the hourly wage of back of the house employees has barely gone up and  in most states in the country including New York, there is something called the eighty- twenty rule. It's a rule that says unless someone spends eighty percent of their time face-to-face with a guest, they are not eligible to share in tips. So if you come to one of our restaurants in New York or actually probably eighty percent of every  full-service restaurants in this country, tips are pooled. What that means is that you the customer

think, let's say you're one of those rare customers that uses your tip as a way to punish someone for bad service which I think is kind of ridiculous because that should be my job to not give you a raise or to fire you if you are giving bad service. So let's say you are one of those people. So now you leave five percent or zero percent or ten percent to prove a point, and you think you're really hurting that server, well you're really hurting everyone in the entire front of the house because in a pooled house everyone is getting that whack. Or if you're someone who thinks that you're going to get a better table next time because you're a big tipper, which is ridiculous because the reservationists are not allowed to share in tips. But let's say that you're someone who thinks you are going to get a good table so you leave a big tip for that   server, that's just getting shared with thirty five other people anyway.

87.    Unlike the mainstream media, many commentators have viewed with skepticism the restaurateurs' claim they are motivated by social justice concerns:

Serving is one of the last jobs women with little education can do and make decent wages to support their families.  I served  previously  as a second  job on the weekend and the tip system motivated me to put out my best at every table. I enjoyed the challenge and the fast pace of the job is motivated by the money collected at the end of the shift. Restaurants will never pay $20 – $30 an hour, and that is what good  servers make.

This is about a separate economy that exists in the restaurant business and how the owners want to get their hands on it. I'll be willing to bet that Danny Meyer (and those

like him) were advised by their billionaire friends that they have millions of dollars flowing through their restaurants and that they need to absorb and control it. Why else would they all of a sudden care about their labor pool, of which, their history includes passing legislation to pay people under the minimum wage and traditionally offer[ing] the least amount of benefits possible (in most cases) and zero job security. This is about the redistribution of wealth, which is only acceptable for the bottom up and not the other way around. They want to take the tip money that servers earn and pay their kitchen staff. That's it. ... The best part of this episode is the demonization of the server and how it's unfair that they make so much more than the kitchen staff. Gee, I always thought it was the owner's job to pay the kitchen staff?

Can [New York] *Eater* publish some article from who is against the no-tip system that will be NICE and FAIR? Why someone (restaurateur), that so far have always paid so little to the back of the house, now sadly should change? WHY??? As owner, you minimize your cost and maximize your profit: so you'll keep pay as low as you can [for] your chefs, and now with the money that you "stole" from the waiter, you'll badly pay your front of the house staff...... and eventually you'll become richer (and cooler, telling friends and *Eater* that you do this for equality!!!)

Whose fault is it the back of the house isn't paid enough? It's the owner's fault. If Danny Meyer thinks his employees need to get paid more he is free to pay them more. The problem is he wants them to get paid more, but doesn't want to raise his prices and doesn't want to decrease his profit. He is shifting from waiters to back of house. He is

100% robbing Peter to pay Paul. And no one in the media is asking the right questions or the right people.

Congratulations on doing your part to muddy the waters on the no-tipping issue. Once again, this is REALLY about owners paying their cooks a proper wage, NOT robbing the servers to pay the cooks. Which is what a no-tipping model really is. The no-tipping model is a perfect cover for more restaurateur shenanigans. The very same tricks that have landed many, many restaurateurs of note (including the sainted Danny Meyer) in tip related settlements/lawsuits.

It annoys me when chefs/owners who go the no-tipping route view themselves as progressive or noble. Newsflash: If you felt the cooks were underpaid, you always had the power to raise their pay. You just chose to pocket the money yourself. Now all you're doing is responding to minimum wage increases by raising prices to accommodate a wage increase while you yourself "maintain the same level of profitability" which is completely fine except you want to pat yourself on the back like you're doing something noble. Just raise the prices and spare us the "we are proud to lead the charge" and the "we hope to strengthen and promote a movement towards a more equitable compensation system."

All of these moves are reactionary instead of progressive. Cooks have been underpaid for years, why all of a sudden is a dramatic change being made? Because the

Case 4:17-cv-05782-JSW   Document 123   Filed 03/30/18   Page 41 of 75

[minimum] wage increase is happening! Bingo! ... If you thought cooks were so underpaid then you should have [paid them] out of your own pocket.

Maybe when they're doing all their financial modeling and forecasting they could budget more money towards paying their cooks and work from there? Just a thought. If higher cooks' pay were prioritized, it would happen without taking tips from servers, bussers and bartenders.

 [T]ipping isn't creating a wage disparity or low BOH wages. In fact, it's what allows restaurateurs to pay BOH a living wage. Catch is, restaurateurs must be willing to curb their profits a bit.

Meyer would have us believe that the reason he is banning tipping is to reduce wage inequality between servers and cooks. I call "B.S." ... It's pure capitalist genius cloaked as crusading socialist justice.

As a retired bartender in NYC for 35 years, we know what's going on... Steal the waiters' tips in a roundabout way to pay others in the restaurant. ... All the food sites like eater.com and the NYT only have been promoting the owners' side of the story ... as I've said in the past, pay the kitchen and floor managers more$.

Danny Meyers has been in charge of how much kitchen staff makes, not the servers. Now deciding that Front of House makes too much money (is that possible in New

Case 4:17-cv-05782-JSW   Document 123   Filed 03/30/18   Page 42 of 70

York?) he is trying to redistribute server's wages. So are servers really supposed to believe owners will have their best interests in mind when they have proven to not raise kitchen wages in years?

If you want to pay your kitchen staff more, just F***ING do it. Nothing was ever stopping you. Hospitality Included will result in a pay cut for hundreds. Period. Don't make yourself out to be a fair wage pioneer. If you want to be truly fair, how about medical coverage. How about eliminating "at-will employment?"

I'm sure the same industry that has lobbied to keep the server wage at $2.13/hr for decades will be very fair with their #notipping policies. How many people have put themselves through college with their tip money? I personally know two dozen.

wow!!! they make more money?? wow?? how? Ah ... yes ... they taking the tips from the waiters and putting in their pocket... great management!! and great article (or was [it] a press release hard to find the difference)

As a restaurant owner, so much of this is questionable, most notably, [The Modern Executive Chef Abram] Bissell's claim that The Modern only generates a 7% profit. When you take into account that they pay their senior line cook just $24k/year (something I'd be ashamed to admit in private, let alone on public radio), it's clear something is amiss.... In short, no one takes on the high risk and hard work required to open a restaurant just to make a 7% profit. These are either real estate investments

disguised as restaurants, or the owners and executive staff receive highly inflated salaries. Before reporting on an issue with such great potential to impact an entire industry, I suggest next time the Freakonomics crew scratch the surface a little deeper.

I agree BOH should be paid better. Interesting how Mr. Meyer and company are "wracking their brains" to offset the disparity when Mr. Meyer is worth a current estimate of over $386 Million. Instead, the message is that FOH employees are overpaid.... [T]he record profits they saw were a direct result of a revenue stream that was going straight from customer to server go instead to Danny Meyer directly which he used to increase the salaries of floor managers and yes give BOH employees a modest wage increase.... Was this [Freakonomics] episode an attempt at journalism or just a commercial for Danny Meyer's establishments?

Call me cynical in 2016, but, I find it hard to believe that the restaurateurs who are crusading for this No Tip policy are altruistically trying to figure out a redistribution rather than simply trying to get THEIR hands [on] the cash left on the table. Please.

Owners are jacking employee tip jars across the country. DUHHHHH

88.     On October 17, 2015, Meyer congratulated Camino via Twitter for ""leading the way."

89.     On October 18, 2015, USHG said it would share best practices regarding hospitality included at its upcoming October 27, 2015 town hall.

FIRST AMENDED COMPLAINT· 43

90.    On **October 19, 2015,** USHG tweeted "listen in on the growing dialogue around #HospitalityIncluded, and ask us questions #hospitalityincluded@ushgnyc,com."

91.    On or about **October 15, 2015,** Meyer told Bill Ritter of ABC7 New York that in order for hospitality included to work "we've got to see a number of our industry colleagues convert and adopt this themselves. ... . The biggest challenge we are going to have Bill to making this all work is that if people come in and we're the only guys who are raising their menu prices enough to pay for this ourselves and we're going it alone, it's going to be a tough thing.

92way."

54.    On October 27, 2015, USHG held a town hall at the Martha Washington Hotel in New ~~New~~ York City, at which it discussed its decision to end tipping and increase prices. The meeting was hosted by

Journee, a trade association of restaurant owners and hospitalityprofessionals. ~~USHG tweeted~~

USHG tweeted to Journee founder Anthony Rudolf: "Thank you for hosting the industry talk.

Looking

forward to keeping the conversation going!" Gwyneth Borden attended the town hall.

93.    On **November 2, 2015,** USHG sponsored a town hall to discuss and answer questions regarding hospitality included. Meyer tweeted: "So grateful to see so many guests for joining us to dialogue on #hospitalityincluded." USHG said at the town hall that the price of a meal after the implementation of hospitality included will increase about 5-8 percent over what it was prior to implementation.

94.    In **November 2015,** Joe's Crab Shack ("Joe's"), announced it would "lead[] the industry" and switch to no-tipping and increase prices by about fifteen percent at 18 of its

25    restates the allegations in the foregoing paragraphs.

26    95.    On or about **November 15, 2015,** Colicchio said on CNBC's On The Money that he

27    eliminated tipping because "I think that I should be able to control or at least compensate my

28

staff. We know that studies at Cornell University [show] that the amount of money left at a tip

has very little to do with service. It has more to do with your accent, your race, and your

gender, as a server, and so I would prefer to compensate my staff."

96.    On or about **November 19, 2015,** USHG implemented hospitality included at The

Modern. The menu prices did not all increase by the same amount. As one example, the price

of a three-course dinner increased from $98 to $122, an increase of 24.5 percent. In addition,

the extra sales tax (8.875%) on that meal is $2.13 (0.08775 x 24).

97.    The Modern's December 2015 profits were the highest ever because, according to

Meyer, "doing the right thing is the most profitable thing." Meyer also said that "all of our

leaders in all of our restaurants are clamoring to be next. They all want to do this because they

have seen some pretty compelling statistics."

98.    On **November 20, 2015,** Meyer told the Chicago Tribune that USHG's economic

modeling shows that after hospitality included is implemented, 100 percent of its employees

would do at least as well financially and 75 percent would do better. The article also quotes a

Chicago restaurant owner who eliminated tips saying that he has heard from "pretty much

every high-end restaurant in the country" asking about his no-tip, mandatory service charge

model.

99.    On or about **December 2, 2015,** Eleven Madison Park announced that it would end

tipping and raise prices. Including taxes, it increased its prices by approximately 30 percent

effective January, 2016. Eleven Madison Park was represented at the meeting referenced in

Par. 79 above.

100.   On **December 8, 2015,** USHG's held a hospitality included town hall, hosted by the Institute of Culinary Education. USHG tweeted: "Big thanks to @iceculinary for hosting our second #HospitalityIncluded town hall. Excited to share best practices!"

101.   On or about **December 14, 2015,** Huertas announced it would end tipping and raise its prices. Alder said that he would help other restaurants adopt a no-tipping model and give them "the confidence to make this change a reality." Alder has also said: "Can we start something bigger than Huertas? Can we help other restaurants get to this point? If we're a leader in the movement, you've got to feel pretty good about where you're going. I'm super passionate about this. If we can get this passion to flow through the ranks, through our staff, throughout industry, then we're going to be in really good shape." Huertas' website states that "[w]e believe that this is the future of dining in New York City and are proud to lead the charge alongside our former employer and mentor Danny Meyer and his Union Square Hospitality Group." At the time of the announcement Sagaria tweeted "Starting today @huertasnyc Will Eliminate Tipping." Upon information and belief, Huertas was represented at the meeting referenced in Par. 79, above.

102.   On or about **December 15, 2015,** Tarlow announced that he would end tipping and raise prices at all of his restaurants. He said that "having Danny out in front of it has been a huge impetus for us to take the plunge." Sagaria tweeted regarding the announcement: "Big (and inspiring news) today!" Upon information and belief, Tarlow attended the meeting referenced in Par. 79, above.

103.   Around the time of his announcement, Tarlow hired a designer to create an open-source "gratuity-free" logo, which is available for free at gratuityfree.nyc. The website states:

Are you an operator that has already moved or is planning to move to a Gratuity Free

model? You can use the logo we created to let your guests know that the prices they

see on your menus include service.

Enter your information, and we'll get back to you with more on the Gratuity Free logo

and high res files.

By submitting this form you agree to the terms of our *Privacy Policy* and consent to us

communicating with you.

The logo is currently being used by restaurants in New York, California, Oregon, and, upon

information and belief, elsewhere.

104.    On or about **December 17, 2015,** Fedora announced that it had "joined a movement of

like-minded restaurants in adopting a hospitality-included model that eliminated tipping."

Sagaria tweeted at the time: "More existing news! Much respect and admiration for

@gabrielstulman & team for taking this step." Fedora subsequently reverted back to a tipping

model, though Stulman said he "continues to believe that [no tipping] has the potential to

change hospitality for the better" and is "thankful for the support of our colleagues who

remain committed." Upon information and belief, Stulman attended the meeting referenced in

Par 79. above.

**105.**    A survey of New York City restaurant goers released on or about **January 7, 2016,**

showed that the majority like tipping, think it is a good system, and are not confused by it.

106.    On or about **January 8, 2016,** David Chang ended tipping at his new restaurant Nishi, located in the Chelsea neighborhood in Manhattan. Upon information and belief, Momo was represented at the meeting referenced in Par. 79, above.

107.    On **January 18, 2016,** Journee hosted a conference titled "Learning From No-Tipping." Sagaria and Adler presented. An industry consultant tweeted: "This issue has brought ppl together in the industry that no other issue has."

108.    On **January 26, 2016,** The Ford Foundation hosted a "discussion" on Suru Jarayama's new book Forked: A New Standard for American Dining. Jarayaman co-founded and co-directs Restaurant Opportunities Centers United ("ROC"), an Oakland-based 501(c)4 organization funded in part by the Ford Foundation that purports to represent the nation's restaurant workers, and yet supports the no-tipping movement even though it has and will substantially reduce income for thousands of restaurant workers, many of whom are women of color with children.

109.    ROC created Restaurants Advancing Industry Standards in Employment ("RAISE"), an association of about 200 restaurants that is a "supportive community of peers around the country, and financial resources to meet and visit with peers in other parts of the country to learn best practices." RAISE members purport to take "the high road to profitability," by, among other things, eliminating tipping. Colicchio and Meyer were early members of RAISE.

110.    The ROC website identifies 215 restaurants that are taking the "high road" to profitability, including 75 in Madison, Wisconsin, 35 in New York City (including Craft and USHG), 21 in the Bay Area, and five in Chicago (including GreenRiver). "These businesses meet our high road criteria and are known leaders within the sustainable and fair food movement in their communities."

Case 4:17-cv-05782-JSW Document 123 Filed 05/09/18 Page 49 of 75

111.   In an interview, Meyer told Jayaraman that tipping "gets into questions of justice, politics, social norms, economics  obviously, class warfare,   gender  and race, and as   you told me, the thing that makes me more  inspired  as anything  is that,  if  you do not have your head buried in the sand  and  you have noticed  that there has  been a widening  gap  between  those who have a lot and those who don't have enough."

112.   Meyer was a featured speaker at the January 26, 2016, discussion:

Thank  you  so  much  and  thank  you all  of you guys  for  being  here  tonight.  Hi  Tom [Colicchio]. I knew you'd be here. So this has been a fascinating journey,  and I've  been so educated by Saru.... And I didn't have the courage but I did have the interest about 21  years  ago  when,  right  about  the  time  that  I  opened  a  second  restaurant,  Gramercy Tavern  along  with  Tom  Colicchio  and  we  were  looking  at  tipping  and  kind  of  the problems with tipping but from a very, very different perspective than we are looking at it  today  quite  frankly.  I  think  it,  just  a  quick  and  important  thing  for  you  guys  to understand that back then the ignominious of tipping was that you would have  waiters who would sometimes not have the opportunity to make the same money one night as compared to the next, and not know what they could make because of the ignorance of diners who might have thought that because the food was taking too long to get out of the kitchen, which had nothing to do with the waiter, maybe we should punish the waiter and  not  leave  much  of  a  tip.  And  there  were  nights  when  waiters  would  be  crying  or sometimes running out on the street after guests, neither one of which was a good scene.

And so that was kind of a motivator to say why do we need tipping? Why can't we do it ourselves? Frankly I didn't have the courage to change it because waiters themselves didn't want the change to happen. Back then, not all tips were being reported as income....

But what's happened all these years later and I really want to chalk this up to good luck which is running into Darren [Walker, President of The Ford Foundation] on an airplane, I'm going to guess what about a year ago.... and not two weeks after that getting a call from Darren saying "you know, I don't know if you've ever met this person that I know and respect so much named Saru," and I almost ran the other way when I heard her name because as much as I have been educated as a restaurateur by the work that Saru, it's true, the work that Saru has done with ROC and I truly have been educated and sensitized to some very, very different issues with respect to tipping that do not exist in the fine dining world but that do exist in a huge percentage of restaurants that are not fine dining restaurants in this country.

As a business person, my style has always been to learn from people who have figured this stuff out way before I did, and then try to see if it really jives with my sense of justice; how it can be pragmatically put into practice as a business and make it work. We think it is good business to have restaurants be sustainable. They are not sustainable with the current system of tipping. And the reason they are not sustainable and what has changed dramatically over the thirty plus years that I've been a restaurateur is that every single time prices on the menu have to go up because

underlying costs go up, whether it is rent or insurance or linen or flowers, or the cost of protein, the cost of any aspect, what happens is that the tip-eligible employees make more money because as the cost goes up, the multiplier called the tip therefore goes up, but nowhere along the way do restaurateurs tend to also pay their back-of-the-house tip-ineligible workers more because then the menu prices would have to go up even further, and then the disparity would only increase over time.

So quickly, let me just recap. Thirty years ago we did not have nearly the disparity between what you could make in the dining room and what you could make in the kitchen. And the cost of living in any town, never mind just New York, was quite a bit lower. So truly, you could come to work at a restaurant thirty years ago, you weren't going to get rich by being a cook but you could at least pay your rent. Today, while the cost of living has gone up at least three-fold since I first became a restaurateur, the hourly compensation for cooks and other non-tipped employees has gone up a whopping 35 percent.[9]

In that same time, tipped employees with the adjusted minimum wage, have been able to make in fine dining at least 350 times as much. Try and imagine being a football coach and your defense gets paid 350 times, 350% more and your offense only gets paid 35 percent more and go back into halftime and try to make everybody feel real good. You can't do it, and nor are you ultimately going to be able to attract the next

_____
[9] Meyer has also said (Par. 124, below) that cook salaries at Union Square Cafe increased from about $10-11 in 1985 to about $11-12 in 2015, which is an increase of approximately fifteen percent.

generation of kids who say when I grow up I want to play offense on a football team. And where we have a situation where culinary students can only afford to be waiters and cannot afford to be cooks, that's a serious problem in terms of the sustainability of our industry....

And we cannot say that we care about fairness, economic fairness, we care about this country, and know that the hospitality industry is the second largest employer in this country after the government, and say that for at least half the people who work in the industry, they can't even afford to be in this industry but it's the only job they can get.

So I'm so grateful for the activism, the education, and also for the convocation that Darren has done by bringing me together with Saru, our organizations together, and really for our entire industry because in addition to I think probably doing more to increase the potential standard of living for a huge swath of our country, I think what you are doing right now has the ability to actually save our industry. Thank you so much.

113. Jayaraman said:

In 2015, something extraordinary happened. Darren brought Danny and I together. We spoke. I also spoke with Tom Colicchio. We talked about these issues maybe for the first time. We'd been talking about them, but more directly for the first time. And Danny Meyer and Tom Colicchio decided to go one step farther. They said we don't actually just want to pay a minimum wage, we don't want to pay a livable wage, we

1    want to pay [ ] a thrivable wage. And because they were able to pay that thrivable wage,

2    they were able to eliminate tips altogether. A huge and incredible move.

3

4    114.    Jayaraman moderated a panel during this discussion:

5    **Jayaraman:** So we have a short panel to hear from these amazing folks. I wanted to

6    start with Danny if that's okay, and just talk to you a little bit about hospitality included

7    and the move. I know that we've talked about how we may come at it from different

8    vantage points, but ultimately I think we are headed in the same path. So could you say

9    a little bit about that and how you see it from your vantage point?

10

11

12   **Meyer:** Well I think what you are doing with respect to One Fair Wage,[10] if that were

13   to sweep this country, I think the entire tipping question would almost become a moot

14   point. Because every time minimum wage does go up, restaurateurs have to raise their

15   prices. And because they raise their prices, tipped employees will continue to make more

16   money. Unfortunately, that will increase the disparity between tipped and non-tipped

17   employees. So if there were one fair wage whereby the two dollars and thirteen cents or

18   two dollars and forty-three cents or whatever they figure that to be becomes

19   seven fifty or nine dollars, which is what we are paying at The Modern right now, plus

20   a revenue share on top of that, there is no way tipping is going to survive at that point.

21   It just can't because if the minimum wage were to go up to say ten dollars, it wouldn't

22   be, it would be twelve dollars, or thirteen, fourteen, fifteen, now all of a sudden the

23   menu prices are going to become so high that diners will revolt about paying a tip on

---

[10] One Fair Wage refers to the elimination of a separate tipped minimum wage.

1    top of that. They won't. They just won't do it. And I think there will be a collision

2    which is great between what you are advocating for and those restaurants who are

3    eliminating tipping so that it is all going to come together as one.

4

5

6    **Jayaraman:** I know Tom wanted to speak out about how he can bring the public

7    along.... What we need of the public and consumers to support the high road.

8    **Colicchio:** Quick numbers. If minimum wage goes up to fifteen dollar that means that

9    that it is the porter who is making fifteen dollars an hour. Cooks are making eighteen,

10   twenty dollars. Waiters are making thirty dollars an hour at that point, thirty five

11   dollars, forty dollars an hour, okay. Now if and when, when I implement tip free, I'm

12   going to raise my prices by twenty percent, twenty-two percent. On top of that I would

13   have to raise prices by another twenty-four percent. So we're talking about almost a

14   fifty percent increase if minimum wage goes to fifteen dollars an hour and there is one

15   fair wage for everybody. On top of eliminating tips.

16

17

18

19   Now it may be double dipping according to what you [Meyer] are saying because tips

20   are going to be eliminated anyway. You may have to because nobody is going to go

21   along with a fifty percent increase. So we're [Meyer and I] kind of saying the same

22   thing. We're coming at it very differently. And so, when I say we need the public to

23   come around for the high road, they need to get used to the fact that it is going to cost

24   more money to go out to dinner. Simple fact.

25

26

27

28

So I'm all for an increase. One fair minimum wage. But journalists that are out there. You're going to have to start getting used to seeing prices increased. Now it's going to get tiered, factored in over a period of time, and so, but other things are going to go up too, not just wages. Because the person who is delivering the food is now going to make fifteen dollars an hour, food is going to cost more. Person at the laundry is going to be making more money. Our laundry is going to cost more. Everything is going to go up. So you have your classic inflation that sort of is going to set in into restaurants.

So we all want this. But we have to get the message out to the public, why we're doing this, why it's important, and especially in a city like New York, a liberal city like New York, how the public will start complaining about this, that they don't want to pay more yet they want to see everybody make more. And so we need to educate the public on why this is happening and how we can make it happen. We can't do it alone. We need everyone to help out here. So if we want to create a fairer wage, it has to be fair across the board for everybody.

115. Jayaraman travels around the country arguing to local policy makers that servers at casual sit-down restaurants such as IHOP and Olive Garden make about $1.50 in tips per hour, and hence a wage of $15 without tips would be a significant raise. Upon information and belief, currently servers at IHOP and Olive Garden on average earn more than $15.00 per hour including tip, where the average check per person is $16.50, on average make over $15.00 per hour in tips alone, and a $15 flat wage would be a significant decrease in pay.

116. On **January 30, 2016,** television personality Anthony Bourdain said about the no-tipping movement: "As Danny goeth, so shall the rest.... For a whole lot of reasons, it's the way of the future."

117. On **February 2, 2016,** USHG's held a hospitality included town hall at the Redbury Hotel. USHG tweeted: "How does no tipping work at @The ModernNYC and @maialino_nyc? Come find out at our #HospitalityIncluded Town Hall."

118. According to a **February 3, 2016** article, Meyer and "30 fellow restaurateurs have committed" to eliminate tipping, "and dozens of restaurants have followed suit."

119. On **February 25, 2016,** USHG implemented hospitality included at Maialino.

120. A **March 2016** study by UC Irvine economics professor Richard McKenzie found that ending tipping will substantially reduce the income of many servers.

121. On **March 2, 2016,** the Alliance sponsored "The Tipping Conference." The conference summary states: "An unprecedented 50% increase in the tip wage combined with other operational challenges has the hospitality industry and the dining public buzzing. The NYC Hospitality Alliance will again bring the restaurant industry together for candid conversations about gratuities, the law and eliminating tipping in lieu of alternative compensation models." Sagaria and Colicchio presented. Sagaria tweeted regarding the meeting -- "Thanks for bringing the industry together and keeping the conversation going."

122. On March 4, 2016, industry consultant and television personality John Taffer said the no-tipping movement benefits owners at the expense of servers.

> Most waitresses and bartenders can make more than the $14 or $15 an hour in tips that the restaurant is going to pay them. So I think it's sneaky. I put 18 percent gratuity on the check, I pay you $15 an hour and I run a negative 4 percent labor cost. I'm making

money on your back. Those excess tips are kept by me, not you. And I think ~~there's~~there's

something inherently wrong about it.

~~123~~USHG Takes a Leadership Role in Moving Industry to No-Tipping Model

56. On March 10, 2016, ~~Sagaria~~a representative of USHG tweeted that the no-tipping movement is "

"an (ultra)

marathon. Not a sprint. One restaurant at a time.~~"~~."

~~124~~57. On March 11, 2016, Danny Meyer was interviewed by Bon Appetit Editor Adam Rapoport at

the South by Southwest Conference ~~("("SXSW")~~-") in Austin on the topic ""Will ~~No-Tipping"~~No-

Tipping' Save the Restaurant Industry~~?"~~?" Meyer ~~commented, *inter alia:*~~

a.~~said that~~ USHG ""felt an obligation to lead on this~~."~~." and runs a ""help-line"" for

restaurants interested in switching to a no-tipping business model.

b. ~~A~~ and a no-tipping model can work at all types of restaurants and price points.

~~c. He would prefer a surcharge to higher menu prices because "it would~~

~~allow our menu prices to remain apparently competitive with everybody,"~~

~~but surcharges are probably illegal in New York City.~~

~~d. The switch to no-tipping at The Modern increased profitability. "If you~~

~~do the right thing you actually end up being more profitable."~~

~~e. An entry-level line cook at The Modern prior to the switch earned~~ ~~about ten or eleven dollars per hour, "~~

58. In 2016, Meyer said in an interview that he believed that Hospitality Included "would not

succeed unless our industry would convert," and ~~by the way~~ that ~~ten or eleven~~

dollars has come all the way up from nine or ten dollars when I started

Union Square Cafe [in 1985]. Completely ridiculous."

f. After the switch, the salary for a beginning server increased from $7.50

(the tipped minimum wage) to $9.00 (the regular minimum wage effective

December 31, 2015), in addition to a revenue share of 13.5 percent of top-

line revenue for all employees, and

g. Top-line revenue numbers are disclosed to all staff.

125. On **March 12, 2016,** Chang tweeted "No-tipping policy is advantageous for diner and

"many, many" restaurants in places with larger dining rooms. I think 90-120 seats is sweet spot: learning." have converted.

126. On or about **March 22, 2016,** it was reported that a server at The Modern said that his

income decreased approximately 15-20 percent after the elimination of tipping.

127. On or about **March 29, 2016,** Chang He also said that servers at no-tipping restaurants are

"getting capped out" and "could be making a lot more if they were taking tips," and that a no-

tipping policy "allows restaurant owners to remix the way USHG has "a team of two or three people spending A LOT of their service charges are distributed

to their staff, which we gotta do if we're retime going to hang onto the best kitchen talent." on … industry panels talking about how we're doing it," and that "we have invited industry

128, members to our town hall meetings" to discuss and consult on hospitality included. USHG is

simply being "transparent" with the industry, according to Meyer.

58.59. On April 11, 2016, GGRA held its second annual conference in San Francisco. The

Program says "[states that "[t]he San Francisco Bay Area Restaurant Community is poised to lead the

nation on solutions to the industry's industry's most vexing problems." " Defendants Vogler, and Hoffman, and Sagaria

together with a representative of USHG, presented on the opening panel, titled "entitled "The Tipping

Point: A Year Later." " USHG tweeted

afterwards that it was "" honored to share in the dialogue

and learn from our west coast peers." "

129. On **April 18, 2016,** Colicchio said during a Bloomberg interview that the no-tipping

movement may succeed if a lot of restaurants switch:

23    At Craft, if I were going to pay my servers an hourly wage that is on [a] par with what

24    they're currently making, it would be in the neighborhood of $34 an hour, So back

25    waiters or bussers in the range of $22. They're making a good wage because of tips.

26    Now, we do away with tips. The only way to fund that would be through raising

27    prices. If the average tip is about 20 percent, we still have to raise prices 23 percent,

because then you're going to push up wages for everyone else. If I were to do it tomorrow, it puts me at a competitive disadvantage to someone who is just shopping online looking at prices. If everyone does it, then I think we'll see some change. The younger generation, millennials who are going out to eat, they're used to not leaving tips. If you look at companies like Uber, I love the fact that I can walk out of the car and not worry about a tip. So I think it's going to change, and I think 10 years from now we're going to look back and go, "Oh, God, do you remember when we used to tip?" Just like now we say, "Remember when you used to smoke in a restaurant?"

130. On **April 28, 2016,** USHG implemented hospitality included at North End Grill.

131. In or around **May 2016,** American Express released a survey of 503 randomly

13   ~~sampled U.S. restaurants. Eighteen percent had adopted a gratuity-free model, 29 percent said~~
14   ~~they plan to adopt a gratuity-free model, 17 percent said they may do so if other restaurants~~
15   ~~followed suit, and ten percent were undecided. Twenty-six percent said they had no present~~
16   ~~intention to end tipping.~~
17

22   ~~132~~60. On May 1, 2016, USHG sponsored a ~~""~~"talk and open house~~""~~" at its GreenRiver <u>restaurant</u>
18
19   ~~restaurant~~ in Chicago ~~titled "~~<u>entitled "</u>Tipping the Scale: Wages, Workplace Culture and the
     Gratuity~~-~~
23   <u>-</u>Free
24   Future~~." Sagaria presented and~~." Defendant Vogler was scheduled to present <u>there,</u> but his flight
     was delayed. Prior to
25   the meeting, USHG tweeted ~~""~~"Join us. Industry leaders will be sharing tips on <u>tipping."</u>
22   ~~tipping."~~
23   ~~133.    On or about **May 4, 2016,** Joe's announced that it would start accepting tips again at~~
24   ~~fourteen of the eighteen restaurants that had eliminated tips in November 2015, because~~
25   ~~customers didn't like the no-tipping system and servers "voted with their feet" and quit. Bob~~26
27   ~~Merritt, the CEO of Joe's parent, Ignite Restaurant Group, Inc. said "[w]e are going to try to~~
28

**Survey Shows that Almost 50 Percent of U.S. Restaurants Have Adopted or Intend to Adopt a Gratuity-Free Business Model, and that Others May Participate if Their Competitors Follow**

61.     In or around May 2016, American Express released a survey of 79503 randomly-sampled

figure out why it worked  in some places and why not in others. The way  we look at it is:  We are really  continuing  the  tests in place  with where it works."  Upon information  and  belief, representatives of Joe's  discussed  its no-tipping  plans with  other  restaurant  groups  at trade association meetings and elsewhere.

American  restaurants.   Eighteen  percent  had  adopted  a  gratuity-free  model.   Twenty-nine percent said they plan to adopt a gratuity-fee model.  Seventeen percent said they may do so if other restaurants followed suit, and ten percent were undecided.   Twenty-six percent said  they had no present intention to end tipping.

**Defendant Vogler Returns to Tipping Because of Server Attrition, Yet He and Other Industry Leaders Still Support Concerted Price Increases and Elimination of Tipping**

62.     On May 15, 2016, defendant Vogler saidstated on PBS'sPBS's Weekend Edition that he went back to

back to tipping because of server attrition, and because othersof other restaurant owners who had said

they would switch but did not switch:

We  were  losing  staff.Servers mostly  ...… We were continuing to hire young new

people, train them, and then they would get the set of skills necessary, and they would

generally give notice and move to other restaurants in our community who were still  on

on a traditional tip economy.

It has been a tremendous amount of work, and we all remain very much in favor of it,

ideologically, and I, like many, think it may be the way things are going. We just

started to feel like an ideologue, insisting on this way of doing it when others in our

community that had said they would switch were not switching. So it really wasn't wasn't happening after a year the way we had thought it might.

Vogler saidstated that one mistake he made was to only increase prices by twentymerely 20 percent, and that

some

restaurants ""making the switch now are raising their prices by more like forty40 percent.".

Vogler further saidstated that profits increased when he ended tipping, and that he remains interested in implementing the policy in the future if more of his competitors do likewise.

134.    On or about **June 4, 2016,** Chang ended his no-tipping policy at Nishi and lowered the menu prices. He said that "[t]his is by no means the end of the no-tipping discussion at Momofuku. But at this moment, we think a tipping model will benefit our guests and staff."

136.    On **July 14, 2016,** USHG implemented hospitality included at Marta.

137.    On **July 15, 2016,** Coliechio said on Larry King Live Now that "I just don't see why professional waiters who are working in great restaurants, why they want to be subject to someone's whim when it comes to paying them."

138.    On **November 2, 2016,** USHG Chief Culture Officer Erin Moran was the keynote speaker at the 2016 Colorado Restaurant Association ("CRA") Conference in Denver. She discussed USHG's implementation of hospitality included, the amount and manner in which prices were increased, impact on employee compensation and retention, difference in implementation in different restaurant types, communicating the change to employees and customers, economic modeling, mistakes made and lessons learned, etc. She showed the audience an USGH produced, three-part animated video series on the "history of tipping," the "economics of tipping," and "investing in the future of the hospitality industry" with hospitality included. She said her biggest regret is that hospitality included was not implemented sooner. She said that the elimination of tipping was her idea, and that herself, Sagaria, and Ashley Campbell, USHG's Chief Financial Officer, were the key people involved in implementing hospitality included. She said that USHG held a number of town halls with "colleagues" (i.e., competitors) at the time USHG announced its implementation of hospitality included to educate them of its plans. She said that USHG subsequently has had conversations with its "industry peers" regarding hospitality included and that USHG would be sharing financial information with them regarding the impact of hospitality included. She

1  said that FOH retention levels did not change after the implementation of hospitality included.

2  She said that The Modern was selected as the first to implement hospitality included because

3  it has three different concepts within one business – the bar room with a more casual type of

4  service and menu, the formal dining room, and a private dining room for large events.  Also,

5

6  The Modern customers are less price sensitive as compared to customers at some other USHG

7  restaurants, and The Modern had one of the strongest leadership teams who could "figure this

8  out." In a question and answer session, Beth Gruitch, CRA representative and co-founder of

9  Denver's Crafted Concepts restaurant group, said to Moran — "what an honor and what a

10  wealth of knowledge.... It's been quite the journey for you all and you know we're about to

11

12  embark on [hospitality included] here in Colorado a little bit so we're kind of tiptoeing around

13  these things ... "

14  139.    On or about **November 10, 2016,** USHG settled for $700,000 a class action alleging it

15  unlawfully required tipped employees to share their tips with non-customarily tipped

16

17  employees including managers.

18  140.    On **November 16, 2016,** a hospitality conference was held in Brooklyn titled

19  "Hospitality Included: One Year Later" to discuss "trial and error." The panel included Adler,

20  Tarlow and Dino Laverini, USHG's Director of Operations.

21  141.    On **December 1, 2016,** Gramercy Tavern implement hospitality included.

22

23  142.    On **December 12, 2016,** Meyer discussed his decision to end tipping on a Motley Fool

24  podcast:

25          It came about, really, for a number of reasons. It's something I've thought about, really,

26          for 20 years, because I just think that it's a crazy system that never should have started

27          in the first place. It was a system that started literally the day after slavery was

28

Case 4:17-cv-05782-JSW Document 123 Filed 03/09/18 Page 63 of 75

1    abolished in America and two different industries, the restaurant industry and the

2    Pullman trnin car industry, successfully petitioned the government to allow for

3    nonpayment of part of the workers because they proved that they could get their

4    customers to pay those people instead.

5

6    And the notion that a tip is actually an indicator or a predictor of the kind of service

7    that you are going to get is also ludicrous, because the implication is that the tipping

8    system prevents bad service, because the waiter or waitress is afraid that you're going

9    to stiff them, which is already an adversarial and negative connotation.

10

11    But for anyone who's ever had bad service, obviously the tipping system didn't prevent

12    it. And then what it encourages is one of two things -- either trying to punish the server

13    with a bad tip, which feels horrible because how do you know that the food took too

14    long because of the waiter? How do you know that wasn't something that happened in

15    the kitchen? Or how do you know that it wasn't because another table was late getting

16    to the restaurant and the kitchen got backed up. So it's a completely false predictor

17    and/or reward or punishment system for service.

18

19

20    And then furthermore, the worst part of it today is that because by law tips are not

21    legally able to be shared with cooks in the kitchen, what it means is that you've created

22    a huge disparity between what a tip-eligible person can make and what a non-eligible

23    person can make. And so we've had, in the 30 years I've been in the restaurant

24    business, about a 250% increase in compensation for tipped employees and about a

25    25% increase for non-tipped employees.

26

27

28

~~And that's horrible and it's unconscionable to say in our culture we care for our employees first, but we only care for part of our employees. It would be like if you went to a football game and you paid the offense 10 times as much as you paid the defense, and then you expected halftime to be Kumbaya. It's just that people don't feel good.~~

~~So we decided to take things into our own hands and get rid of it. And we think we need to do it for the very sustainability of our restaurants in a city where every time menu prices go up (which they do, because real estate continues to go up, health insurance goes up, labor, minimum wage keeps going up). Every time that goes up in a tipping restaurant and you have to tip on top of higher menu prices, the disparity between what a tipped employee and a non-tipped employee just increases.~~

~~And so we decided instead of complaining about it, or saying, "Well, that's horrible, but that's just the way it is, that's the system." Whoever wrote the rule that we can't address the system and correct it ourselves?~~

~~On **January 2, 2017,** Meyer said that "tipping is actually one of the biggest hoaxes~~

~~143.~~

~~ever pulled on an entire culture, the American culture.... There's just nothing good about it."~~

~~He also said during the same interview that starting hourly pay for USHG back-of-house~~

~~employees increased only twenty percent over the thirty-one years prior to the implementation~~

~~of hospitality included.~~

~~144.~~ On or about January 4, 2017, Boulder, Colorado restaurateur Bobby Stuckey said that "~~"~~"hospitality included ~~...~~... will end up being one of the biggest game changers in the industry. While it is going to be hard to execute, it will in the long run be the best for our fun but crazy industry~~."~~"

145. On **January 17, 2017,** Meyer said that profits at USHG restaurants implementing a no-tipping policy dropped initially (contrary to what he had said earlier), but "came back up" as the managers learned to "operate under a new economy."

146. In and around **February 2017,** the NYC Hospitality Alliance has lobbied New York City government officials to allow restaurants to impose surcharges. The City directly benefits from the conspiracy through greater tax revenues because sales tax is not collected on tips but is collected on increased prices or surcharges.

147. On **March 5, 2017,** Sagaria presented on hospitality included at the Charleston Wine and Food Exposition ("CWFE"). Sagaria said that restaurants need to switch to a service-included model and that a "policy mandate" to include service in pricing would help stem the flow of servers to other restaurants. He further said "we need to figure it out now or there won't be a tomorrow" and that there is no one-size-fits-all model and within USHG they employ different modes of implementation at different restaurants. A conference summary says that tipping "represents a large, culturally engrained power dynamic that's difficult for any one restaurant to change. If we are really committed to finding a way to reduce the wage and power disparity in our restaurants, build continuity and sustainability into the business and employment model, and treat everyone fairly, and we agree that abolishing tipping is the way to do that, it may take the entire industry ... to get behind it." Following the conference, Sagaria tweeted "Thank you for a thought provoking and timely dialogue on #HospitalityIncluded" and "TY for continuing the conversation! We can all agree something needs to change. The biggest question is how our industry makes that change." CWFE tweeted in response: "Some doing different models during the day - counter service then table service at night. No one way to tackle."

Case 4:17-cv-05782-JSW   Document 123   Filed 03/30/18   Page 66 of 73

148.   On **March 27, 2017,** RAISE hosted the Diners United and Tipped Workers Resource

Center Conference in D.C. Participants discussed "business practices and strategies to promote the High Road to profitability," including, upon information and belief, the strategy of eliminating tipping and increasing prices.

149.   On **March 28, 2017,** Sagaria participated in a "dynamic dialogue" on hospitality included sponsored by the Chef Action Network, a national association of restaurant owners.

150.   On or about **June 6, 2017,** Sagaria said that switching to hospitality included is like "opening a restaurant all over again," but USHG remains committed to implementing hospitality included at its remaining NYC restaurants.

151.   On **June 16, 2017,** Meyer and Sagaria spoke about hospitality included at the 2017 Food and Wine Classic in Aspen, Colorado. Meyer said "we have to stop blaming the tipping system for cooks not getting paid well. You can pay people the way you want to pay people ."

152.   On **July 20, 2017,** Sagaria presented on Hospitality Included to bar and restaurant owners and managers at the 2017 Tales of the Cocktail festival in New Orleans. He reportedly told the audience that prices on many menu items increased by 40% following the implementation of hospitality included.

~~153~~64. On July 24, 2017, Meyer said during an interview that he remains committed to hospitality included, and that ~~""~~"I think ~~it's~~it's inevitably gonna be part of how restaurants do business. I ~~don't~~don't know how long ~~it's~~it's going to ~~tale~~take to get there~~.~~, I think some have wanted to do

1   it because from a philosophical standpoint they completely embrace it but from a mathematical

and/or emotional standpoint in terms of leadership, they ~~haven't~~ haven't quite figured out how to

do it."

~~out how to do it."~~ 2

25   He said the first time patrons experience it ~~"~~"there is actually a moment

28

where you have sticker

shock …"…" He said that he is ""sad when a restaurant earnestly tries it

and cannot figure out the math."." He said that ""one of the worst things about tips, it'sit's a drug,

and people cannot get off the drug. You start waiting tables as a tipped employee usually to put yourself through some

other thing you are pursuing, and you make so much money …,.… that

you end up waking up twenty years later and your career that you were first interested in

passed you by …"…". Meyer said stated that he believes that in 10 ten or 15 years, no-tipping will be the ""industry

norm."."

154.    As of the date of this First Amended Complaint, at least ten of USHG's restaurants have implemented hospitality included, including: Cafe 2 at MOMO, Cafe Marchio, Daily Provisions, Gramercy Tavern, Maialino, Marta, Martina, North End Grill, The Modern, Vini Fritti, and Union Square Cafe. USHG's website says that "our other New York restaurants will continue the change throughout 2017."

155.    On or about **September 27, 2017,** Tarlow announced that tipping would be eliminated and prices would be increased at Diner and Marlow & Sons effective October 2, 2017.

156.    On **October 17, 2017,** Grub Hub reported that hospitality included has had a substantial negative impact on server compensation, contrary to what Meyer said at the time of implementation, and that "people have left the company in droves [and] staff morale has dropped considerably." According to the article, the income of one USHG server dropped $10,000 annually following implementation of hospitality included.

157.    In **February 2018,** Momofuku instituted a no-tipping policy at Momofuku Ko in New

25   York.

26   158.    In or around **February 2018,** Meyer said for the first time that USHG lost about 30 to

27   40 percent of its "legacy front-of-the-house staff" as a direct result of the implementation of

28

hospitality included. As of the date of the original Complaint, USHG's website says that servers will not make less under hospitality included. Meyer also said that "it's not right" and "it's not fair" that USHG's compensation for its kitchen workers increased only twenty-five percent since 1985.[11]

159.    Switching to a hospitality included model is a complex process. According to one industry consultant:

> Minimum wage hikes are on the horizon for many of our clients and this changes everything for the restaurant industry. Menu prices must go up and tips could possibly be a thing of the past. Our online resources and staff are here to help you dete1mine the best steps to take to maintain a profitable business ... If the hospitality included model is one that you are exploring, then you likely realize the necessity to reevaluate and devise new budgets, a new business plan, and even a new break-even analysis. Revisiting this part of your business may be reminiscent of when you first opened your doors. Not to worry. [Our] leading teams comprised of industry experts in restaurant accounting, menu engineering, and labor management will help guide you through the transition.

160.    Competing restaurants in other locations have agreed to implement a no-tipping model. For example, in Portland, Oregon in the summer of 2016, a group of restaurants ended tipping and increased prices by about **18** percent, and used the gratuity-free logo referenced in Par. 82, above. One of the owners was quoted saying: "My overall hope is that this will

---

[11] During the same period, consumer prices increased by approximately 130 percent through inflation.

slowly evolve in the restaurant industry.... A lot of restaurateurs are talking about this right now. Almost every restaurateur I know this is one of the first things on their mind." And it was reported that in Minneapolis in or around February 2017, a "who's who of local restaurateurs" met "in a back room … in a really out of the way space" and discussed no-tipping/higher prices as a response to minimum wage hikes. One attendee reportedly said that "it seems like they are trying to keep it quiet."

a        161 San Francisco Restaurants Are Also Colluding on "Health Care" Surcharge

65.      Upon information and belief, dozens of restaurants in San Francisco ""collectively"" 9 agreed to impose surcharges after the city enacted legislation in 2008 requiring certain 10 employers to provide health insurance for their employees. Trou Normand and Bar Agricole

currently charge a five percent surcharge purportedly ""to support San Francisco  employer

mandates."."

Upon information and belief, much of defendants' price-fixing activity has been conducted in secret. Formal discovery should reveal additional evidence of price fixing and defendants' real motives and efforts to conceal their illegal conduct.

19 **VII. CLASS ALLEGATIONS**

16266. This suit is brought as a putative class action pursuant to Fed.R.Civ.P., 23. The class is defined as:

All persons who purchased food or drinks from a defendant restaurant as early as 2014 during the period when any such restaurant had in place a no-tipping policy and consequently increased its menu prices or added a surcharge.



Excluded from the class are past or present owners, officers, managers, or corporate employees of defendant restaurants, ~~GORA~~ GGRA and the ~~Alliance, and the~~ judge and magistrate assigned to this matter, and their law clerks.

67. The alleged class is so large that joinder of all members is impracticable.

68. Questions of fact and law common to all class members predominate over questions affecting only individual class members. Among the common factual and legal questions:

    a.    Whether the defendants agreed with one another and/or with others to increase prices at their establishments.

    b.

27

Whether the defendants agreed with one another and/or with others to end tipping at their establishments.

13      c.
14      d.
15      when.
16



d.      Whether the defendants implemented the agreed-upon price increases, and when.

e.      The identity of co-conspirators not made defendants in this action.

e.      f.      The specifics of meetings and other communications in furtherance of the charged conspiracy (e.g., date, location, participants and witnesses, who said what).

g.

h.

knowing concealment conspiracy.

h.     Actions taken to portray the conduct as legal and in the public interest.

i.     Whether the class incurred an antitrust injury, and

j.     The proper measure of injury and damages.

69.     These common issues are central to the litigation. The only significant factual question not common to the class as a whole is the specific amount of damages each class member

incurred. The amount of damages can be determined from credit card records and other evidence of purchases.

16670. The claims of the proposed class representative isare typical of the claims of the putative class members. There are no m1iqueunique defenses that apply to the proposed class representative that do not apply equally to other class members.

16771. The proposed class representative will fairly, adequately, and diligently represent and protect the interests of the class.

16872. The proposed class representative does not have any interest in conflict with or antagonistic to the interests of other class members.

73. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and could overburden the courts. Further, individual cases may be impractical and too costly relative to the potential recovery. In the absence of a class action, defendants may retain the benefits of their wrongful conduct and the charged conspiracy may continue unabated.

74. Defendants have acted on grounds generally applicable to the putative class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

75.     The proposed class representative has retained competent counsel experienced in class action litigation and antitrust litigation.

# VIII.   CAUSES OF ACTION

## COUNT 1: VIOLATION OF FEDERAL SHERMAN ACT

### (15 U.S.C. §1)
### (Against All Defendants)

76. The preceding paragraphs are re-alleged in full and incorporated herein.

77. The Sherman Act makes unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations …" 15 U.S.C. Section 1.

78.  Horizontal price fixing is a *per se* violation of the Sherman Act, and the purported reasonableness of the fixed price or claimed motive of the participants is immaterial.

79. Each defendant is jointly and severally liable for the entirety of the damages caused by the conspiracy. All defendants are liable regardless of whether Brown made purchases at each defendant.

80. As discussed herein, beginning in or around the fall of 2014, defendants knowingly negotiated formed, entered into, and joined a price-fixing conspiracy, and subsequently acted in concert to put the agreement into effect by ending tipping and increasing prices at their establishments.

81.    The charged conspiracy has and continues to impact and affect interstate commerce, and has occurred and continues to occur within the flow of interstate commerce. Representatives of USHG travelled to San Francisco, Austin, Charleston, Denver, Chicago and other locations to facilitate the conspiracy. Defendant Vogler traveled to Chicago to facilitate

the conspiracy, the posited law of

GGRA traveled to New York City in furtherance of the conspiracy. ~~Tarlow~~A New York-based no-tipping proponent developed a ""gratuity-

free"" logo used by

restaurants in New York, California and Oregon, among other places. UponDefendants

information and belief, some restaurant owners who attended USHG town halls in New York

City do business outside the State of New York. Conspirators in California communicated

with conspiratorslike-minded restaurateurs in New York City via electronic means and

social media, in support of the conspiracy. Many members of

the putative class are domiciled in a state other than the state where they incurred damages.

The defendantoutside California and have traveled to California where they patronized the restaurants at

issue. The restaurants at issue purchase food and drink products manufactured outside the state in

of California which the restaurant is located and were shipped across state lines into the state in which theCalifornia.

restaurant is located.

177.   The extensive factual allegations — not mere conclusions — in the First Amended

Complaint meets the plausibility pleading standard explained by the Supreme Court in *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) *and Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

178.   Because conspirators typically do not document or announce their illegal agreements

in public, direct evidence of a conspiracy is rarely obtainable at the pleading stage. "To

require that each private plaintiff have personal knowledge of the legal and factual intricacies

of an alleged national

82. The class representative and putative class members were overcharged on their purchases from defendant restaurants as a result of the conspiracy ~~would impair at least to some degree the ability of private~~

~~citizens, and are entitled~~ to ~~augment by private actions governmental enforcement of Congress's will."~~recover

~~*Bogosian v. Gulf Oil Corp.*, 337 F. Supp. 1234, 1235-36 (E.D. Pa. 1972).~~

~~179. Here, however, the~~ treble their actual damages, as well as their costs and reasonable attorneys' fees, pursuant to the Clayton Act, 15 U.S.C. Section 15(a).

83. The charged conspiracy ~~necessarily did operate partly in public,~~ is ongoing, as it continues to require local and ~~direct~~ visiting diners to

~~evidence~~ pay higher prices in lieu of ~~concerted action~~ voluntary tipping, ~~and~~ and ~~collusion among and between the~~ thus injunctive relief requiring defendants ~~is~~ to ~~some extent already available as noted through the plentiful meetings, correspondence and public statements discussed herein. Further evidence will be discovered as to the defendants' participation in~~ withdraw from the conspiracy~~.~~

6 ~~The conspirators have a shared purpose and common~~ is necessary, appropriate and in the public interest~~, in that, as acknowledged,~~

~~by several defendants herein, a no-tipping policy would not likely succeed on a large scale~~

~~without concerted action by multiple participants in the restaurant community. Only by~~

~~working together could the defendants achieve their long-term objective of transforming the~~

~~industry.~~

## COUNT 2: VIOLATION OF CALIFORNIA CARTWRIGHT ACT (California Business and Professions Code § 16720, et seq.)

84.     The preceding paragraphs are re-alleged in full and incorporated herein.

85.     Defendants entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade as described above.

86.     Defendants' conduct is a violation of California Business and Professions Code Sections 16720, *et seq.*, also known as the Cartwright Act.

~~86.~~87. The class representative and putative class members were overcharged on their purchases from defendant restaurants as a result of the conspiracy, and are entitled to recover treble their actual damages, ~~and~~together with their costs and reasonable ~~attorneys'~~attorneys' fees, pursuant to ~~the Clayton~~

~~Act, 15 U.S.C. Section 15(a).~~

the Cartwright Act.

88.     The charged conspiracy is ongoing, as it continues to require local and visiting diners to pay higher prices in lieu of voluntary tipping, and thus injunctive relief requiring defendants to ~~withdraw from the conspiracy, is necessary, appropriate and in the public interest.~~

~~COUNT 2: VIOLATION OF CALIFORNIA CARTWRIGHT ACT~~

~~(California Business and Professions Code§ 16720, et seq.)~~

~~(Against All California Defendants[12])~~

183.

184.   Defendants entered into and engaged in an unlawful contract, combination, and conspiracy in restraint of trade as described above.

185.   Defendants' conduct is a violation of California Business and Professions Code Sections 16720, *et seq.*, also known as the Cartwright Act.

---

[2] The California defendants are: Trou Normand, Bar Agricole, Vogler, Camino, Moore, Hopelain, Comal, Paluska, and Hoffman.

186.   The class representative and putative class members were overcharged on their purchases from defendant  restaurants  as a result of the conspiracy, and are entitled to recover treble their  actual  damages,  and  costs  and  reasonable  attorneys'  fees  pursuant  to the Cartwright Act.

187.   The charged conspiracy is ongoing and thus injunctive relief requiring defendants to formally withdraw from the conspiracy is necessary, appropriate and in the public interest.

COUNT 3: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

**(California Business and Professions Code §§ 17200, et seq.)**

**(Against All California Defendants)**

188.  89.   The preceding paragraphs are re-alleged in full and incorporated herein.

189. Defendants' 90.   Defendants' price-fixing conduct constitutes unfair competition and unlawful and fraudulent business acts  and practices in violation of California Business and Professional Code, Sections 17200 *et seq*.

190.

91.      Defendants intend by their actions to impair and injure competition between  and among them, and to increase prices to the detriment of consumers, and to reduce and suppress wages to the detriment of their servers and other customarily-tipped employees.

92.   ~~Defendants'~~ Defendants' violation of the Cartwright Act also constitutes a violation of ~~California's~~California's Unfair Competition Law.

~~192~~93. As a result of ~~defendants'~~defendants' violations of the California Business and Professions Code~~.~~ ~~Section~~Sections 17200 *et seq*., they have unjustly enriched themselves at the expense of the class representative, ~~the~~the proposed class, and servers and other customarily-tipped employees~~.~~. The

FIRST AMENDED COMPLAINT - 87

unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and

practices continue.

19394. To prevent this unjust enrichment, defendants should be required, pursuant to Business

and Professions Code Sections 17203 and 17204, to disgorge their illegal gains for the purpose

of making full restitution to all injured class members. Defendants should also be

permanently enjoined from continuing their violations of the California Business and

Professions Code.

19495. The acts and business practices alleged herein constitute a continuing course of unfair

competition by means of unfair, unlawful, and fraudulent business acts and practices within the

meaning of ~~Califomia~~ California Business and Professions Code, Sections 17200, *et seq*., including,

but

not limited to, violations of the Cartwright Act.

~~**COUNT 4: VIOLATION OF NEW YORK DONNELLY ACT**~~

~~**(New York General Business Law§ 340)**~~

~~**(Against All New York Defendants[13]**~~

~~195. The preceding paragraphs are re-alleged in full and incorporated herein.~~

~~196. The Donnelly Act provides that contracts, agreements, arrangements, or combinations~~

~~in restraint of trade are unlawful. The Act is interpreted consistent with the Sherman Act with~~

~~respect to horizontal price-fixing agreements.~~

FIRST AMENDED COMPLAINT - 88

13   The ~~provision and compensation of other providers such as~~

27   ~~Momofuku, Chang, Marlow, Tarlow, Happy Cooking Hospitality, Stulman, Huertas, Miller,~~

28   ~~Adler, Eleven Madison Park, Humm, Guidara, NYC Hospitality Alliance, and Rigie.~~

197.   The evidence indicates that the New York defendants engaged in unlawful price-fixing by, *inter alia:*

a. Aiding and abetting the price-fixing activity in the California as discussed herein;

b. Meeting in secret with each other and with other restaurateurs and reaching a consensus to increase prices and end tipping at their establishments; and

c. Providing assistance and "best practices" to restaurants in New York and elsewhere interested in switching to a no-tipping model; and

d. Increasing prices and eliminating tipping as agreed upon.

198.   The violation of the Donnelly Act has caused and continues to cause pecuniary injury and damages to plaintiff and the proposed class, as well as to servers and other customarily tipped employees who work or have worked at defendant restaurants in New York and California

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his behalf and on behalf of the defined class pray, prays that this Court enter judgment on his behalf and on behalf of the class and order that:

1. The ComtCourt has personal jurisdiction over all named defendants;

2. This action is certified as a class action pursuant to Federal Rule of Civil Procedure 23, and the defined class is as stated in the Complaint;

3. Defendants shall pay the costs and expenses of a court-approved notice program designed to notify putative class members of their claims;



4. The charged conspiracy violates the Sherman Act, the California Cartwright Act, and the

California Unfair Competition Law, and the New York Donnelly Act;

3      5.

4

5

5. Plaintiff and the class members shall recover threefold their actual damages, in addition to pre-judgment and post-judgment interest, costs and reasonable ~~attorneys'~~ attorneys' fees;

~~5.~~6. Defendants must fully withdraw from the conspiracy and otherwise be fully enjoined from

further participation; and

. The Court should make further findings and award further relief as is just and proper

and in the public interest under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b)(1), plaintiff hereby demands a trial by jury on all matters triable by jury.

Date: ~~March 9, 2018~~          January 28, 2019          MAILLY

LAW ~~OFFICES OF ANDREW WOLFF, P.C.~~

~~/s/ David Lavine~~

~~David Lavine~~

~~Co-Counsel for Plaintiff~~

~~TIMOTHY BROWN~~

~~MAILLYLAW~~

~~/s/~~



TIMOTHY BRO\VN BROWN

s/ Guy E. Mailly Mailly

13

14

Guy E. Mailly Co-Counsel for Plainti

15

16                                     *s/ David Lavine*_____
17                                     David Lavine
                                       Co-Counsel for Plaintiff
18                                     TIMOTHY BROWN

19

20                                LAW OFFICE OF STEVEN E. UHR, PLLC

21                                     *I s /s/ Steven E. Uhr* _____
                                       Steven E. Uhr, Admitted *Pro Hae Hac Vice*
22                                     Co-counsel for Plaintiff
23                                  5  TIMOTHY BROWN

24

25

26

27

28